**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **Case No. 23-cr-0278 JKB** |
| **CHRISTOPHER BENDANN,** | : | |
| | : | |

**CHRISTOPHER BENDANN'S OPPOSITION TO GOVERNMENT'S REQUEST FOR**
**<u>PRETRIAL DETENTION</u>**

Christopher Bendann, through counsel, opposes the government's Pretrial Memorandum

In Support of Pretrial Detention (ECF No. 14) ("Gov't Memo.").[1] Specifically, under 18 U.S.C. §

3142, Mr. Bendann requests that this Court release him on the following conditions of release:

- 24/7 electronic monitoring, consistent with Mr. Bendann's state release conditions,
- Allow Mr. Bendann to have outside physical exercise due to his heart condition,
- Third-party custodian, and
- No contact with the complaining witness.

---

[1] The government filed the Gov't Memo. on Sunday, August 20, 2023, at approximately 3:39 p.m.

## **INTRODUCTION**

 Def. Ex. 1: Window of Lance Bendann, who is Chris Bendann's 78-year-old father, broken by a stun grenade used by FBI SWAT in their armed August 18, 2023 pre-dawn raid and arrest of Chris

Def. Ex. 4: Lance Bendann's window (from the inside) 

 Def. Ex. 5: Shattered glass and wood from Lance Bendann's window

On Friday, August 18, 2023, at approximately 5:00 a.m., numerous law enforcement officers raided the home of Lance Bendann. He is the 73-year-old father of Chris Bendann. Mr. Bendann was staying with his father as a condition of his state pre-trial release. The raid included the Special Weapons Attack Team ("SWAT") of the Federal Bureau of Investigation ("FBI"). FBI SWAT destroyed the windows in Lance Bendann's home with stun grenades as depicted in Defense Exhibits 1, 4, and 5. In the dark of the early morning hours, FBI SWAT trained the red lasers from their weapons on the heads of both Lance Bendann and Chris Bendann. FBI SWAT handcuffed both Lance and Chris. They would not provide their names nor talk with Chris Bendann's lawyer, who was on the phone. They also refused to allow Chris Bendann to talk with his lawyer, despite his request.

FBI SWAT knew that Chris Bendann was non-violent for, at least, four reasons. **First**, the August raid was the *second time* in just over six months that the law enforcement had engaged in a pre-dawn raid of his Chris Bendann. On Friday, February 1, 2023, state law enforcement raided Mr. Bendann's home. During that raid, law enforcement (who had surveilled Mr. Bendann days earlier) found no guns or other evidence of violence.[2] **Second**, by August 2023, law enforcement—including both the state and federal prosecutors assigned to this case—had been working with defense counsel for six months as they litigated both the state case and a sealed portion of the federal case. During that litigation, Mr. Bendann attended approximately ten court dates without

---

[2] Past is prologue. The February 2023 state SWAT raid occurred on a Friday. As a result, law enforcement knew that Mr. Bendann would probably be detained over the weekend because his lawyer would not be notified with ample time to seek his release. Here law enforcement employed the same Friday-SWAT-raid tactic on August 18, 2023. The last time they employed this tactic the state correctional facility placed Mr. Bendann on something akin to a 22-day "suicide watch" due to his mental health and the state-side sex abuse charges, which exposed Mr. Bendann to threats in prison. Hopefully, this Court will not reward law enforcement's Friday-SWAT-raid tactic by further needlessly detaining Mr. Bendann.

any issue of violence. **Third**, Mr. Bendann has perfect compliance on pre-trial release. One of his conditions of pre-trial release is that he must wear an ankle monitor. As a result, law enforcement had access to his whereabouts 24-7-365 and had reason to know he was not engaged in violent misconduct. Importantly, they had reason to know exactly where he was in Lance Bendann's home on August 18, 2023 and did not need to destroy the home's windows with stun grenades to find him. ***Finally***, ***Mr. Bendann has no criminal record***.

