**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| **v.** | *   **CRIMINAL NO. JKB-23-278** |
| | * |
| **CHRISTOPHER KENJI BENDANN,** | * |
| **Defendant.** | * |
| | * |
| | * |

**\*\*\*\*\*\*\*\*\*\***

**GOVERNMENT'S CONSOLIDATED RESPONSE
TO DEFENSE PRE-TRIAL MOTIONS**

The United States of America respectfully submits this consolidated response to the following two pre-trial motions filed by Christopher Kenji Bendann ("Bendann" or "Defendant") in this matter:

1. Defense Motion to Suppress Evidence Obtained Through Search Warrants (ECF No. 78);

2. Defense Motion to Suppress Evidence Obtained from Cellphone (ECF No. 79);

**I.   PROCEDURAL BACKGROUND**

On February 1, 2023, Baltimore County District Court Judge Karen Pilarski signed a residential search warrant for Bendann's home in Baltimore, Maryland. In addition to Bendann's residence, the warrant authorized the search of Bendann's person, Bendann's Honda CRV, and the search and seizure of multiple electronic devices[1]. On February 3, 2023, law enforcement executed the warrant and arrested and charged Bendann in the District Court for Baltimore County with Sexual Child Abuse (Md. Ann. Code Crim. § 3-602), Second Degree Rape (Md. Ann. Code

---

[1] This warrant is included as Defendant's Exhibit 1 with Defendant's Motion to Suppress (ECF 78). The government will refer to the same exhibits in this response.

Crim. § 3-304), Third Degree Sexual Offense (Md. Ann. Code Crim. § 3-307), Fourth Degree Sexual Offense (Md. Ann. Code Crim. § 3-308) and Perverted Practice (Md. Ann. Code Crim. §3-322), all against Minor Victim.   Case No. D-08-CR-23-14083. On February 27, 2023, the Grand Jury sitting for Baltimore County returned a 16-count indictment, charging Bendann with Sexual Child Abuse, Second Degree Rape, Second Degree Sexual Offense, Third Degree Sexual Offense, and Solicitation of a Minor.   Baltimore County Circuit Court Case No C-03-CR-23-00938.

On February 9, 2023, after the execution of the residential search warrant and prior to the state indictment, United States District Court Magistrate Judge Beth Gesner issued a search warrant for the eighteen digital devices that were seized by law enforcement on February 3, 2023 as well as various online accounts maintained by Bendann.   Specifically, the federal warrant authorized the search of the following online accounts maintained by Bendann:   Google (cbendann@gmail.com), Snap (username: ckbend); Instagram (usernames ckbenda and fd_tch), and Apple iCloud (cbendann@gmail.com).

The Federal Bureau of Investigation (FBI) took custody of the devices to search them for digital evidence based upon Minor Victim's statement that Bendann took sexually explicit videos and images of him.   By order of this Court, filed under seal in BPG-23-446 (now MJM-23-446), the FBI ceased their search of the electronic devices on March 14, 2023.[2]  Over the next several months, the parties engaged in filings and litigation under seal in MJM-23-446, and the examination of the digital evidence remained stalled.   On August 10, 2023, the search of the electronic devices and the Apple iCloud account resumed by order of this Court.   On August 16,

---

[2] The government made the decision to include the iCloud account cbendann@gmail.com as part of the proceedings in MJM-23-446.  The iCloud account was obtained pursuant to a separate warrant and not part of the Court's March 14, 2023 order.  Because the contents of the iCloud account could likely include some of the same evidence that may be found on Bendann's Apple devices, the government also stopped searching the iCloud account.

2023, the Grand Jury returned a six-count indictment charging Bendann with five counts of Sexual Exploitation of a Minor (18 U.S.C. § 2251(a)) and one count of Possession of Child Pornography (18 U.S.C. § 2252(a)(5)(B)) based on materials recovered from Bendann's iCloud account.  (ECF 1).  Agents arrested Bendann on August 18, 2023, and the case was unsealed (ECF 5).

On February 12, 2024, the Defendant filed two pretrial motions in this matter (ECF 78 & 79).  The government respectfully submits this consolidated response to Defendant's pretrial motions.  A motions hearing is scheduled for April 23, 2024, and a jury trial is set for August 21, 2024.