Since January 2023, state and federal law enforcement suspected that Mr. Bendann was involved in several sex abuse charges involving a single complaining witness. Those charges include: Sexual Abuse of a Minor, Sexual Solicitation of a Minor, Second-Degree Sexual Offense, Second-Degree Rape, Third-Degree Sexual Offense, and the recent federal charges of Sexual Exploitation of a Minor and Possession of Child Pornography. Moreover, the state government's first search warrant for the February 2023 Friday-SWAT-raid included child pornography. The latest federal indictment changes nothing—Mr. Bendann has known since January 2023 about the investigation and harmed no one.

These charges date back to 2016 and end in 2019—with the exception of the latest child pornography possession charge that allegedly ends in January 2023. Since Mr. Bendann has been on state pre-trial release for more than six months, he has not engaged in any criminal misconduct.

Yet, in the face of this knowledge and the presumption of Mr. Bendann's innocent, *see*, *e.g.*, 18 U.S.C. § 3142(j) ("Presumption of innocence"), law enforcement abused its power by engaging in an unnecessary amount of force to arrest a man for the second time, who has no proven history of violence. As several high-profile cases demonstrate and as undersigned counsel has

experienced, law enforcement could have avoided the terrorizing, intimidating, and dangerous[3] use of FBI SWAT by just calling undersigned counsel and arranging for self-surrender. If such an approach works for a former president accused of being a part of a racketeer influenced and corrupt organization linked to January 6 or a police officer accused of excessive force, then certainly that approach would have worked for Mr. Bendann. Instead, law enforcement deeply traumatized Mr. Bendann and his father—for a second time—on August 18, 2023, with the needless use of assault weapons and flash grenades.

This unreasonable, pre-dawn, Friday-FBI-SWAT raid is paradigmatic of the government's unreasonable request for preventative, pre-trial detention. Such a request is unreasonable and violates 18 U.S.C. § 3142 because it is not "the least restrictive further condition or combination of conditions, that. . . will reasonably assure. . . the safety of any other person." 18 U.S.C. § 3142 (c)(B).[4] Accordingly, this Court should deny the Gov't. Memo.

## FACTUAL BACKGROUND

The undisputed facts are straightforward. On Friday, February 2, 2023, state law enforcement searched Mr. Bendann's house, car, and various electronic devices. For this search, state law enforcement used SWAT, despite having surveilled Mr. Bendann and knowing that he has no criminal record nor violent past. The Affidavit for the State Search Warrant alleged that the places searched would yield criminal evidence of various sexual crimes against minor victims including, child pornography.

---

[3] The 78-year-old Lance Bendann has a heart condition and that FBI SWAT team could have seriously compromised his condition on August 18, 2023, in the dark pre-dawn hours, as they trained the red lasers on him from their weapons.

[4] The government does not argue in Gov't. Memo. that Mr. Bendann is a flight risk. *See generally* Gov't. Memo. The Defense agrees.

On February 9, 2023, the FBI obtained a search warrant for the items seized by the state on February 2, 2023.

On February 21, 2023, Baltimore County Circuit Judge Jan Alexander released Mr. Bendann on pretrial conditions of release, which include a 24-7 lockdown at his house with an ankle monitor. There are some exceptions to the lockdown, including attending court hearings and meetings with lawyers. At every turn, the state prosecutor opposed Mr. Bendann's pre-trial liberty arguing that Mr. Bendann is a danger. Despite the state prosecutor's arguments, Mr. Bendann never violated pre-trial release.

On February 27, 2023, the state indicted Mr. Bendann for various sexual offenses. Those offenses are: Sexual Abuse of a Minor - Md. Code, Crim. L. § 3-602(b)(1) (four counts), Sexual Solicitation of a Minor – Md. Code, Crim. L. § 3-324 (two counts), Second-Degree Sexual Offense – Md. Code, Crim. L. § 3-306 (four counts), Second-Degree Rape – Md. Code, Crim. L. § 3-304 (two counts), Third-Degree Sexual Offense – Md. Code, Crim. L. § 3-307 (four counts). All 16 counts span from March 20, 2016 to March 19, 2018. There are no allegations of misconduct after 2018 or about five years ago. All the counts concern one complaining witness.