## II.   SUMMARY OF FACTS

The investigation into the Defendant began on January 21, 2023, when the Baltimore County Department of Social Services ("DSS") received a report that a middle school teacher at the Gilman School ("Gilman") had provided alcohol to students.  The report specified that the teacher, Bendann, drove students to the area of St. Paul's School and Meadowood Regional Park in Baltimore County, requested that the students remove their clothing, and had the students run around the park area, naked, in front of Bendann.  The report alleged that this occurred more than once, and that the incidents occurred in July and August of 2021.  On January 16, 2023, Gilman placed Bendann on administrative leave, and he was subsequently terminated on January 20, 2023.  Upon receipt of the DSS report, Baltimore County Police ("BCPD") began their investigation into the allegations involving Bendann.

Victim 1

On January 26, 2023, a student from Gilman was interviewed at the Baltimore County Child Advocacy Center ("CAC").  This student, born in December 2005, is referred to as Victim

3

1 in the Baltimore County search warrant (Def. Ex. 1).  Victim 1 disclosed during the recorded interview that Bendann had been his middle school advisor.  Victim 1 reported that Bendann housesat or babysat for several Gilman families including Victim 1's parents, who employed Bendann to watch Victim 1 and his siblings on weekends when they were out of town.  On these occasions, Victim 1 stated that Bendann allowed Victim 1 to drink alcohol and allowed Victim 1's friends to drink as well.  Bendann bought alcohol for Victim 1 and his friends, and in return Bendann instructed Victim 1 and his friends to do "naked laps."  Victim 1 described "naked laps" as removing all clothing and running around in front of Bendann.   Victim 1 described a specific instance when after requiring Victim 1 and his friends to run "naked laps," Bendann drove Victim 1 and his friends to Bendann's home and directed them do "naked laps" at his home.  Victim 1 said Bendann had a Ring doorbell camera on his porch and that it may have captured this incident.

Victim 1 described another occasion when Bendann was housesitting at Victim 1's home in Baltimore County in 2021.  Victim 1 had gone to a party and had been drinking.  Bendann picked Victim 1 up from the party.  Victim 1 and Bendann returned to Victim 1's home alone, and Victim 1 began watching television.  After eating food prepared by Bendann, Victim 1 described that he "blacked out," and when he woke up, he was naked in his bed with only the living room blanket covering his genitals.  Bendann told Victim 1 he was sleep walking and dancing and had removed his own clothing.  Victim 1 did not feel he had consumed enough alcohol to render himself incapacitated in this way.

Victim 1 also disclosed that Bendann  made friend-requests to students on social media platforms such as Instagram and Snapchat and described Bendann as very persistent about

contacting students.  Victim 1 stated that Bendann became upset if the students did not respond to him.

<u>Minor Victim</u>

On January 30, 2023, Minor Victim was forensically interviewed at the CAC.[3]  This interview was audio and video recorded.  Minor Victim disclosed that Bendann had sexually abused him and had taken explicit images and videos of him.   Minor Victim stated that he met Bendann when Minor Victim attended middle school at Gilman.  Bendann was his student-advisor during this time.  According to Minor Victim, when he was in 8th or 9th grade, Bendann would give Minor Victim and his friends rides home after they had been drinking.  In exchange for the ride, Bendann made Minor Victim and his friends run naked at Meadowood Regional Park and at the hill at St. Paul's School.  Minor Victim stated that this went on for over a year.

On one occasion, when Minor Victim was a freshman or sophomore in high school at Gilman, Bendann drove a long way to pick Minor Victim from a party.  On the drive home, Bendann stopped at McDonald's and bought Minor Victim something to eat.  Bendann then told Minor Victim that Minor Victim "owed him" for having Bendann drive such a long way. Bendann told Minor Victim to get naked and masturbate.  Minor Victim was 15 or 16 years-old at the time.  Minor Victim complied with Bendann's request.  Minor Victim described Bendann's car as a silver Honda CRV.  Over the course of the following year, Bendann continued to demand that Minor Victim remove his clothes and masturbate during their drives,

---

[3] Minor Victim is the person who is the subject of the Indictment in this case.  In the Baltimore County search warrant, Def. Ex. A.,  Minor Victim is identified as Victim 2.  Minor Victim, born in March 2001, was 16 and 17 years old at the time of the offenses, but was 21 years old at the time of the interview.

and at some point, during these encounters, Bendann began to touch Minor Victim's genitals. The first touching began in Bendann's car when Bendann picked Minor Victim up from a party. The abusive acts intensified, and, as Minor Victim described, "things got worse."