Starting on March 6, 2023 and continuing to present, Mr. Bendann filed a series of Motions contesting his state case. Mr. Bendann has attend every single motions hearing in state court. Additionally, he has attended several trial preparation meetings with his lawyers. For each of these hearing and meetings, Mr. Bendann perfectly complied with this conditions of release.

On March 13, 2023, Mr. Bendann filed, *under seal*, an Emergency Motion to Appoint Judicial Official To Filter Attorney-Client Privileged and Work Product Information. Mr. Bendann filed this Emergency Motion in reliance on a four-year old Fourth Circuit opinion *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019). This Opinion is about the illegal

search of undersigned counsel's law firm in 2019 by the United States Attorney's Office for the District of Maryland (USAO-MD). Thus, USAO-MD has known about the problems with their searching of electronic devices for at least four years. Yet, the USAO-MD still continues to illegally search attorney-client privileged and work product information without following the law in the Fourth Circuit. Chief Magistrate Judge Beth P. Gesner granted Mr. Bendann's Motion. Both the defense and the government have worked together to address the search of Mr. Bendann's device. That work continues.

On August 18, 2023, despite the work between the defense and the government (both state and federal), FBI SWAT raided Lance Bendann's house with an arrest warrant. They arrested Mr. Bendann. They gave no notice to the defense. They never gave Mr. Bendann the opportunity to self-surrender. At the initial appearance, the government asked for detention, despite the defense's objection that the government needs to make a threshold showing that they can detain Mr. Bendann under 18 U.S.C. § 3142 and *United States v. Al-Azzaway*, 768 F.2d 1141 (9th Cir. 1985). Magistrate Judge Bredan Hurson granted the government's motion for a continuance.

Now, Mr. Bendann stands charged with five counts of sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a), and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) & 2256.

## ARGUMENT

The Bail Reform Act of 1984 requires pretrial release under the least restrictive conditions that will reasonably assure the accused's appearance at court proceedings and the safety of the community. 18 U.S.C. § 3142(c)(1)(B). The Bail Reform Act's directives are rooted in the Fifth Amendment's prohibition against the deprivation of liberty without due process and

the Eighth Amendment's prohibition against excessive bail. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (citations omitted). Additionally, the Bail Reform Act recognizes that accusations in an indictment are not convictions, and the accused is presumed innocent. *See* 18 U.S.C. § 3142(j) (stating that "[n]othing in this section shall be construed as modifying or limiting the presumption of innocence"). Moreover, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also Miranda v. Garland*, 34 F.4th 338, 376 (4th Cir. 2022) (Urbanski, J., concurring in part) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). Thus, the Court has both a statutory and constitutional mandate to release the accused under the least restrictive conditions that protect the safety of the community.

The empirical data also demonstrates that the over-reliance on pretrial detention is unnecessary. Indeed, pretrial release with reasonable conditions is effective at ensuring future court appearances and preventing criminal activity. Br. of Amici Curiae Current & Former Prosecutors, Dep't of Just. Offs., L. Enforcement Offs., and Judges in Support of Pls.–Appellants, *Daves v. Dallas County*, No. 18-11368, 2021 WL 1566352, at *14 (5th Cir. Apr. 12, 2021) ("As an extensive body of research reveals, pretrial release with nonfinancial conditions determined by individual assessments can be very effective at ensuring appearance for court proceedings" and reducing criminal activity).

In determining the appropriate conditions of release, a court shall consider: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4). These

factors support release conditions Mr. Bendann seeks—and fail to establish by clear and convincing evidence that Mr. Bendann should be preventatively detained. 18 U.S.C. § 3142(e).

## A.      Nature and circumstances of the offense charged (18 U.S.C. § 3142(g)(1))

The first factor—the nature and circumstances of the offense charge—weighs in favor of the relief Mr. Bendann seeks. 18 U.S.C. § 3142(g)(1). The five counts of Sexual Exploitation of a Child, in violation of 18 U.S.C. 2251(a) and the one count of Possession of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(5)(B) & 2256, are serious. While the complaining witness is approximately 22 years old today, the charges allege misconduct when the complaining witness was a minor from 2017 to 2019. Additionally, according to the defense investigation, the complaining witness is not in the Baltimore area and plays a Division I sport at a university. Accordingly, the condition that Mr. Bendann have no contact with the complaining witness will address any alleged and disputed concern about the complaining witness's safety. Thus, this factor weighs in favor of the release conditions sought by Mr. Bendann.