Bendann had Minor Victim join him while housesitting for Gilman families where he would sexually abuse Minor Victim. Bendann also sexually abused Minor Victim at Minor Victim's home.  Bendann  recorded these instances of abuse, which often occurred in showers in the residences of Gilman families and in Minor Victim's home.  During his interview at the CAC, Minor Victim provided specific details about these instances of abuse and the locations and addresses where they occurred.

Minor Victim also disclosed that Bendann would contact Minor Victim via text message and over social media platforms such as Snapchat and Instagram, demanding that Minor Victim send naked videos and images of himself to Bendann.  Minor Victim  stated that Bendann reached out to him on Snapchat and started "making deals" with Minor Victim.  Specifically, Bendann repeatedly threatened Minor Victim with exposure if Minor Victim did not produce a certain number of nude images.  Bendann told Minor Victim how to pose and became mad if Minor Victim was not smiling in the images.  If Minor Victim tried to block Bendann on social media, Bendann harassed Minor Victim's friends and threatened Minor Victim with exposure of the nude images.   Minor Victim estimated he sent hundreds of videos and thousands of images of himself naked or engaged in masturbation to Bendann through Snapchat.  Minor Victim also said that Bendann had a black iPhone in a white phone case that contained a hidden folder in the camera roll of that phone.

When Minor Victim left the Baltimore area for college in 2020, Bendann created an Instagram account with the username, "FD_TCH" that contained naked images of Minor Victim from high school.  Bendann used this Instagram account to send friend requests to Minor Victim's friends.

Minor Victim gave law enforcement his cell phone and iPad with written consent that they could search his devices.  Investigators located text messages between Bendann and Minor Victim.  Minor Victim had Bendann listed as "Mr. Bendann" in his devices, and the following chat occurred on December 7, 2022:[4]

| | |
|---|---|
| Bendann: | [Minor Victim's name] Boy |
| Bendann: | Puppy fucking answer |
| Bendann: | [Minor Victim's name] |
| Bendann: | Why does [Minor Victim's friend] keep adding me |
| Bendann: | Puppy^ |
| Bendann: | Puppy respond |
| Bendann: | Puppets |
| Bendann: | Pup really? Snap back you are down to one a day and it is a big problem |
| Bendann: | Hey |
| Bendann: | Snap again |

Minor Victim also disclosed that Bendann contacted him on January 16, 2023 when Bendann was first placed on administrative leave by Gilman.  Bendann asked if Minor Victim was

---

[4] This portion of a chat occurred about 8 weeks prior to the residential search warrant by BCPD on February 3, 2023, and is contained in the affidavit of that warrant.

the person who reported Bendann to Gilman.  Bendann then stated to Minor Victim that he was deleting everything.

## III.    MOTION TO SUPPRESS EVIDENCE OBTAINED FROM SEARCH WARRANTS (ECF 78) 1.

Bendann argues that the state search warrant issued on February 1, 2023, and the federal search warrant issued on February 9, 2023, failed to establish that there was probable cause to believe that evidence of a crime would be found on the stated devices.  ECF 78 at 2.  With respect to his claim that there was insufficient probable cause to establish that evidence of a crime would be found, Bendann seems to only challenge the warrants' probable cause as to the *devices*.  ECF 78 at 2 ¶ 3.  As discussed below, probable cause also existed to believe that evidence of a crime would be found in Bendann's residence, vehicle, online accounts and about his person.  Additionally, Bendann argues that the warrants were based on stale information.  *Id*.  Bendann further argues that the *Leon*  exception does not apply because both the state and federal judges who granted these warrants acted as a "rubber stamp,"  meaning both judges granted the warrants without considering whether or not probable cause existed.  (ECF 78 at 4). Bendann is incorrect on all claims.

The search warrants were constitutional as both affidavits contained sufficient details to establish with specificity and particularity that evidence would be found on Bendann's devices.  Furthermore, the search warrants were not based on stale information as the crimes being investigated involved prolonged criminal activity over the course of years. Even assuming *arguendo*, that there was insufficient probable cause in the affidavits (which there was not), the good faith exception applies because any reasonable officer would have relied on the sufficiency of the search warrants authorized by Baltimore County District Court Judge Karen Pilarski and

8

United States Magistrate Judge Beth Gesner in this case. Neither judge acted as a "rubber stamp" for the police. Bendann's motion to suppress all evidence derived from search warrants should be denied.