## B.      Weight of the evidence against the defendant (18 U.S.C. § 3142(g)(2)).

The second factor—the weight of the evidence against the defendant—also supports Mr. Bendann. The charges and evidence against Mr. Bendann all arise from a single adult complaining witness. Mr. Bendann disputes that witness's narrative and credibility. Regardless, the government's allegation of sexual conduct between Mr. Bendann and that complaining witness does not establish Mr. Bendann's danger to "children everywhere." Gov't. Memo at 14.

To create the appearance of a serial offender, the government refers to the other witnesses interviewed by law enforcement as "victims." But those other interviewees do not provide evidence to support that label; indeed, Mr. Bendann is not charged with any criminal conduct against anyone but the single complaining witness, in this case or in the parallel state

prosecution. Nor do those other interviewees provide any evidence about alleged sexual abuse between Mr. Bendann and the complaining witness, of which they were apparently unaware.

Rather, these interviewees discuss rumors and gossip surrounding Mr. Bendann.[5] Many of them assert that Mr. Bendann was known to provide Gilman high school students with rides home after they became intoxicated at underage drinking parties, and that Mr. Bendann was known to interact with Gilman students via social media. A central thread in the interviews is the allegation that Mr. Bendann would purchase alcohol for underage Gilman students or alumni, and in exchange, when transporting them home, would request that the students run "naked laps" outdoors. Mr. Bendann denies these allegations.

Most of the interviewees assert no personal knowledge of the conduct, but instead describe how Mr. Bendann was "weird," and then relate the rumors they have heard about other students being supplied with alcohol or streaking. Of the minority of interviewees who do claim to have personally witnessed this conduct, none claim to have been personally provided with alcohol by Mr. Bendann or to have actually participated in the streaking themselves, nor do they describe Mr. Bendann engaging in any sexual conduct or using any kind of force or threat to coerce others' participation. The evidence does not support the government's presentation of the conduct of teenagers at Gilman as "grooming" on Mr. Bendann's part.

There is only one complaining witness in this case, and the allegations of years-old, discrete conduct between him and Mr. Bendann is not clear and convincing evidence of Mr. Bendann's danger to children everywhere. The other witnesses interviewed do not support that

---

[5] The interviews all took place after the circulation of press reports indicating that Mr. Bendann had been terminated from Gilman based on allegations of unnamed inappropriate conduct with students. Additionally, one interviewee—best friend of the complaining witness—refers to his organization of the entire group, having urged them to come forward to law enforcement to support their friend.

characterization either. Rather, the best possible evidence of Mr. Bendann's danger to the public is his record over the past six months while already on pre-trial release. Mr. Bendann has been perfectly compliant and posed no danger to anyone.

Regarding the complaining witnesses credibility, there are two points. First, the government's own filing admits that the complaining witness used Mr. Bendann to "help[] him circumvent parental oversight of their underage child." Gov't. Memo. at 7-8. That is evidence that the complaining witness was less than honest to his own parents about his underage drinking. The defense investigation has revealed that underage drinking is not the only thing the complaining witness hid from his parents and others.

Second, that single, complaining witness has a financial interest in the outcome of this case. His family hired counsel to sue Gilman School. When defense counsel told the state court of the complaining witness's financial interest, counsel for the complaining witness was present and said nothing. That silence is an admission.

## C.    History and characteristics of the defendant (18 U.S.C. § 3142(g)(3)).

The third factor—the history and characteristics of the defendant—also weighs in favor of Mr. Bendann's request. As part of its examination of this factor, the Court must consider Mr. Bendann's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). The Court also must consider "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law." U.S.C. § 3142(g)(3)(B).