> **A.** **The Warrants Contained Sufficient Probable Cause To Believe That Evidence Would Be Found on Bendann's Electronic Devices and in Other Specified Locations**

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., Amend. IV. Evidence obtained from Bendann's residence, his vehicles, his person, his electronic devices, and his iCloud and other online accounts should not be suppressed because the evidence was seized pursuant to facially valid search warrants, supported by probable cause, and issued by a neutral magistrate.

> In reviewing a search warrant application, a magistrate judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983).

"To begin with, warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011) (internal citation and quotation marks omitted). A court reviewing a judge's assessment of probable cause must accord his or her decision "great deference," and should not "invalidate a warrant 'by interpreting [an] affidavi[t] in a hypertechnical, rather than a commonsense, manner.'" *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.), *cert. denied*, 510 U.S. 983 (1993) (quoting *Gates*, 462 U.S. at 236). "So long as the magistrate had a 'substantial basis for . . . conclud[ing]'

that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

A commonsense reading of the statement of probable cause contained in the original and subsequent affidavits demonstrates that both the state district court judge and the magistrate judge had a substantial basis for concluding the warrants were supported by sufficient probable cause. The affidavits set forth enough information to form a considerable basis that a search would uncover evidence of wrongdoing – namely, that the initial residential search warrant would uncover the iPhone described by Minor Victim, and the iPhone (and other devices) as well as the iCloud would lead to evidence relating to the Sexual Exploitation of Children, Coercion and Enticement, Possession of Child Pornography.

The law does not require a high level of evidentiary proof at the warrant-application stage. The law does require only that an affidavit demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Doyle*, 650 F.3d 460, 472 (4th Cir. 2011) (*quoting United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983). That standard is amply satisfied here.

"Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. The probable cause standard does not require officers "to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause." *Taylor v. Farmer*, 13 F.3d 117, 121–22 (4th Cir. 1993). The probable

cause standard is "not a high bar," *United States v. Blakeney*, 949 F.3d 851, 859–61 (4th Cir. 2020), and the highly specific details the Defendant demands are not required.

Probable cause may be established through information from any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip which has been corroborated, *Gates*, 462 U.S. at 241. Further, an affidavit may be based in whole or in part on hearsay information, so long as there is a sufficient indicia of reliability. *See, e.g., United States v. Ventresca*, 380 U.S. 102, 103 (1965); *United States v. McKenzie-Gude*, 671 F.3d 452, 459–60 (4th Cir. 2011); *Hurwitz*, 459 F.3d at 473*; United States v. Dequasie*, 373 F.3d 509, 518 (4th Cir. 2004); Hodge, 354 F.3d at 309; *United States v. Chavez*, 902 F.2d 259, 265 (4th Cir. 1990); and Fed. R. Crim. P. 41(c)(1).

Here, the affidavits included detailed statements about the nature of Bendann's crimes and Bendann's use of electronic devices in the commission of those crimes. Bendann's use of a cellphone to communicate with Minor Victim via text message, Snapchat, and Instagram as well as Bendann's use of devices to photograph and record the sexual abuse established probable cause to believe that evidence of the crimes would be found on his devices. At Bendann's request, Minor Victim stated that he sent Bendann "hundreds of videos and thousands of images." When interviewed, Minor Victim provided his own cellphone and iPad which contained evidence to support not only that Bendann had been sexually exploiting and abusing Minor Victim, but that Bendann had used electronic devices in the commission of those crimes. In a text exchange dated December 8, 2022, less than two months before the execution of the state search warrant, Bendann threatened Minor Victim. Then on January 16, 2023, Bendann told Minor Victim that he was

"deleting everything."  Minor Victim also gave investigators information about a hidden folder on Bendann's iPhone, which he described as black in a white phone case.

The federal warrant also included information provided by Minor Victim about a specific Instagram account (username: "fd_tch") that contained nude photographs of Minor Victim. According to Minor Victim, Bendann used this account to send friend requests to Minor Victim's friends.  Minor Victim also stated that Bendann's Snap and Instagram usernames were "ckbend" or "ckbenda."  Follow up investigation confirmed that Bendann did in fact have the following online accounts:  "cbendann@gmail.com" through Google, "ckbend" through Snap, "ckbenda" and "fd_tch" through Instagram.

Both warrants established sufficient probable cause to believe that evidence of these crimes would be found on Bendann's devices and within his online accounts.