Mr. Bendann has strong ties to his community. Toward that end, Mr. Bendann submits six character letters. With the exception of Kathleen Brosi, all the character witnesses wrote these letters back in February 2023 for Baltimore County Circuit Court Judge Jan Alexander. Given the essence of time, the defense reached out to the character witnesses to confirm that they still stand by Mr. Bendann, despite the new federal Indictment; they do; the defense did not ask the character witnesses to re-write the character letters. Some highlights from those letters follow:

- **John Claster (Lifelong Family Friend)**:

    o  I do not believe [Chris] is a danger to society. He has always been incredibly respectful and courteous whenever I have been with him which included dinners at the Bendann house, dinners out, and numerous times together on the Gilman campus during athletic and school events. As I said above, I believe that Chris understands the seriousness of the charges he faces, and I believe he will choose to be a respectful and law abiding citizen as he goes through the process of repairing his life.

- **Andrew Eifler (Classmate and Friend)**

    o  [Chris has] often house-sat for my parents when they've been away. I am aware of the current charges against Mr. Bendann and was completely shocked when I heard about them. Chris is mild mannered, and a good friend. Based on my relationship with him, I don't believe he would be a danger to the Gilman community or the general community.

- **Emily Fairchild, MD (Lifelong Family Friend)**

    o  Knowing Christopher's character as I do, I wondered if the charges were related to some type of retaliation by a disgruntled student, or due to anti-Asian bias. I read the salacious information printed by the press which I took with a grain of salt, as we all should, knowing that the press will print anything to get clicks and sell subscriptions. As he was arrested and imprisoned I wondered, what ever happened to "innocent until proven guilty". I watched as he was tried and convicted in the press and his neighbors turned against him. Sexual abuse of a minor is a serious charge, but in Christopher's case it has not been proven beyond a reasonable doubt by a jury of his peers. In addition, the veracity of the charges brought by a single student and his parents, who may turn out to have ulterior motives, has not been confirmed by others.

- **Margaret Kidder (Lifelong Family Friend)**

  o Please note that in the many years that I have known Chris Bendann, I have not observed Chris to make verbal comments or demonstrate behaviors that would be considered to be threatening or dangerous to others. I do not believe that Chris Bendann is a danger to the Gilman Community or the general community at this time.

- **Timothy Wilkins (Classmate, Colleague, and Friend)**

  o I have never known Chris to be a danger to anyone and am confident that - if given the opportunity to be freed on bail - he would pose no danger to any members of the community. Chirs would be supported by many family and friends up to and through a trial.

- **Kathleen Brosi (Family Friend and Neighbor)**

  o It is impossible for me to imagine that Christopher Bendann would ever intentionally harm anyone. I have known him very well since he was about eleven years old. His family and mine then lived two houses apart and became friends. . . I think of him as part of my family.

The complete character letters are at Def. Ex. 6.

Chris was raised in Baltimore after being adopted from South Korea in 1984 by his loving father, Lance Bendann. Lance remains a supportive and involved parent who is standing by Chris and is serving as his third party custodian.

In many ways, Chris dedicated his life to the Gilman School and its community. He attended Gilman himself, graduating in 2003, and then went on to Skidmore College where he earned a Bachelor's degree in History and the Classics in 2008. His first job out of college was to return to Gilman as a teacher in the middle school—in Geography and Social Studies—where he continued to serve until just a few weeks ago.

During his more than 15 years of service, Chris did not just teach. He was a trusted and respected community figure. He served as an admissions officer, and then eventually as admissions coordinator for the middle school. He was the volunteer director of a mentoring

program. He was a member of the board of the alumni society. He was a coach for sports teams and part of the summer transition team. The list goes on.

As part of an informal tradition at Gilman, Chris was also trusted to housesit, babysit, and dogsit by dozens of Gilman families over the years. Despite the shocking allegations in this case, many of those families and friends are standing by Chris. Eleven people attended the state-side pretrial detention hearing in support of Chris, including Gilman community members and even two current Gilman employees.

Put simply, Chris Bendann had a stellar reputation before these false accusations. Chris has **no criminal record**. He has never failed to appear for any judicial proceeding, given that he has never before been involved with the judicial system. Before this case, he had never before been arrested.