There was also ample probable cause in the state warrant affidavit to believe that evidence of a crime would be located in Bendann's residence in Baltimore, his Honda CRV and on his person.  First, the affidavit details the manner in which sexual offenders collect, maintain and store sexually explicit material and that storage locations typically include homes, vehicles, commercial storage facilities, on persons, and within computers and media devices.  Second, the affidavit detailed incidents in which Bendann committed certain acts in various locations to include his own residence, residences of other Gilman families, and his Honda CRV.

## B.    Probable Cause Was Not Stale.

Bendann complains that probable cause was stale as it pertained to the search of his house, car, person, and electronic devices, arguing that the affidavits alleged "misconduct" that occurred "some two to seven years prior to February 2023." (ECF 78 at 2).   Bendann states that there is no

probable cause that the devices would include fruits, instrumentalities or evidence of a crime dating back nearly "two to seven years prior." In other words, Bendann contends the warrants lack particularity in terms of time. To be sure, particularity does "forbid fishing expeditions while simultaneously preserving the flexibility of law enforcement to adapt to unforeseen circumstances that arise in an investigation predicated on incomplete information." *United States v. Dargan*, 738 F.3d 643,547 (4th Cir. 2013).

"In the context of child pornography cases, courts have largely concluded that a delay, even a substantial delay, between distribution and the issuance of a search warrant does not render the underlying information stale." *United States v. Richardson*, 607 F.3d at 370 (concluding that lapse of four months did not render probable cause to search for child pornography "stale"); *see, e.g. United States v. Newsom*, 402 F.3d 780, 783 (7th Cir. 2005) ("Information a year old is not necessarily stale as a matter of law, especially where child pornography is concerned."); *United States v. Carroll,* 750 F.3d 700, 707 (7th Cir. 2014) (concluding that an affidavit to search five years after a child pornography crime has occurred was not stale because it remained reasonable to expect "images of child pornography would still be present on defendant's computer or other digital storage device or, if deleted, that the images could be recoverable."); *United States v. Harvey*, 2 F.3d 1318, 1323 (3d Cir. 1993) (concluding that two to fifteen months does not render information stale); *see also United States v. Bosyk*, 933 F.3d 319, 330–32 (4th Cir. 2019) (rejecting defendant's staleness argument), *cert. denied*, 140 S. Ct. 1124 (2020); *United States v. Farmer*, 370 F.3d 435, 438–40 (4th Cir.), *cert. denied*, 543 U.S. 1022 (2004); and *United States v. Rhynes*, 196 F.3d 207, 234 (4th Cir. 1999).

13

Child sexual abuse and child pornography crimes are not static or immobile.  It takes time to coerce, entice, and solicit victims; the crimes themselves are continuing in nature.  Criminal actors often amass collections of child pornography and save digital files of their victims for several years.  This conduct can span extended periods of time.  In fact, in the state warrant, the affiant stated that she knows through her training, knowledge, and experience that people who engage in child pornography and child exploitation "keepsake the images and videos and often times retain them indefinitely."  Def. Ex. 1, p. 15.   Similarly, in the federal search warrant, the affiant stated that "individuals who have a sexual interest in children or images of children often maintain their collections that are in digital or electronic format in a safe, secure, and private environment, such as a computer or cellphone, and in the surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence."  Def. Ex. 2., p. 4.   The affiant asserts that "computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools."  *Id*. at p. 7.

Here, Bendann contacted Minor Victim in January 2023 and stated he was actively "deleting everything," which implies that Bendann had evidence to delete "two to seven years" after the allegations of sexual abuse and exploitation.    Law enforcement had access to chats between the Bendann and Minor Victim from December 2022 that confirm Minor Victim's disclosure that the exploitation and abusive conduct by Bendann continued into Minor Victim's young adulthood.  In that December 2022 chat, Bendann refers to Minor Victim as "Puppy" which

14

agents recognized as terminology that "refers to a dominance and submission... in an erotic lifestyle.  This reference is indicative of one person having power and control over another party within a sexual relationship."  (Def. Ex. 1, p. 10 and Def. Ex. 2, p. 15, footnote 2).

In this investigation, detectives had information that Bendann had exploitive sexual contact with Victim 1 as late as September 2021, 16 months prior to the search warrants in this case. Further, detectives were shown continuing contact between Minor Victim and Bendann about 4 weeks prior to the search warrants in this case.    Most compellingly, detectives had information from just days prior to the search warrants that Bendann questioned who had reported his conduct to Gilman and told Minor Victim that he was "deleting everything."  The probable cause for these warrants was not stale, and the affiants provided sufficient explanations as to why these search warrants were temporal in particularity.