Chris's current confinement is nightmarish and traumatizing because it is reminiscent of the 22 days he was confined in the Baltimore County prison. There, he was briefly put on suicide watch after his initial detainment and was told by other inmates and prison employees that he will be killed in prison. Humanity and decency require this Court to release Mr. Bendann with conditions as this factor—18 U.S.C. § 3142(g)(3)—is in Mr. Bendann's favor.

**D.     The nature and seriousness of the danger to any person that would be posed by the person's release (18 U.S.C. § 3142(g)(4)).**

The fourth factor—the nature and seriousness of the danger that would be posed by Mr. Bendann's release. requested modifications to his conditions of release—weighs in his favor. For comparison, in a gun case the D.C. Circuit considered this factor and revered the district court because it failed to find "a concrete, prospective threat to public safety." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir.), *judgment entered,* 844 F. App'x 373 (D.C. Cir. 2021).

Here, there is no concrete, prospective threat to the complaining witness or any other person. The government argues that Mr. Bendann's social media post proclaiming his innocence and his lawyer's statement that the complaining witness is "less than honest" does not constitute "intimidation tactics." Gov't. Mot. at 13-14 & Ex. B. To the contrary, Mr. Bendann's claim of innocence is no different that when he will plead "not guilty" to the Indictment at his arraignment. His claim is consonant with the presumption of innocence, which is a bedrock of American jurisprudence and recognized in the Bail Reform Act, itself. 18 U.S.C. § 3142(j). Finally, as Mr. Bendann remarked in his social media post over 3,300 people have been wrongly accused in this country. In the 50th Year of Mass Incarceration, that is fact—not intimidation. *See* https://www.law.umich.edu/special/exoneration/Pages/about.aspx.

Additionally, defense counsel's explaining that the complaining witness has reasons to "be less than honest" demonstrates the restraint of the defense. Gov't. Mot. at 14. Unlike the government, the defense has never called the complaining witness a liar. The defense has also demonstrated restraint by not using the complaining witness's name—who is an adult male in college—in public. While there is a state Order precluding the Parties from filing a document with the complaining witness's name, there is no Order stopping the defense from stating the complaining witnesses name publicly. Neither Mr. Bendann nor defense counsel have done so. Such is an example of restraint and treating *all witnesses* with the dignity and humanity they deserve. The defense invites the government to join it in this more honorable way of trial lawyering.

By contrast and like the government's repeated Friday-pre-dawn use of SWAT for a non-violent person, the government attorney's reference to Mr. Bendann as having a "boldness to lie"

demonstrates a lack of restraint and fails to afford Mr. Bendann the dignity and humanity he deserves.

The government argues that Mr. Bendann is a "continuing threat to children everywhere." Gov't Memo. at 14. The government again is engaging in unreasonable and SWAT-like rhetoric. Even when the Gilman School terminated Mr. Bendann in January 2023, after its investigation, Gilman concluded in its letter to Mr. Bendann that there was no evidence of inappropriate *physical* contact by Mr. Bendann toward students. That fact contradicts the government's position that Mr. Bendann is somehow a continuing threat to children. Additionally, the condition that Mr. Bendann not have any contact with minors addresses this contested issue. Thus, the 18 U.S.C. § 3142(g)(4) factor ways in favor of Mr. Bendann's release.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated above, Mr. Bendann respectfully requests that the Court modify deny Gov't. Memo. and immediately release Mr. Bendann with the following conditions:

- 24/7 electronic monitoring, consistent with Mr. Bendann's state release conditions,
- Allow Mr. Bendann to have outside physical exercise due to his heart condition,
- Third-party custodian, and
- No contact with the complaining witness.

These conditions are the least restrictive means of complying with the Bail Reform Act.


Dated: August 21, 2023

Respectfully submitted,

_____

Kobie A. Flowers
Michael R. Abrams
Brown, Goldstein & Levy, LLP
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202
T: (410) 962-1030
F: (410) 385-0869
kflowers@browngold.com
mabrams@browngold.com

*Counsel for Christopher Bendann*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a copy of this pleading was served on all counsel of record via the Court's electronic filing service.

Date: August 21, 2023                                 */s/ Kobie Flowers*
                                                     Kobie Flowers