### C.      Officers Relied Upon the Search Warrants in Good Faith

The affidavits in each warrant provide properly detailed probable cause.  But even if their statements of probable cause were deficient, Bendann's motion would still fail because officers relied on the warrants in good faith.  When officers seize evidence in good faith in reliance on a facially valid warrant issued by a judge, and the affidavit is later found to lack probable cause, the evidence is not subject to exclusion.  *See United States v. Leon*, 468 U.S. 897 (1984) (affidavit of experienced narcotics officer who acted in reliance on information provided by informant of "unproven reliability" held to lack probable cause, but evidence seized by agent who acted in good faith reliance on the facially valid warrant was not subject to suppression); *see also United States v. Edwards*, 798 F.2d 686, 690 (4th Cir. 1986). When applying the good faith exception, courts "should examine the totality of the information presented to the magistrate in deciding whether an

officer's reliance on the warrant could have been reasonable." *United States v. Legg*, 18 F.3d 240, 244 n.1 (4th Cir. 1994).

There are "four situations in which an officer's reliance on a search warrant would not be reasonable," that is, where the "good faith exception" would not apply: (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth; (2) the magistrate wholly abandoned his detached and neutral judicial role; (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid. *United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (*quoting Leon*, 468 U.S. at 923).

Bendann claims that the good faith exception does not apply because the search warrants were (in the Defendant's view) granted by the state and federal judges acting as a "rubber stamp" and that the Affidavits failed to provide the judges with any basis by which to determine the existence of probable cause (ECF 78 at 5).  Defendant's argument is meritless.

On February 1, 2023, Baltimore County District Court Judge Karen Pilarski reviewed BCPD Detective Shannon Markel's applications and affidavit in support of search warrants for the following:

    i.      the Defendant's home in Baltimore County;

    ii.     the Defendant's person; and

    iii.    the Defendant's vehicle:  2009 Honda CRV

Judge Pilarski determined that she "was satisfied that there is probable cause" to search the Bendann's home, vehicle, and person, "and that probable cause for issuance of the Search and Seizure Warrant exists, as stated in the Application and Affidavit attached to this warrant." Def. Ex. 1, p. 21.

Judge Pilarski also determined that there was probable cause to believe that there was evidence relating to the Maryland state crimes of Sex Abuse of a Minor (Md Ann. Code, Crim. Law, §3-602(b)(1)), Child Pornography (Md. Ann. Code, Crim. Law, §11-207(a))), and Possession of Child Pornography (Md. Ann. Code, Crim. Law, § 11-208)). Specifically, Judge Pilarski determined that she was satisfied with the items to be seized, the breadth of the search of those places, and the method law enforcement would use to conduct those searches. *Id.* at pp. 21 and 22.

Detective Markel relied upon the authorized search warrants and executed them accordingly. She, and other law enforcement members, did seize evidence including the eighteen electronic devices. The seizure of these electronics on February 3, 2023, occurred two weeks after the Defendant was notified his employment at Gilman had terminated. Federal Bureau of Investigation ("FBI") sought the subsequent search warrant for electronic devices and the Defendant's Apple iCloud and other online account to assist with the investigation. Further, based on Minor Victim's disclosure, probable cause existed that the Defendant had committed the federal crimes of Sexual Exploitation of a Minor (18 U.S.C. §2251(a)) and Possession of Child Pornography (18 U.S.C. 2252A(a)(5)(B)).

On February 9, 2023, United States Magistrate Judge Beth Gesner reviewed FBI Special Agent Rachel Corn's applications and affidavit in support of search warrants for the following:

i.      the Defendant's Google account associated with cbendann@gmail.com;

ii.     the Defendant's Snap account, username "ckbend;"

iii.    the Defendant's Instagram account "ckbenda" and account "fd_tch;"

iv.    the Defendant's Apple account associated with cbendann@gmail.com; and

v.     the Defendant's 18 digital devices seized from his home on February 3, 2023.

Magistrate Judge Gessner determined that she found "that the affidavit(s)… establish probable cause to search and seize" the above listed accounts. Def. Ex. 2, pp. 2, 5, 8, 11 and 14.

Magistrate Judge Gesner also determined that there was probable cause to believe there evidence relating to the crimes of Sexual Exploitation of Children (18 U.S.C. §2251(a)), Coercion and Enticement (18 U.S.C. § 2422(b)), Distribution and Receipt of Child Pornography (18 U.S.C. § 2252A(a)(2)), and Possession of Child Pornography (18 U.S.C. § 2252A(a)(5)(B)) within Google, Snap, Instagram, and Apple business records for the accounts described above and the eighteen digital devices. Specifically, Magistrate Judge Gesner determined that she was satisfied with the items to be seized within those accounts, the breadth of the search of those accounts, and the method law enforcement would use to conduct those searches. *Id.* at Attachments B-1 through B-5.

Special Agent Corn relied upon the authorized search warrants and executed them accordingly. She, and other law enforcement members, did seize and search this evidence in accordance with the parameters authorized by this Court.

This "rubber stamp" argument merely reprises Bendann's assertion that the warrant affidavits were deficient. As explained, the affidavits and warrants were valid, and it was reasonable for law enforcement to rely on them in good faith. Indeed, the facts in each affidavit

clearly establish probable cause that evidence related to Sexual Child Abuse (Md. Ann. Code, Crim. Law, §3-602) and Sexual Exploitation of a Minor (18 U.S.C. § 2251(a)), and related state and federal crimes, will be found at Bendann's home, person, and vehicle, and subsequently within Bendann's electronic devices and online accounts.  Each affidavit and warrant have particularity and specificity as to the places to be searched and the things to be seized; each affidavit was based on temporally fresh or current probable cause.

Detective Shannon Markel and Special Agent Rachel Corn both acted in good faith in securing and executing the respective warrants and had every reason to plausibly rely on the warrants authorized by Baltimore County District Judge Pilarski and Magistrate Judge Gessner. The Defendants' Motion to Suppress Evidence Obtained from Search Warrants should be denied.

**2.     Defendant's Motion to Suppress Evidence Obtained From Cellphone (ECF 79)**

The Baltimore County Search Warrant (Def. Ex. 1) contained language that granted law enforcement permission to unlock any secured electronic devices using biometrics:  facial recognition and fingerprints.  Upon entry in the home, officers located Bendann upstairs and escorted him to his downstairs dining room and kitchen area.  A Baltimore County police officer who remained just inside the front entrance to the residence captured this time on his body worn camera.[5]  Officers had Bendann sit in a chair, he was not handcuffed, and he was provided additional clothes to change into.  Approximately 7 minutes and 55 seconds into the body worn camera footage, Detective Markel verbally advised Bendann of his Miranda rights, and he invoked his right to have an attorney present.  Bendann did ask Detective Markel what it means for a

---

[5] The government will play this video during the motions hearing and will submit the video as Government Exhibit 1.

warrant to be sealed, and she explained that process to him.  She also explained that pursuant to the warrant, she may need his "face or hands" at some point "for certain things."  Other than routine questions regarding who to contact for him or what clothes he wanted retrieved, Bendann was not subjected to a custodial interrogation at any time.  Although an agent can be seen standing near Bendann engaging in conversation with him while the search warrant is executed, the agent will testify that the conversation was not related to the investigation and that they spoke about baking, plants, espresso machines, and puzzles.

Approximately 29 minutes and 15 seconds into the video and as authorized by the state court warrant, Detective Markel brought Bendann's iPhone to him and held it in front of his face. The phone prompted the user to enter a passcode.  Bendann on his own volition and without a request from anyone, entered a six-digit passcode, and the phone unlocked.   While Bendann typed in his code, Detective Markel observed the first four digits (████) that Bendann entered.  Detective Markel did not ask for the passcode nor did Bendann state his passcode to her.  Det. Markel gave the cell phone to the FBI Digital Forensics examiner on scene, Jon Shumway, who put the cellphone in airplane mode.  Mr. Shumway then opened the "Password" setting on the iPhone phone in an attempt to access all of the stored passwords to various apps contained within the phone.  This required another biometric entry.  Mr. Shumway approached Bendann again and used the facial recognition feature.  The phone prompted Mr. Shumway for the numeric passcode.  Mr. Shumway entered the kitchen and showed Detective Markel that he needed a second biometric entry or the numeric passcode.  Mr. Shumway will testify that Bendann turned to them and stated, "it's my birthday, ████"  Detective Markel can be heard on the body worn camera footage repeating, "████?"  Bendann replied, "Yes."

Detective Markel will testify that when she initially saw Bendann enter the first four digits of the passcode as ██, she thought she recognized that as his date of birth but wanted to check the search warrant operations plan, which was on the kitchen counter, to confirm. Detective Markel entered the kitchen area and as she was checking the search warrant operations plan, Agent Shumway entered the room and advised that he needed the passcode. Detective Markel stated to Bendann, "██████" to which Bendann replied, "Yes."

Bendann argues that Detective Markel "directed and compelled" him to enter his passcode into the phone and that as a result, the Government should be precluded from admitting any evidence obtained in connection with the "passcode-aided search of his phone." ECF 79 at 2-3. Bendann's argument, citing *Miranda, Edwards,* and *Wong-Sun* is erroneous[6].

In *United States v. Oloyede*, 933 F.3d 302 (4th Cir. 2019), the Petitioner sought to suppress the search of her cell phone based on her own entry of her passcode into her phone. The FBI agent on scene handed the cellphone for the Petitioner and asked, "Could you please unlock your iPhone?" The Petitioner took the phone, entered her passcode, and handed the phone back to the agent. The trial judge found that the entry of the passcode to unlock the phone "was not a 'communicative response' and was therefore not a testimonial statement subject to *Miranda.*" *Id.* at 308. The search was upheld on appeal. "Unlike a circumstance, for example, in which she gave the passcode to the agent for the agent to enter, here she simply used the unexpressed contents of her mind to type in the passcode herself." *Id*. at 309.

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966); *Edwards v. Arizona*, 451 U.S. 477 (1981) and *Won-Sun v. United States*, 371 U.S. 471 (1963).

Here, even though Bendann was in custody and had invoked his right to have an attorney present before answering any questions posed to him by law enforcement, his action to input his passcode was voluntary.  The admission of data from Bendann's phone – the fruit of him opening it – presented no risk that coerced statements would be used against him at trial.  *See Oloyede, id. See also United States v. Patane,* 542 U.S. 630, 632-633 (2004) ("Admission of nontestimonial physical fruits (the pistol here) does not run the risk of admitting into trial an accused's coerced incriminating statements against himself.   In light of reliable physical evidence's important probative value, it is doubtful that exclusion can be justified by a deterrence rationale sensitive to both law enforcement interests and a suspect's rights during an in-custody interrogation.") Although the government cannot use the voluntary act of inputting the passcode *as evidence of Bendann's ownership of the phone*, it can use the contents of the phone seized pursuant to a valid search warrant when Bendann voluntarily accessed it.   The action did not violate the Bendann's *Miranda* rights or Fifth Amendment privilege against self-incrimination.

Even if the passcode to the Defendant's phone was compelled such that the content of the cell phone was illegally obtained, which it was not, the evidence from the cell phone may "nevertheless be admitted if the government can establish by preponderance of the evidence that the information ultimately or inevitably obtained would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 444 (1984). *See also United States v. Bullette*, 854 F.3d 261 (4th Cir., 2017) ("Whether law enforcement would have inevitably discovery the evidence by lawful means is a question of fact.") *See also United States v. Will*, 2015 WL3822599 (4th Cir., 2015) (The content of the cell phone would have been ultimately discovered, even without the cellphone

passcode provided by the Petitioner, and thus the inevitable discovery exception to the exclusionary rule applies).

Det. Markel already saw the first four digits to the passcode when Bendann entered it willingly into the touchscreen.  Seeing Bendann enter ██, Detective Markel will testify that she recognized the numbers as Bendann's possible day and month of birth and surmised that the last two digits were likely the year of his birth, prompting her to check the search warrant paperwork for the year of his birth.  Det. Markel will testify that *even if* Bendann did not verbally confirm the last two digits of his passcode to be █, she inevitably would have checked his date of birth in the search warrant operations plan and deduced that his complete passcode was in fact .

Based on this, assuming *arguendo* that Bendann's passcode was compelled, the forensic analysis would have uncovered the same content even if Bendann had not provide his passcode. Law enforcement had a valid search warrant for the contents of the phone which would have been inevitably discovered with or without a passcode.

**Conclusion**

Wherefore, the government respectfully requests that this Court deny Defendant's motions to suppress evidence obtained from search warrants and evidence obtained from cell phone.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:      _Colleen Elizabeth McGuinn_
Colleen Elizabeth McGuinn
Kim Y. Hagan
Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a copy of the foregoing document was served electronically via ECF to counsel of record for the defendant.

Colleen Elizabeth McGuinn
Assistant United States Attorneys