<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                         NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,      )
                                    )
 4             vs.                  )   CRIMINAL CASE NO. JKB-23-278
                                    )
 5   CHRISTOPHER KENJI BENDANN      )

 6                       FRIDAY, AUGUST 9, 2024
                              Courtroom 5A
 7                         Baltimore, Maryland

 8                        PRETRIAL CONFERENCE

 9        BEFORE:  THE HONORABLE JAMES K. BREDAR, Senior Judge

10   On Behalf of the United States:
          Colleen E. McGuinn, Esquire
11        Kim Hagan, Esquire
          United States Attorney's Office
12        36 South Charles Street
          Baltimore, MD 21201
13
     On Behalf of the Defendant:
14        Christopher C. Nieto, Esquire
          1 North Charles Street, Suite 1301
15        Baltimore, MD 21201

16        Gary E. Proctor, Esquire
          233 East Redwood Street, Suite 1000C
17        Baltimore, MD 21202

18   Also Present:
          M. Evan Cocoran, Esquire - on behalf of minor victim
19        Justin Redd, Esquire - on behalf of Gilman School
          Rachel Corn, Special Agent FBI
20        Calista Walker, Special Agent FBI

21
     _____
22          (Computer-aided Transcript of Stenotype Notes.)

23          Reported by:  Kassandra L. McPherson, RPR
                     Federal Official Court Reporter
24               101 W. Lombard Street, 4th Floor
                        Baltimore, MD 21201
25                        (410) 962-4544
</pre>

Pretrial Conference 08/09/2024

```
 1                  P R O C E E D I N G
                        10:16 a.m.
 2

 3        (Court called to order.)

 4            MS. MCGUINN:  Good morning.  Assistant United States

 5   Attorney Colleen McGuinn on behalf of the Government calling

 6   United States of America versus Christopher Kenji Bendann.  This

 7   is criminal case number JKB-23-278.

 8        Your Honor, I'm joined at counsel table with my co-counsel,

 9   Kim Hagan, also a United States Attorney, and to her right are

10   both Special Agents Rachel Corn and Calista Walker both of the

11   FBI, Your Honor.

12            THE COURT:  Good morning to all of you.

13        Mr. Nieto.

14            MR. NIETO:  Yes, Good morning, Your Honor.  For the

15   record, Christopher Nieto and Gary Proctor on behalf of

16   Mr. Bendann who is standing between us both.

17            THE COURT:  Thank you.  Good morning.

18        Everyone may be seated.

19        We're convened this morning primarily for the purpose of

20   conducting a pretrial conference in anticipation of our jury

21   trial which is scheduled to begin in 12 days.  But before we

22   turn to the general topics that we address at that sort of

23   event; I want to take up the matter that is on the docket under

24   seal at paper number 120.  It is under seal, accordingly, those

25   of you who are in the gallery must step out.
```

```
 1        Counsel for third parties who are potentially impacted by
 2   the subject of document number 120 may remain and we'll sort out
 3   who's who in just a moment.
 4        Those of you who are stepping out, we'll invite you back as
 5   soon as the sealed business is completed.
 6        Mr. Flowers, I don't know if you're still counsel of record
 7   or not.
 8             MR. FLOWERS:  I'm not counsel of record but I've had
 9   --
10             THE COURT:  Then you've still got to step out.
11             MR. FLOWERS:  Will do, sir.  Thank you, Your Honor.
12   (The following proceedings are SEALED by order of the Court:)
13             (Page 3, Line 13 = Page 22, Line 25)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    (End of sealed proceedings.)
24    (RECESS was taken from 10:51-11:03 a.m.)
25          THE COURT:  We're ready to resume with our pretrial
```

1   conference.

2       For the record, I asked my law clerk to distribute the

3   Court's proposed voir dire and proposed preliminary

4   instructions.  Hopefully you've had a few moments to look at

5   those documents.  They're very similar to what the parties

6   submitted, and I appreciate the work the parties did in advance

7   to narrow that focus.

8       Is the voir dire acceptable to the Government?

9           MS. MCGUINN:  Yes, Your Honor.

10          THE COURT:  Is it acceptable to the Defendant?

11          MR. NIETO:  Yes, Your Honor.

12          THE COURT:  Are the Court's proposed preliminary jury

13  instructions acceptable to the Government?

14          MS. MCGUINN:  Yes, Your Honor.

15          THE COURT:  Are they acceptable to the Defendant?

16          MR. NIETO:  Yes, Your Honor.

17          THE COURT:  Thank you.  Let's turn to the motions in

18  limine that have not yet been ruled on.

19      And we'll start with the Government's.  And Ms. McGuinn,

20  your motions are where, at ECF 36 and 101?

21          MS. MCGUINN:  Pertaining, yes, to the 414, 404(b).

22  Yes, Your Honor, the original notice was filed under 36, the

23  amended or addendum with argument is at 101.

24          THE COURT:  Okay.  So it seems that we've got

25  essentially four pieces of evidence about which there might be a

1  dispute, and with respect to which there may be the opportunity

2  to rule pretrial on the admissibility questions.  Some of these

3  questions may have to wait until they're presented in context

4  during the trial, but I'm not opposed to taking a shot and

5  seeing if we can narrow some things up front.

6       So I suppose the first issue is that the Government intends

7  to present some evidence related to an adolescent boy, other

8  than the so-called minor victim in the case.  Who's -- is the

9  Government comfortable with my referring to this person by their

10 initials?

11       MS. MCGUINN:  Yes, Your Honor, that's fine.  Thank

12 you.

13       THE COURT:  So the initials are W.G.  And why don't

14 you summarize or make a proffer of what you intend to present,

15 and we'll see here now, on the record, whether or not the

16 Defendant objects, and if there is an objection see if we can't

17 resolve it.

18       MS. MCGUINN:  Thank you.  Your Honor, the Government

19 will also refer to this particular person as W.G.  And I

20 appreciate defense counsels' professionalism, that even though

21 these individuals are adults, they were children at the time, so

22 I appreciate that they've done the same in their filings.

23       Your Honor, as to the proffer as to W.G., and, quite

24 frankly, several other of the now young adult contemporaries of

25 minor victim who were classmates of him.  As to W.G., W.G. will

1  testify as to the general world of things in terms of how he

2  knew the Defendant, how he knew minor victim.  That he attended

3  parties or gatherings at some of the homes where house sitting

4  and babysitting occurred.

5          THE COURT:  Will he say that he is the same or roughly

6  the same age as the minor victim?

7          MS. MCGUINN:  Yes.  All of the evidence under this

8  parameter are all witnesses who either the same age or same

9  grade, or were one grade ahead of this victim but they are all

10 contemporaries.  So they're all roughly now, 22, 23, 24 years

11 old all of them.

12         THE COURT:  Okay.  And further on time, when will he

13 contend that this event, that he's going to testify about,

14 occurred?  How old will he say that he was?

15         MS. MCGUINN:  He was 16 to 17 years old to the best of

16 his memory.

17         THE COURT:  Okay.

18         MS. MCGUINN:  That the -- which is the time of the

19 alleged abuse in this case against minor victim, the same

20 relative years.

21         THE COURT:  And you must know birth dates of minor

22 victim and W.G.

23         MS. MCGUINN:  I know minor victim's by heart.  I do

24 not know W.G.'s by heart but I do know minor victim's.  He is

25 March of 2001.  W.G. is, I believe he might be 2000.  I think I

1    put that actually in my motion.

2        THE COURT:  So you believe and you proffer that the

3    witness, W.G., was older and is older than minor victim.

4        MS. MCGUINN:  One school year, yes.  And it goes to

5    they started in seventh grade together, the minor victim left,

6    came back.  So they, at some point, were classmates but they

7    remained friends even when they were a grade apart.

8        THE COURT:  Well, it strikes me this is actually

9    somewhat important, isn't it?  Because if -- well, perhaps not.

10    If your proffer is that the witness will testify that this event

11    occurred before the witness had reached his 18th birthday.

12        MS. MCGUINN:  Yes.

13        THE COURT:  And that is your proffer.

14        MS. MCGUINN:  Yes.

15        THE COURT:  Okay.  Well, that's probably enough on the

16    dates and times.  You may continue.

17        MS. MCGUINN:  Thank you.

18      Your Honor, W.G. will testify that while he was 16 and 17

19    years old, before he reached the age of 18, that while his --

20    while his parents were away and the Defendant was at his home

21    house sitting, babysitting, he went in to take a shower.  And

22    when he entered his own bedroom, so not a public area of the

23    home, he went into his own bedroom wearing only a towel as one

24    does when they finish a shower.  And the Defendant was sitting

25    on his bed and the Defendant said let's wrestle, and began to

1    grab the towel off of W.G.  And grabbed it with such force that

2    W.G. was pulling it back so hard, with such force, that the

3    towel actually ripped in two.  And it's at that point that

4    victim -- excuse me, W.G. contested or whoa, whoa, words to that

5    effect, and the Defendant left the room and nothing else was

6    said about that particular incident.

7         W.G. had actually, if my memory serves, had mentioned this

8    to some of the guys that he's friends with at the time, but it

9    really didn't become something that law enforcement knew about,

10   certainly until the charges in this particular case and everyone

11   was being interviewed in light of the investigation.

12        THE COURT:  And proffer again the particulars of what

13   you expect the witness to say exactly, specifically with respect

14   to the towel and the Defendant's alleged grabbing of it.

15        MS. MCGUINN:  So, Your Honor, I understand that W.G.

16   will say that the -- he came into the bedroom, his own bedroom

17   while the Defendant was lawfully in his house and not sleeping

18   in his room.  The Defendant was sitting on his bed.  The

19   Defendant said words to the effect of let's wrestle, and grabbed

20   W.G.'s towel that he was wearing, which was the only thing

21   keeping him clothed or covered.  That the Defendant pulled the

22   towel with such force that W.G. was pulling it back and the

23   towel ripped, in fact, from the force at which -- of which the

24   Defendant and W.G. pulled back.

25        THE COURT:  And was the consequence of that then that

1  W.G. was exposed, naked to the Defendant?  Will he testify to

2  that effect?

3          MS. MCGUINN:  I believe the proffer will be that he

4  was not fully exposed, Your Honor, but certainly in some state

5  of undress, yes.

6          THE COURT:  That whatever, the towel itself was no

7  longer successfully --

8          MS. MCGUINN:  Fully covering him.

9          THE COURT:  -- covering the private parts of his body.

10          MS. MCGUINN:  I would believe that it was not fully

11  covering him.  And I -- to be fair, Your Honor, I don't remember

12  his -- and I don't think we actually asked him that specific,

13  but I believe he was trying to hold it in front of his private

14  area as would be an instinctual thing.

15          THE COURT:  Okay.  Very good.  And who wants to argue

16  this one?

17          MS. MCGUINN:  Do you -- there's a second part.  I'm

18  sorry, there was a second part of that.

19          THE COURT:  Sorry.

20          MS. MCGUINN:  The second part of that was W.G., as

21  well as some of the other, again, same contemporary age mate

22  witnesses as to minor victim, that those individuals the

23  Defendant would Snapchat message them and --

24          THE COURT:  So this is other people who are going to

25  testify during the trial are going to say this?

1          MS. MCGUINN:  Yes, Your Honor.

2          THE COURT:  Can we have their initials?

3          MS. MCGUINN:  So one is J.S., one is -- well, two of

4    them are actually the same initials, J.S.  So one is J.Sch, one

5    is J.St., T.W.  That's the three, yes.  Those three individuals.

6          THE COURT:  J.S.

7          MS. MCGUINN:  J.Sc., we can say that.

8          THE COURT:  J.Sc.

9          MS. MCGUINN:  J.S.

10          THE COURT:  J.S. And T.W.

11          MS. MCGUINN:  And T.W.

12        And those individuals, in addition to W.G., will say that

13   they would Snapchat the Defendant as part of their routine while

14   they were still in high school and, again, still under the age

15   of 18.

16        That the Defendant would -- if they were sometimes -- and I

17   don't know how informed Your Honor is as to Snapchat and what's

18   called a streak, where kids take photos of half their face and

19   send them to each other and then you have to send it back the

20   next day and you keep your streak alive.  Sometimes it's just

21   partially your face, it might be taken at night.  And so

22   sometimes these four individuals, these four boys would -- might

23   be shirtless because they're getting ready to go to bed.  The

24   Defendant's response, they will testify, at least on one

25   occasion, he would ask them do you have any pants on, or take

```
 1    off your pants, or can I see your tummy, or words to that
 2    effect.  The boys collectively all ignored him when he would
 3    make those kinds of comments to them thinking it weird but not
 4    responding to him and not engaging with him.
 5              THE COURT:  Okay.
 6              MS. MCGUINN:  So that's W.G.'s, what I'll colloquially
 7    say the towel incident, as well as the attempts via Snapchat to
 8    see further parts of the body of these four particular
 9    witnesses.
10              THE COURT:  Okay.  Mr. Nieto.
11              MR. NIETO:  Thank you, Your Honor.  Preliminarily,
12    just so I understand the format of the day.  The Government's
13    ECF filing, which I know was done earlier in the case and I took
14    it to be more prophylactic than anything else, contains other
15    types of -- other types of prior acts that they seek to
16    introduce, some of which are contained in ECF 101.  But as I
17    understand it, the matters enumerated in 101 are the basis for
18    today's -- that's what the Government anticipates introducing.
19              MS. MCGUINN:  That's correct, Your Honor.  The
20    Government's --
21         Thank you, Mr. Nieto.
22         The Government's 36 was somewhat prophylactic.  As Your
23    Honor may recall, last fall we were in somewhat of a different
24    posture and so we put every gamut that we could possibly think
25    of.  We've certainly narrowed it down, and so the only issues
```

```
 1    before the defense and the Defendant today are the ones in 101.
 2             THE COURT:  To the extent that there were other
 3    matters proffered in the record the Government's not going to
 4    introduce them at trial.
 5             MS. MCGUINN:  Correct.  It's all encapsulated in 101.
 6             MR. NIETO:  That's what I suspected, I just wanted
 7    clarification, Your Honor.
 8             THE COURT:  Yep.
 9             MR. NIETO:  And again, too, in addition, in advance of
10    today's hearing we had been in communications with the
11    Government as to whether or not they anticipated on calling
12    Minor Victim 1 as a witness within their case in chief.  We
13    thought that was important because, as Your Honor can see
14    through some of the filings that the Government has provided,
15    Minor Victim 1's testimony will encapsulate the relationship
16    that he had with Mr. Bendann.  Without his testimony --
17             THE COURT:  Well, what's the answer to that?
18             MR. NIETO:  I'm sorry, Your Honor?
19             THE COURT:  What's the answer to that?  Is Minor
20    Victim 1 going to be called as a witness?
21             MS. MCGUINN:  Just for purposes of the record, he's
22    minor victim in the indictment.  There's no one.  I just want to
23    make sure we're clear he's minor victim.  Your Honor, the
24    Government learned that the defense attempted to subpoena him
25    for trial as a result of that given, I guess, put it mildly,
```

 1  since our hand was forced the Government has subpoenaed minor

 2  victim.  It is our understanding and belief that he will testify

 3  in the Government's case in chief.

 4          THE COURT:  In the Government's case in chief.

 5          MS. MCGUINN:  Yes, Your Honor, because of the position

 6  we were placed.

 7          THE COURT:  Well, whatever, but you're calling him as

 8  a witness in your case in chief.

 9          MS. MCGUINN:  Yes, Your Honor.

10          MR. NIETO:  And so then again, Your Honor, that was a

11  question with regards to our analysis.

12      In the Government's filing, Your Honor, they had sought to

13  introduce specifically these types of -- these portions of their

14  case under 413 or 414.  That standard is a little different than

15  that under 404(b).  And we have -- we were objecting under 413

16  and 414 because we didn't feel that it met the criteria as

17  outlined by those rules.  We thought that it was more aptly

18  controlled by 404(b) and the 403 analysis.

19          THE COURT:  Okay.  And if the Court were to address it

20  with a 403 and a 404(b) analysis, the defense position would be,

21  win or lose the Court applied the correct rules of evidence in

22  deciding the admissibility of this evidence.

23          MR. NIETO:  Yes, Your Honor.  Yes, Your Honor.  And so

24  yes, Your Honor is correct, under 404(b) these alleged,

25  quote/unquote, prior bad acts would only be permissible to prove

```
1   motive, opportunity, intent, preparation, plan, knowledge,
2   identity, or absence of mistake or accident if, of course,
3   relevant to an issue other than character it was necessary and
4   reliable.
5       With regards to the allegations of this towel grabbing
6   incident; Your Honor, it's our position, respectfully, that the
7   allegation is simply not reliable.  The basis for that, Your
8   Honor, is because this event allegedly occurred, I believe, at
9   least seven or eight years ago.  It is, as I understood from the
10  discovery, uncorroborated.  And, unfortunately, Your Honor, from
11  our perspective, almost impossible to dispute based on the lack
12  of context or information surrounding that.
13          THE COURT:  Well, you can cross-examine the proponent,
14  the person who is saying it happened.
15          MR. NIETO:  Absolutely, Your Honor.  Absolutely.  But
16  again, just in terms of as one of the factors for the Court to
17  consider the reliability of that, that's why we reference that
18  to His Honor.
19      From our perspective, just based on the way it was framed
20  as it was included in the discovery, this sounded like more so
21  like an act of horseplay that may have veered off into a
22  different direction but then, as the Government indicates,
23  immediately stopped.  Our concern is that this would create an
24  unsubstantiated innuendo that this is, in fact, a bad act rather
25  than what can be construed equally simply as an innocent
```

 1    mistake.

 2            We also suggest, Your Honor, that --

 3            THE COURT:  Innocent mistake.  Pulling -- attempting

 4    to pull a towel from an otherwise unclad adolescent who you're

 5    charged with watching, babysitting, whatever the term for it is.

 6    Innocent?

 7            MR. NIETO:  Well, and again, Your Honor, that being --

 8    not having the opportunity to delve more into exactly what we

 9    anticipate W.G.'s responses will be on cross-examination, I

10    understand the Government's proffer.  But again, one of the

11    aspects and issues with regard to this case is under the theme

12    of revisionist history.  And so once the initial allegations

13    against Mr. Bendann were publicized, many other allegations have

14    emerged.

15        And the concern is, is that then looking through a prism of

16    this is a sex offender type case, what could otherwise be

17    construed as mistakes or horseplay or not a prior bad act is now

18    being presented and viewed in that capacity.  Not because it, in

19    fact, was, but because of the nature and the context of where we

20    currently sit in relation to this case.

21            THE COURT:  Well, I think you're on safe ground if

22    your contention is that for one of these arguably collateral

23    acts to be admissible under 404(b) and not run afoul of 403 it

24    has to have some kind of sexual quality to it.  Two fully

25    clothed adolescent boys rolling around on the floor of the

1    family room, putting each other in headlocks and wrestling

2    doesn't have a sexual quality to it.  And someone watching that

3    isn't necessarily -- I think it's not reasonable to suggest that

4    that has a sexual quality to it.  But that's not what the

5    Government's proffered to me.  They've proffered events that are

6    about the removal of or the lack of clothing.

7         MR. NIETO:  Understood, Your Honor.  And again, what I

8    was -- what I was getting to here was really more so with regard

9    to the prong of the reliability of this particular testimony.

10        THE COURT:  Okay.  Fair enough.

11        MR. NIETO:  And so that was what I was suggesting on

12   that point.

13        We would also submit, Your Honor, in opposition to the

14   introduction of this evidence, is that it identically -- or

15   similarly is not necessary.  The elements of the offenses

16   charged in this particular case; this does not go to the heart

17   of it.  Indeed, these -- the version of events that W.G. will be

18   providing to the court, from my review of this case, are wholly

19   inconsistent with the story that minor victim will be providing

20   to the jury in almost every relevant sort of way.

21        The W.G. story seems to be a forcible act as I think it's

22   being framed, of disrobing someone within their own home without

23   their permission in an aggressive way.

24        Upon minor resistance, and I don't mean that as a pun.

25   Under minimal resistance whatever was happening immediately

1    stopped, was never repeated, and never came to light until all

2    the allegations emerged.  That is very distinct and different

3    than that of what minor victim was suggesting as the Government

4    has outlined extensively in their filings under the auspices of

5    grooming; they talk about the friending, the coercion, the

6    meaning of getting on someone's good side, the simple

7    requesting.  And that the juvenile, under the circumstances,

8    unable to resist, then complied, although not legally being able

9    to.  That is a very different situation than what we see in this

10   situation with W.G.

11        And our sincere concern is that the aggressive nature of

12   that allegation is -- we will end up having a mini trial on

13   these allegations that do not go to the heart or the claim that

14   we have here, which is simply the using of a minor to create

15   sexually explicit material for the purposes of a visual

16   depiction.  There's no allegations in the W.G. story that there

17   was any recording, an attempt to record, or anything of that

18   sort.  And so for those reasons, Your Honor, the 403, probative

19   versus prejudicial concerns we think override whatever probative

20   values that the Government has suggested the Court would apply.

21        Additionally, as the second portion of the Government's

22   proffer is these -- I suppose these messages about are you

23   wearing pants.  Or as they had put in the filing, show me your

24   tummy.  As we had said in our filing, are you wearing pants,

25   respectfully, Your Honor, clearly seems like a joke because this

1  friend group someone had posted a picture without them having a

2  shirt on.  There was no follow-up.  There was no continued

3  conversation or clarification as to what their means.  In fact,

4  there's nothing to even suggest there was any nefarious intent

5  behind it whatsoever.

6       It's going to call for the jury to infer, as the Government

7  intends to imply, a more nefarious intent.  And, Your Honor,

8  these conversations cannot be viewed in a vacuum.  This comment

9  in a random text, without a precursor or forewarning to suggest

10 something else was coming would be subject to a different

11 analysis.  I submit to Your Honor that's clearly in response to

12 a picture that W.G. voluntarily posted and shared with others

13 within his friend group in which he was naked from the waist up.

14      The show me your tummy comment, Your Honor, as we had

15 suggested in our filings, Your Honor, that is obviously clearly

16 not genitalia, anus, or pubic area.  Under 403 these

17 unsubstantial allegations do not go towards the elements for the

18 offenses alleged, and the probative value is greatly outweighed

19 by the value of prejudice inherent within.

20      THE COURT:  Thank you, Mr. Nieto.

21      I'm ready to rule.  These rulings are, of course, subject

22 to reconsideration in the midst of trial depending upon what

23 sort of foundation is laid and so forth.  And to the extent that

24 I make rulings here and counsel want to continue to advocate a

25 position that's in conflict with my ruling, you're free to do

1    so.  But the point will then need to be, that, hey, this

2    evidence didn't present in the way that the parties and court

3    assumed that it would at the time of the pretrial conference.

4    So intent is an issue in this case; what was the Defendant's

5    intent with respect to interactions that he had with these

6    adolescent boys.

7          With respect to proof that the Government presents, every

8    witness will be subject to cross-examination, that's our system.

9    And the proposition that is put forward by a particular piece of

10   testimony or evidence is subject to close scrutiny and

11   cross-examination by the defense.  And the Court expects that

12   that engine for ascertaining the truth of a disputed matter will

13   be functioning fully through the course of this trial.

14         I find that with respect to the two pieces of proffered

15   evidence that both tend to be evidence of conduct tending to

16   show a sexual interest in boys under the age of 18.  And, in the

17   context of the charges in this case, that's relevant.  It's

18   highly relevant.  In fact, such proof, arguably, is intrinsic

19   and we don't even have to go to 404(b) to look for an exception

20   to the character evidence rule to determine its admissibility.

21         So my first finding is that it's intrinsic, it's involved

22   with the Defendant's alleged state of mind during this period as

23   he interacted with this community of adolescent boys.  But I

24   alternatively find that it's -- if it's not intrinsic it's

25   admissible because it tends to prove the intent of the defendant

1  in a case where intent is an issue.  And the Defendant's intent

2  is highly relevant to the question of whether or not he is

3  guilty of the charges that the grand jury has brought.

4      The towel incident, I find, is a straightforward issue, not

5  a close call.  An adult who has been left in charge of an

6  adolescent boy, who proposes wrestling when the adolescent boy

7  is clothed only in a towel after taking a shower, and then the

8  testimony as proffered is that the adult grabbed the towel in

9  particular and had some success in removing it from the

10  adolescent's possession and the way that the adolescent was

11  using it to protect his privacy, I think it's relevant evidence

12  of a sexual interest in that adolescent who hasn't reached his

13  18th birthday.

14      With respect to the Snaps it's a little closer call.  The

15  issue about the tummy in particular, what is that, but I think

16  it is of sufficient detail and the question itself going to sort

17  of the physical state of the person and what is being revealed,

18  can I see more of your body without clothing on it, which is

19  what's implied in that; together with the other apparent

20  question of are you wearing pants directed at a boy who is shown

21  an image just of the upper portion of his body which is not

22  clothed, that bespeaks a sexualized interest.  And accordingly,

23  the ruling at this point is that I'm not excluding it.  And

24  provided an appropriate foundation is laid, and that otherwise

25  appears relevant at the time it's offered, I expect to admit it.

1       Is it more prejudicial than probative?  It's prejudicial

2  evidence, that's for sure.  But what's misunderstood about Rule

3  403 all the time is that the question isn't whether something is

4  more prejudicial than probative, it's whether it's unfairly

5  prejudicial.  I mean, the government only presents evidence that

6  is prejudicial in the sense that it tends to show guilt; that's

7  their whole purpose and objective.  The question is whether it

8  has an unfair quality to it that overwhelms its probativity.  In

9  this case I find the balance tips in favor of probativity so the

10  request for exclusion under 403 is denied as well.

11       In light of the position that the Defendant took at the

12  outset on 413 and 414 I need not address the application of

13  those rules to this evidence.

14       All right.  We had some other items.  I think we have the

15  question about contact with the adolescent boys in conflict with

16  the employment rules at the Gilman School.

17           MS. MCGUINN:  There is, but there's a second one that

18  I think you're skipping over which is what we call colloquially

19  the naked laps; the coercion, enticement of the boys to run

20  naked in front of him.  That's on the Government's motion.  I

21  don't know that the defense addressed it in theirs so --

22           THE COURT:  Oh, yeah.  And the Defendant did not

23  respond to that.  Should I take that as you don't choose to

24  react to that notice at this time, Mr. Nieto?

25           MR. NIETO:  Your Honor, I would say that we would

1  object under the 403 analysis, that it is unfairly prejudicial

2  versus the probative value but submit on that.

3        THE COURT:  Thank you.  Provided an appropriate

4  foundation is laid and there are not relevancy issues at the

5  time that the Government actually presents that evidence, I

6  expect to admit it because I find that it is more probative than

7  unfairly prejudicial.  I also find that it's intrinsic.

8     All right.  Now we're over to the --

9        MS. MCGUINN:  Yes, sir.  The impermissible contact

10  with --

11       THE COURT:  Show me -- tell me -- give me the proffer

12  of how this evidence is actually going to present.  Somebody

13  from the Gilman School is going to come and testify and say,

14  hey, we have rules and this is what teachers are allowed to do

15  and not allowed?

16       MS. MCGUINN:  Yes, Your Honor.

17       THE COURT:  How are you going to present that?

18       MS. MCGUINN:  Yes, Your Honor.  The Government's

19  calling Angela Johnson who is the HR representative of Gilman

20  and has been for many, many years, including during the time

21  frame the Defendant was a teacher there.  The entire time frame

22  the Defendant was a teacher there.  And the headmaster of the

23  school, Henry Smyth, who doesn't write the policies but is

24  certainly aware of them as the headmaster.

25     Those witnesses will testify that during the years of --

1  relevant years of 20 -- I think it's actually technically 2015

2  because the school year starts then, through 2018, at least

3  while our minor victim was attending the Gilman School, that the

4  policy in place at Gilman was that teachers were not to be,

5  quote/unquote, friends with any student on social media.  That

6  being things such as friends or contacts on Instagram and

7  Snapchat, that sort of thing.  And that the policy at the school

8  was such that teachers were not to communicate with students via

9  text message unless there was some sort of emergency.  Such that

10  there's a hey, there's an emergency, your mom is coming to get

11  you because there's a snow delay or some reason like that that

12  they can't use the school approved email, Gilman@EDU.  So the

13  two witnesses from Gilman will testify to that.

14      And then subsequent to that, the minor victim as well as

15  the other witnesses who are his contemporaries, or were his

16  contemporaries, will say they were all friends with the

17  Defendant on Snapchat at various points, most of them until high

18  school.  Minor victim we have text message while he was still

19  the student of the Defendant.  Defendant asking --

20          THE COURT:  I have two questions for you.  Has every

21  other -- has any other teacher ever violated that policy?

22          MS. MCGUINN:  I actually don't know because I never

23  asked.  But I do know that --

24          THE COURT:  Okay.  So without a definite answer to

25  that question, my assumption to that is yes, they have violated

1  it.

2      More specifically, is that a policy that is specifically

3  designed to prevent inappropriate sexual relationships and

4  pursuit of students?

5          MS. MCGUINN:  I don't know.

6          THE COURT:  Or does it have a much broader purpose

7  than that?

8          MS. MCGUINN:  I think it's much broader than that,

9  Your Honor.  I think it's that general school policy of the

10  perception of engaging with students on a, quote/unquote, friend

11  level instead of being a teacher-student.

12          THE COURT:  Because it affects, overall, the sort of

13  role of the teacher --

14          MS. MCGUINN:  Yes.

15          THE COURT:  -- and the environment.  And there is, in

16  that profession, thought to be a value, and even a necessity of

17  there being a distance between students and teachers to promote

18  the educational experience that the school was trying to

19  achieve.

20          MS. MCGUINN:  Yes.  Yes, Your Honor.

21      And to the extent that Your Honor may be familiar with

22  teenagers, sometimes teenagers post really ridiculously dumb

23  things on Snapchat and Instagram, and we wouldn't want teachers

24  necessarily interacting with students doing those sorts of

25  things that are meant for their age mates to laugh at or guffaw

Pretrial Conference 08/09/2024

1  at or whatever it might be.  So I agree with Your Honor, it's to

2  set that distance between to one who is an educator and supposed

3  to promote the well-being of our students versus someone who's

4  acting as their age mate or as their friend.

5            THE COURT:  All right.  So given that we're not

6  finding much difference in our views about the purpose of rules

7  like this, and the fact that they have a very broad and sweeping

8  purpose designed to serve multiple important interests, tell me

9  how an individual teacher's alleged violation of that policy in

10  particular is relevant in the context of this case.

11            MS. MCGUINN:  So, Your Honor, we have a series of text

12  messages between the Defendant and minor victim starting in as

13  early as 2015, which is when minor victim would have been 14

14  years old and his student.

15            THE COURT:  Right.

16            MS. MCGUINN:  He is communicating with him; do you

17  want to go to breakfast?  Where do you want to go?  I'll pick

18  you up for ice cream.  All of these, what the Government would

19  call grooming behaviors; getting more familiar with him, and

20  certainly in violation of the broad view of that policy.

21            THE COURT:  Yeah.

22            MS. MCGUINN:  Making himself invaluable to minor

23  victim in terms of acting more like a friend; I can take you to

24  go get ice cream; I can take you to go get breakfast; we can get

25  breakfast before school; we can get breakfast after homeroom or

```
 1   advisor.  We can go to dinner.  I can pick you up, you can go to
 2   dinner with some of the older kids, which was an enticement for
 3   minor victim to get to hang out with some of the bigger kids on
 4   the lacrosse team.
 5        All of these types of behaviors are in violation of the
 6   policy that the Defendant was certainly aware of.  But then,
 7   moreover, he used it in such a way to create that relationship
 8   with minor victim.
 9        THE COURT:  That may all be true, and that would
10   certainly seem to all be admissible.
11        MS. MCGUINN:  Yes.
12        THE COURT:  I'm not talking about that.
13        MS. MCGUINN:  Okay.
14        THE COURT:  I'm talking about the policy itself.  The
15   fact that you want to put into evidence that oh, and this
16   violated the Gilman School policy.
17        MS. MCGUINN:  I think it's more in lines of the fact
18   that the Defendant knew, if he didn't already know in his own
19   way as an adult, a functioning 32-year-old adult at the time,
20   but he knew because he was instructed also by the school that
21   you are not to do this because we want to keep those boundaries
22   in place.  Which is also kind of -- and the other part of this
23   argument is he was put on notice during meetings that you were
24   not to be -- those boundaries are being blurred --
25        THE COURT:  The policy makes perfect sense to me and
```

```
1    it serves multiple important interests and purposes in the
2    context of running a school, no dispute whatsoever.  But I'm not
3    convinced that its violation in this case is relevant to the
4    issues that are specifically on trial here, so it's excluded.
5              MS. MCGUINN:  Yes, sir.
6              THE COURT:  Okay.  Let's see.
7              MR. NIETO:  I believe the next part, Your Honor, would
8    be the Google searches.
9              THE COURT:  It's the Google searches.
10             MS. MCGUINN:  Yes, Your Honor.
11             THE COURT:  All right.  Do we have those specifically?
12        So I take it that as part of this investigation the
13   government or the grand jury subpoenaed the Google company, or
14   how do you refer?
15        I think President Bush was once heard to refer to it as The
16   Google.
17             MS. MCGUINN:  Correct.
18             THE COURT:  But a subpoena was served on Google.
19             MS. MCGUINN:  A search warrant as well to get the
20   contents, yes.
21             THE COURT:  A search warrant.  And it was as to
22   particular accounts, and those were CBendann@gmail.com and
23   CKBendann@gmail.com?
24             MS. MCGUINN:  Yes, Your Honor.
25             THE COURT:  And you asked for the search history that
```

1   Google evidently maintains.

2           MS. MCGUINN:  Yes.  And I provide it in our

3   attachment, which again, I apologize for some of that

4   discrepancy, that I missed some of the redirections, Your Honor.

5   But the Government provided Your Honor with a sample of some of

6   what we believe are the relevant texts.  And certainly some of

7   them, I think him searching specifically for this victim, not

8   once, not twice, but many times, are -- is certainly relevant.

9   I don't think the defense is arguing that, but I think the

10  Defendant's argument is the Government's contention that some of

11  these searches -- I'll use the very first one as an example,

12  naked blonde boys, the use of the word boys is relevant under

13  414, 413, 404, et cetera, as to show the Defendant's sexual

14  interest in boys.

15          He also searches --

16          THE COURT:  Yeah.  I think the problem you've got, Mr.

17  Nieto, is that I get everything you're saying, but boys, first

18  and foremost, means young males.  And I'm not going to dispute

19  with you the fact that someone my age, 67 years old, might

20  occasionally refer it his pals as the boys or whatever.  But

21  that's not the first meaning that jumps out.  It is one, but

22  it's not the first one.  What do I do about that?

23          MR. NIETO:  Well, I guess, Your Honor --

24          THE COURT:  Naked blonde boys.  What are you searching

25  for when you're searching for naked blonde boys?

 1              MR. NIETO:  And so I think, as Your Honor just

 2    succinctly said it, it's maybe the first thing that comes to the

 3    Court's mind, but there's one of maybe other variety of reasons.

 4    And I suppose, Your Honor, that is -- that's the crux of the

 5    issue for ourselves which is endeavoring to anticipate or see

 6    into the intent behind that search, based on what I think is

 7    Your Honor's perception of what that word means versus another

 8    non-nefarious, non-prior bad act.

 9              THE COURT:  Well, my job is not really just to

10    ascertain my perception of what the word means, but objectively,

11    in the culture, what does it mean.

12              MR. NIETO:  Forgive me, yes.

13              THE COURT:  And I think my -- in fact, I know that my

14    conclusion on that is that, in general, that means males who are

15    younger than 18.

16              MR. NIETO:  And I suppose, Your Honor, one of the

17    issues that we have here is the search engine upon which these

18    are being made.  Google, I respectfully can submit to the Court,

19    you cannot find child pornography or inappropriate photos or

20    videos just by doing a normal Google search; those are not

21    allowed to be viewed.  So in the sense as this is a case about

22    what we would call CP --

23              THE COURT:  What we would call?

24              MR. NIETO:  CP, Your Honor, in terms of child

25    pornography.  That is not what one would find by doing a Google

1  search of this nature, that's the first thing.  And I do think

2  that's an important part, Your Honor.  This is not a search

3  that's done on an illicit website or in a fashion in which and a

4  location of which those types of illicit images could be

5  located.

6          THE COURT:  But you're asking me to infer that your

7  client knew what the rules were at Google and that it's futile

8  to go on Google and search for child pornography.  Why would I

9  necessarily infer that?

10         MR. NIETO:  Your Honor, I would just assume from --

11  forgive me, Your Honor.  Our perspective --

12         THE COURT:  Your position is everybody knows you can't

13  find child pornography by making a Google search.

14         MR. NIETO:  Yes, Your Honor.

15         THE COURT:  Yeah, I'm not sure if that's right.

16         MR. NIETO:  Just because of its illegal nature and the

17  manner of which it's not readily accessible by anyone on a

18  Google search that has no age verification.  Even adult

19  pornographic sites have an extra level of security.  But be that

20  as it may, Your Honor, again, in anticipation of this hearing I

21  endeavored to recreate some of these Google searches.  I will

22  say it was for the purposes of this case insofar as law

23  enforcement is concerned, but it cannot be recreated, which was

24  part of the frustrating aspect, to try to see what it was that

25  Mr. Bendann was allegedly not only searching for but then had

1    reviewed.

2           THE COURT:  Why can't you go on Google and search for

3    naked blonde boys?

4           MR. NIETO:  I can, Your Honor.  The search results

5    that come from that --

6           THE COURT:  Yeah.

7           MR. NIETO:  -- now, in August of 2024, are different

8    than what the Google search would reveal at the alleged time

9    that the search was done.

10          THE COURT:  Yeah, but who cares what it revealed then

11   or now, it's the probativity of it.  I assume the Government's

12   position is that the Defendant made such a search at all.

13          MR. NIETO:  And I suppose, Your Honor, in -- as we're

14   endeavoring to determine what was the intent, right, what was it

15   that he was searching, was he looking for prurient materials or

16   not, being able to recreate that to see where it would take us,

17   I thought, was an important factor in that analysis.  And I'm

18   simply telling the court that I cannot recreate these searches

19   to provide the court some additional context on that.

20       But primarily, what our main issue here, Your Honor, is

21   that it's a concern of -- in that if Mr. Bendann is attracted to

22   members of the same sex --

23          THE COURT:  Yeah.

24          MR. NIETO:  -- that these searches brush upon that

25   desire, that attraction.

1          THE COURT:  Yeah.  And many that are listed here, in

2   my mind, would be inadmissible for exactly that reason.  I think

3   what we're going to have to do though is go through this lengthy

4   document that the Government has submitted to me and rule on

5   them one at a time.  And I don't think it's going to be that

6   hard to make the call.

7          MS. MCGUINN:  Your Honor, as to anything that

8   specifically without the word boy in it says the word gay, or

9   there would be any argument that that is what the Government's

10  trying to illicit or make, quote/unquote, some sort of bad act,

11  that's clearly not our place.

12      So, for example, the second search that's listed, I would

13  agree, sure, that is not necessarily relevant, it doesn't have

14  the word boy in it, that's fine.

15         THE COURT:  I think the simplest approach on this is,

16  relatively quickly I can go down the list and tell you which

17  ones are going to presumably be admitted.  And if I don't name

18  them then don't offer them.

19         MS. MCGUINN:  Okay.

20         THE COURT:  Are you ready?

21         MS. MCGUINN:  Just a moment, Your Honor.

22         MR. NIETO:  May I sit?

23         THE COURT:  Mr. Nieto, I don't want to cut you off,

24  did you have anything else or did we basically cover it?

25         MR. NIETO:  Court's indulgence.

```
1              THE COURT:  Yes.

2              MR. NIETO:  No, Your Honor.  Thank you.

3              MS. MCGUINN:  Just so I know, are you going to list

4    which ones are admissible or not?

5              THE COURT:  These are the ones that are presumably

6    admissible, if I don't make it onto my list now don't offer them

7    because they are excluded.

8              MS. MCGUINN:  Yes, sir.

9              THE COURT:  Okay.  And I'm looking at the Government's

10   Exhibit A, Google searches, document 101-1.

11             MS. MCGUINN:  So the unredacted one, because the ones

12   you see redacted include the victim's name which would clearly

13   be relevant.

14             THE COURT:  I need the unredacted version -- I've got

15   the redacted version up here -- since I'm going to be ruling as

16   to inclusion instead of exclusion.

17             MS. MCGUINN:  Thank you.

18             THE COURT:  Do you have another copy of the unredacted

19   version?

20             MS. MCGUINN:  I do.  I have some highlights on it but

21   I'm happy to give it to you.

22             THE COURT:  Show it to Mr. Nieto so he can see what

23   the highlights are.

24             MS. MCGUINN:  Just some of the ones I wanted to bring

25   to Your Honor's attention.  It's a front and back document.
```

```
 1   Give me a minute to pull up a copy myself, please.
 2              THE COURT:  Yes.  Have you publicly disclosed the
 3   initials of the minor victim such that I can safely refer to
 4   them in open court or I should not?
 5              MS. MCGUINN:  If you could just say minor victim, Your
 6   Honor, we have not disclosed that and since he hasn't testified
 7   yet.
 8              THE COURT:  All right.  So these are the ones that I
 9   rule come in:
10        Naked blonde boys.
11        Lovely blonde boy, et cetera.
12        Minor victim lacrosse.
13        Whatever this is, 67035 --
14              MS. MCGUINN:  Yes.
15              THE COURT:  -- minor victim.
16        Minor victim vine.
17        Vine, minor victim's first name.
18        Minor victim lacrosse.
19        The 6703035/minor victim.
20        Down near the bottom of the page, boys naked outdoors.
21        I'm on the second page now.  Teenboysmilk.com.
22        Naked boys in public.
23              MS. MCGUINN:  May I interrupt you for one moment?
24              THE COURT:  Yeah.
25              MS. MCGUINN:  The one that you see an astrological
```

1  sign, that happens to be minor victim's birth sign.  We would

2  ask to include that, I know that's not particularly obvious, he

3  seeking his astrological sign.

4          THE COURT:  Oh, yeah, yeah, yeah, yeah.

5          MR. NIETO:  And respectfully, Your Honor, to simplify

6  matters, that March -- I'm sorry, that astrological sign,

7  anything subsequent to that, that is, for our understanding,

8  after minor victim had turned 18, we do not have an objection to

9  these Google searches.

10         THE COURT:  Anything -- because it begins April 26th,

11 2019?

12         MR. NIETO:  Yes, Your Honor.

13         THE COURT:  You're saying that everything on the list

14 that is subsequent to that you do not object?

15         MR. NIETO:  Correct, Your Honor.

16         THE COURT:  All right.  Well, then I guess the way

17 this ruling needs to be worded is to say that those searches

18 that I've identified to this point, plus all on the unredacted

19 version of 101-1 beginning on April 26th, 2019, and thereafter,

20 are presumably admissible.  The presumption being based on the

21 assumption that proper foundation is otherwise demonstrated and

22 they're relevant in context.

23     And, Mr. Nieto, as to my ruling on the April 26, 2019,

24 searches and those that came after, that's without defense

25 objection.

1          MR. NIETO:  Correct, Your Honor.

2          THE COURT:  And the defense objection is only to those

3   that I have ruled are admissible prior to April 26th, 2019.

4          MR. NIETO:  Yes, Your Honor.

5          THE COURT:  Okay.  Does that take care of that issue,

6   Ms. McGuinn?

7          MS. MCGUINN:  Yes, Your Honor.  Thank you.

8          THE COURT:  If the clerk will hand this back.

9          MS. MCGUINN:  Thank you.

10         THE COURT:  All right.  Are there other motions in

11  limine?  13.

12         MS. MCGUINN:  I'm sorry, which one are you referring

13  to?

14         THE COURT:  Getting my own notes straight.  I think

15  we're onto 105 at this point.

16         MS. MCGUINN:  Oh, consent.

17         THE COURT:  Yeah.  The Defendant has not responded to

18  this.  I don't want to get into questions with the defense team

19  about what their strategies are, what their plans are, what the

20  defense is, et cetera, et cetera.  The Government is seeking to

21  preclude evidence and argument that would be in the nature of

22  proof of consent.  And they want the court to rule that anything

23  that the defense proffered or presented in that regard is per se

24  inadmissible, because in this sort of case, given the age of the

25  minor victim at the time of the relevant offenses, the matter of

1    consent is irrelevant.

2        First of all, is that the Government's position?

3            MS. HAGAN:  Yes, Your Honor.

4            THE COURT:  All right.  Refresh my memory about the

5    cyberstalking counts and the age of minor victim when those

6    events allegedly occurred.

7            MS. HAGAN:  The cyberstalking count, the time frame,

8    Your Honor, is after minor victim is over the age of 18 and it's

9    only the one charged count.  But the age of the minor victim, as

10   alleged in the cyberstalking count, is not relevant -- I'm

11   sorry, it's not an element to that particular charge.

12           THE COURT:  Right.  So let's -- does the defense want

13   to be heard on this question before I rule?  You don't have to

14   say anything if you don't want to, but on the, you know, the

15   question of whether the Court should bar the Defendant from

16   presenting evidence or argument of consent as a defense, or as

17   part of a strategy to undercut any of the Government's testimony

18   or evidence.

19           MR. NIETO:  Your Honor, we are aware of the legal

20   defense limitations and we would not be arguing that anyone

21   under the age of 18 is able to consent.

22           THE COURT:  The Government's motion is granted, 105,

23   but I think it really is just an explicit statement of the law

24   that applies in this environment.  So granted.

25       All right.  Is that it on motions in limine.  Ms. McGuinn?

```
 1            MS. MCGUINN:  Is Your Honor's question about what else
 2   might remain?
 3            THE COURT:  Yeah.
 4            MS. MCGUINN:  So, Your Honor, the only issue, I think,
 5   and I believe Ms. Hagan will be addressing it ultimately, is
 6   that Your Honor ruled -- provided an order as to the Defendant's
 7   109 and 112.  We wanted to flush out a little bit more on 112
 8   which has to do with the Defendant's allegations as to chain of
 9   custody.  We did, per Your Honor's order, did provide a witness
10   list.  We did provide a purported exhibit list.  As counsel
11   knows, we're still adding a few exhibits, but they have the
12   general view of things, including which witness is assigned to
13   which exhibits.
14        The reason being, is none of us want to start this trial on
15   the 21st, start to produce or publish videos and then all of the
16   sudden there's this objection.  So we just wanted to clarify
17   sort of -- we've provided certifications under the rules as to
18   the chain of custody, we've not received a hard and fast answer
19   one way or the other from the defense as to what objections they
20   might have to that.  So I think we wanted to -- although I
21   understand Your Honor's ruling, I think we wanted to understand
22   where we are so none of us are starting this trial and wasting
23   time and things of that nature.
24            THE COURT:  Mr. Nieto, Mr. Proctor, the chain of
25   custody through -- I guess is it all Google?
```

1       MS. MCGUINN:  No, Your Honor.  There's -- as one
2   example, there's an Apple chain of custody.  So a search warrant
3   was done at Apple.  Apple encrypts that information.  That's
4   de-encrypted by Quantico.  There's -- we have a certification
5   from the mechanical engineer at Quantico as to that they're
6   exact same files with the exact same EXIF data found on the
7   Defendant's laptop.  So it goes to, obviously, the weight not
8   the admissibility.  So we just wanted to understand --
9       THE COURT:  All right.  Well, I think that you're
10  entitled to rulings in advance from the Court, to the extent
11  that I can make them, just to make the trial as efficient as
12  possible.  So let's hear the chain of custody issues.
13      Please proffer how you plan to prove chain of custody with
14  respect to the different pieces of electronic evidence and the
15  different companies that are involved, what's encrypted, what's
16  not encrypted, who decrypted it.  And to the extent that you're
17  planning to rely on certificates as opposed to the testimony of
18  live evidence -- or live witnesses, you should make that all
19  explicit now.
20      And then I'll turn to the defense and ask them whether they
21  object to the admission of these exhibits on chain of custody
22  grounds in particular.  It's not -- you're not going to be asked
23  to take a position at this point on relevancy but, you know, I'm
24  going to ask for any objections on chain of custody and then
25  rule, at least as to that issue, so that the Government knows

1  what it is that they need to present for there to be an adequate

2  foundation for admission of the exhibits, or at least knows what

3  they need to try to accomplish that.

4        Defense counsel understand what I'm saying?

5            MR. PROCTOR:  Yes, Your Honor.

6            THE COURT:  All right.  So let's hear the proffer.

7  How are you going to do it?

8            MS. HAGAN:  As a preliminary matter, as my

9  understanding from counsel shortly before we started this

10  morning, that if minor victim was testifying that they did not

11  have an objection to the Government introducing certifications

12  that we have provided that outline the process in which devices

13  and information was obtained in this case.

14            THE COURT:  On the theory that minor victim is going

15  to, himself, authenticate the evidence?

16            MS. HAGAN:  I don't know what their theory was, but

17  that was -- my understanding was that they --

18            MR. PROCTOR:  Absolutely.

19            THE COURT:  Okay.  Well, you've already indicated that

20  minor victim is going to testify during the Government's case in

21  chief.

22            MS. HAGAN:  Yes.

23            THE COURT:  Will he also be an authenticating witness

24  with respect to these communications?

25            MS. HAGAN:  Yes.

1          THE COURT:  All right.  In light of that, does the

2    Defendant acquiesce in the chain of custody as demonstrated by

3    the certificates that have been provided by the Government in

4    discovery?

5          MR. PROCTOR:  A video is just like a photograph.  If

6    minor victim is shown that video and says, that's me, I

7    recognize it, there is no --

8          THE COURT:  Then you don't care where it came from.

9          MR. PROCTOR:  What we were trying to avoid, and what

10   the motion in limine was designed to do was to prevent an end

11   run around that.  So if he testifies and authenticates the video

12   and confirms it's him in it there is no chain of custody.

13         THE COURT:  Well, what with other records, like Google

14   searches?

15         MR. PROCTOR:  Google searches.

16         THE COURT:  He won't know anything about that.  That's

17   going to be the Google company saying we were served with a

18   search warrant, we checked our records, this is what we

19   supplied.

20         MR. PROCTOR:  A lot of them are also on my client's

21   computer that was analyzed, so I believe an agent could testify,

22   I checked the hard drive of his computer, I found these

23   searches.  In which case, you don't need anyone from Google

24   because they were located -- like if you searched my house and

25   you find something in my drawer, it's almost like that with the

```
1   Google searches.  The person who finds it when they check the
2   hard drive can testify to it.
3               THE COURT:  Well, Ms. Hagan, you have to tell me
4   whether or not you're satisfied.
5               MR. PROCTOR:  I do not need someone from Google to
6   come here, if that's what you're asking.
7               THE COURT:  It's not exactly what I'm asking.  What
8   I'm asking is whether you're going to object if there isn't
9   somebody here from Google.  And I'm, you know, Mr. Proctor,
10  you're -- in the role that you're in you have a lot of
11  responsibilities to balance.  What I infer is that you're
12  signaling the court that provided the Defendant testifies in
13  person your strategy --
14              MR. PROCTOR:  The victim.
15              THE COURT:  Excuse me.  Provided the victim testifies
16  in person, your strategy is not about trying to defeat evidence
17  that is presented to the court on a chain of custody theory.
18              MR. PROCTOR:  Mr. Nieto has already made all the
19  arguments we're going to make with regard to the Google
20  searches.  We have no additional arguments.
21              THE COURT:  All right.
22              MS. HAGAN:  Can I just address one other matter that
23  they raised, Your Honor.
24              THE COURT:  Yeah.
25              MS. MCGUINN:  In ECF 112, the example that was
```

1   provided in their motion in limine objecting to images being

2   introduced, absent an admissible chain of custody, pertain to

3   the search warrant return from Apple.

4        And as the defense alleged, they've never been able -- this

5   is quote, "They've never been able to see the data in its native

6   format as provided by Apple."  And as they briefly outlined in

7   their motion in limine, certain de-encryption process occurred

8   at Quantico but they didn't actually get to see the native

9   files.

10       There were -- I just want to place on the record that there

11  were five separate dates by which the defense was permitted to

12  meet with the agents and review the Apple return in response to

13  that search warrant.  On two of those occasions the defense had

14  present their computer expert who also had an opportunity to

15  review the materials from that search warrant returned from

16  Apple.  At no point in time was there ever a request of the

17  Government to actually observe the native files before the

18  de-encryption process occurred at Quantico.  This was the first

19  time we had seen an allegation in their motion in limine that

20  they've never had an opportunity to see that.  They never

21  requested that.

22            THE COURT:  Well, is the encryption and decryption in

23  relation to images?

24            MS. HAGAN:  Yes.  But those images were also found on

25  one of Mr. Bendann's devices; the exact same images that contain

```
 1   the exact same EXIF data.  And one of the certifications that

 2   the Government has provided to counsel, from a program manager

 3   at Quantico, explains the process, this de-encryption process

 4   that that information goes through once it is sent from Apple to

 5   the FBI.

 6            THE COURT:  Mr. Proctor, do you persist in any

 7   objection to the admission of any of the electronic evidence in

 8   this case -- images, videos, or texts -- on the ground that the

 9   Government has not sufficiently demonstrated a chain of custody

10   and sufficiently, credibly explained that the evidence remains

11   intact and has integrity despite the fact that it was encrypted,

12   decrypted, et cetera.  Do you --

13            MR. PROCTOR:  Again, provided minor victim testifies

14   and authenticates it we have no additional objections to make.

15            THE COURT:  So, Ms. Hagan.

16            MS. HAGAN:  Your Honor, the Government has provided

17   certifications under 902(14) establishing the authenticity of

18   the processes that were used to download the information from

19   both victim's devices as well as the information from Apple.

20            THE COURT:  Are those certificates sufficient,

21   Mr. Proctor?

22            MR. PROCTOR:  With a testifying -- again, I hate to

23   split hairs.  With a testifying witness in place they're amply

24   sufficient.

25            THE COURT:  All right.  Ms. Hagan, are you satisfied?
```

```
1              MS. HAGAN:  Yes, Your Honor.  I mean, the Government's
2    position is that even without --
3              THE COURT:  I understand that completely --
4              MS. HAGAN:  -- but yes.
5              THE COURT:  -- but that's not where Mr. Proctor is
6    prepared to go.  But he is prepared to say that if minor victim
7    is going to testify then he has no objection because he believes
8    it would be futile.
9         Fair enough, Mr. Proctor?
10             MR. PROCTOR:  Yes, sir.
11             MS. HAGAN:  Your Honor, I mean, it's their motion,
12   Your Honor.  We believe we've established that we can meet the
13   authenticity requirements to introduce these materials.  We do
14   intend to have --
15             THE COURT:  How about this.  Are you prepared to
16   withdraw the motion without prejudice to your presenting it
17   later if minor victim doesn't testify?
18             MR. PROCTOR:  Absolutely.
19             THE COURT:  All right.  It's withdrawn.
20        All right.  Anything else on motions in limine?
21             MS. MCGUINN:  No, Your Honor.
22             THE COURT:  All right.  Mr. Nieto?  Mr. Proctor?
23             MR. NIETO:  Court's indulgence, very briefly.  My
24   apologies.
25             THE COURT:  Yeah.
```

1              MR. NIETO:  Nothing additional, Your Honor.

2              THE COURT:  Thank you.

3         Let's talk for a minute about logistics related to what

4    I'll call sensitive exhibits.  I take it that during the course

5    of the trial the Government plans to present in evidence images

6    that are pornographic.

7              MS. MCGUINN:  Yes, Your Honor.

8              THE COURT:  And that are graphic.

9              MS. MCGUINN:  Yes, Your Honor.

10             THE COURT:  So, obviously, we have to strike the right

11   balance in terms of how we present that evidence to the jury and

12   place it before witnesses who need to identify it and so forth.

13   But I don't think it's necessarily the case that images of that

14   type need to be displayed on the big screen in the courtroom

15   like every other exhibit during the course of trial.

16        What's the Government's position?

17             MS. MCGUINN:  So, Your Honor, counsel and the

18   government -- counsel for the defense and the government

19   conferred prior to being here.  The main pieces of evidence are

20   the first five counts, which actually there's five counts, it's

21   about eight videos.  The Government has, we use the word trimmed

22   those videos.  One, for example, is ten minutes, we've trimmed

23   it down to about three.  The reason, some of it -- some of it is

24   longer than we might even need, but there are conversations

25   between minor victim and the Defendant that we didn't feel

```
 1   comfortable cutting unless the defense agreed because that might
 2   be some sort of argument for them.  We just looked at all of
 3   them in our office.  My understanding is there's no objection to
 4   the Government introducing the full but only publishing these
 5   trimmed counts, or these trimmed videos, eight of them.
 6        We have also all agreed that, obviously, this would not be,
 7   in the interest of privacy interests and certainly in compliance
 8   with the statute, that they would not be on display to the
 9   audience.  The jury would obviously need to see them, Your Honor
10   would need to see them.  And defense counsel has actually been
11   kind enough to agree that we would even turn these monitors this
12   way so that only the parties can view when we get to that
13   portion.
14        It is the Government's contention at this point that those,
15   for example, minor victim will be shown some still photographs
16   that match those videos so as to not re-victimize him and
17   re-play the videos through him.  We will play the videos, or
18   publish the videos actually through Agent Walker when we get to
19   that point in the trial.  That's the Government's position.
20        She may testify before minor victim because of some time
21   issues, but the Government -- minor victim has, like I said, has
22   been shown stills and will corroborate that those, you know,
23   that is him and those stills match the videos.  That's how we
24   plan to do them.
25             THE COURT:  Is there going to be any issue about their
```

1  admissibility through the agent when the minor victim hasn't

2  testified first, or is defense counsel going to be content to

3  see if the Government can connect it all up before they rest?

4          MR. PROCTOR:  There would not be an issue provided he

5  comes.  The issue is going to be if he doesn't come then we'll

6  be moving for a mistrial, in all candor.

7          MS. MCGUINN:  We have no belief or intention of not

8  calling him at this point.  As I've indicated to counsel, my

9  only concern has only ever been the well-being of minor victim.

10 And so we are intending to call him.  He's been served with a

11 subpoena, he knows.  It was just more of a timing with other

12 witnesses' schedules and things as to when he might go.

13         THE COURT:  Got it.

14    All right.  So court staff are on notice that we'll have to

15 make special arrangements in terms of how our monitors are

16 operating.  We'll need notice from the Government.

17         MS. MCGUINN:  Yes, Your Honor.

18         THE COURT:  And from the Defendant if these kinds of

19 events are going to occur during a defense case.  We need notice

20 in advance to the courtroom deputy clerk that the party plans to

21 present this sort of graphic, visual evidence in the next

22 portion of the trial, the next witness, whatever, so that the

23 court has ample opportunity to take the steps that are necessary

24 and appropriate.

25         MS. MCGUINN:  Relatedly, Your Honor, Agent Walker will

 1  have her own laptop.  I believe that Your Honor has seen this

 2  before.  She will have her own laptop and she will be the one

 3  holding that evidence and playing that evidence because her

 4  laptop doesn't connect to the internet and all those

 5  precautions.

 6       When we get to that portion, obviously I agree, and the

 7  Government agrees to give Your Honor and the courtroom deputy

 8  notice, we will need to switch which computer is displaying.  We

 9  did this a year ago with Judge Russell, it went relatively

10  smoothly switching which laptop as opposed to our laptop was the

11  source of the publishing.  The other, I guess, somewhat related

12  issue there --

13       THE COURT:  The tricky part of that is you typically

14  have to do that from the podium to connect in to our system.

15       MS. MCGUINN:  So I know we did -- again, I know we did

16  this in Judge Russell's courtroom, and Mr. Budlow and I did that

17  together and I just am blanking at the moment, but I will

18  re-learn how we did it.

19       THE COURT:  Yeah.  If it can possibly be done from the

20  table that's better.  And keep in mind that people are sitting

21  behind agents.

22       MS. MCGUINN:  That's why if the agent has the laptop

23  up there with her -- and I'll work with the courtroom deputy,

24  and it was Ms. Klein who helped us in Judge Russell's trial, and

25  I'll get her number beforehand, maybe we'll come Monday, Tuesday

1    before trial and make sure it works.

2            THE COURT:  That's where I was going, because there

3    needs to be a rehearsal of methods and techniques.  And defense

4    counsel is perfectly free to be present while all of that is

5    being sorted out between the Government and the courtroom deputy

6    in terms of how this is all going to actually happen.  But the

7    right balance has to be struck and we have to get it right.

8            MS. MCGUINN:  Yes, Your Honor.

9        And relatedly, the Government intends to introduce a

10   handful of other videos that make up the cyberstalking count.

11   In theory, minor victim, in some of those, is technically an

12   adult.  But again, out of privacy concerns, and given this

13   started when he was a minor victim, we would ask that those be

14   treated in the same respectful manner, in that I do not believe

15   that an audience needs to view anything of that nature.

16           THE COURT:  What's the defense position?  Any

17   objection to our handling the, what I'll call the adult

18   electronics in the same way as the juvenile data?

19           MR. PROCTOR:  No, Your Honor.  The concern I always

20   have is that somehow flagging for the jury the prejudice, like

21   we've taken all these extreme steps because --

22           THE COURT:  We'll do our best to conceal from the jury

23   that any of this is actually going on.  As far as the jury is

24   concerned they're just seeing images that are coming up on their

25   monitors.  And the fact that the large monitor in the back of

```
 1   the courtroom is blank shouldn't be known to the jurors.
 2                MR. PROCTOR:  Agreed.
 3                MS. MCGUINN:  I don't think they need to know that.
 4   But I think even to the extent that they might, I think it's
 5   pretty obvious, in the nature of it, that there's certainly
 6   privacy and decency concerns.  But we will not necessarily
 7   address that with the jury.  I agree they don't necessarily have
 8   to know that, but if they --
 9                THE COURT:  Nobody is going to highlight it.  No one
10   is going to call attention to it.
11                MR. PROCTOR:  I've got no interest in the wider public
12   who have a right to be here and witness, but they certainly
13   don't have a right nor should they see images of a graphic
14   nature.
15                THE COURT:  Well -- right.  Or the videos of texts of
16   a graphic nature, which I assume is part of the cyberstalking
17   proof.
18                MS. MCGUINN:  Yes, there's some of those.  And we have
19   ways that we've handled that as well, Your Honor.  And so we
20   will make every precaution and we'll certainly do a dry run.
21                THE COURT:  All right.  Are we planning to use JERS in
22   this trial?
23                THE CLERK:  No, Your Honor.  We're not permitted to
24   use JERS given the nature of the charges.
25                MS. MCGUINN:  So that said, does Your Honor want your
```

1   own binder of all the PDF's?

2         THE COURT:  I'll have to have it because we're not

3   using JERS.

4         MS. MCGUINN:  Yes, sir.  And we will -- we are working

5   -- I have a thumb drive for counsel to give them digital copies

6   but we'll make them a hard copy as well.

7         THE COURT:  Okay.  Let's see if we can make some more

8   progress here.

9     Where are we on the witness lists?  Is the Government's

10   witness list ready?

11         MS. MCGUINN:  Yes.  We turned it over yesterday or the

12   day before.

13         THE COURT:  Very good.  Is the Defendant planning to

14   supply a witness list or not?

15         MR. NIETO:  Your Honor, yes.  We will definitely

16   supply one before trial.  It's a work in progress currently.

17         THE COURT:  Well, you're not required to do so, but if

18   you're able to do so without prejudice to your client,

19   obviously, it helps the trial to move a little bit more

20   smoothly, and it also allows me to voir dire.

21         MR. NIETO:  For the voir dire, absolutely.

22         THE COURT:  But you're not required to.

23     Exhibit lists?

24         MS. MCGUINN:  We handed a working copy to the defense

25   yesterday.  Almost everything of substance is on there.  There's

1  a few exhibits that we might sub out, they're summary exhibits.

2  They have notice of everything else though.

3          THE COURT:  All right.  So I'm not picky in terms of

4  how exhibit lists are assembled.  I don't care whether you use

5  numbers or letters or combinations thereof.  All I require is

6  that it be coherent and logical.

7          MS. MCGUINN:  Yep.  Yes, sir.

8          THE COURT:  Okay.  And I would like to receive the

9  exhibit list before the morning of trial.

10         MS. MCGUINN:  Oh, yes.  I think we should -- we

11 anticipate labeling everything this coming week, and we'll

12 provide hard copies to the court, to counsel, and an exhibit

13 list with numbers.

14         THE COURT:  Let's go over the jury selection process.

15 I think I've picked a jury with almost all the lawyers in here,

16 but things have changed slightly since COVID.

17     The procedure I will follow is that the voir dire that you

18 have and that you've now -- both sides have approved and neither

19 has any objections, we'll now convert that into a document that

20 looks like an answer sheet.  It has a space underneath every one

21 of those questions where a person can scribble an answer or

22 notes to themself and so forth.

23     And then when the jury selection process begins, the venire

24 will be brought into this courtroom.  Actually, we're going to

25 pick the jury downstairs in the ceremonial courtroom.  So that's

1  where we'll be at the start of this trial so that we can
2  accommodate the number of jurors, and any members of the press
3  or public that may wish to attend.  So the jurors will be in the
4  courtroom occupying the lower half of the gallery, and some in
5  the jury box as well.  I'm expecting to bring about 70 to 75
6  jurors in for this.
7       We will begin by my picking up the voir dire questions, and
8  then each of the jurors will have a clipboard and their own
9  answer sheet which consists of all of the questions with a space
10 to provide an answer.  And then I will slowly go through all of
11 the questions, with the jurors being given an opportunity to
12 mark a yes or no answer on their form and then scribble a note
13 which will, perhaps, help to jog their memory if they had a yes
14 answer.  We'll get through that entire process, whatever it is,
15 35, 40 questions, and then the jurors will turn in their
16 respective answer sheets to the courtroom deputy clerk and leave
17 the courtroom and go next door to Courtroom 1B where court staff
18 will sit with them.  And then they will be brought back into the
19 ceremonial courtroom and seated in the jury box one at a time.
20      In addition to the parties and the court, the public and
21 press are still present in the ceremonial courtroom and can
22 follow and hear what's transpiring if they wish to, only the
23 other jurors have been excluded from that event.  And then we'll
24 start through the answer sheet with each respective juror,
25 focusing only on those questions to which they have indicated a

1    yes answer.  And then I will develop that yes answer with them,

2    perhaps with the aid of notes that they have scribbled on their

3    answer sheet.

4        Some of the questions that we're going to be asking

5    potential jurors in this case will perhaps touch upon sensitive,

6    private matters.  And in the Court's discretion I expect that

7    sometimes I will clear the gallery and determine that that

8    portion of the voir dire should occur only with the court and

9    parties able to hear.  Of course, it will be on the record.

10    That's very similar to what happened in the old days when we

11    took up some questioning only at the bench and with others in

12    the courtroom not able to hear, and that's the appropriate way

13    to handle sensitive matters.  But, more generally, their yes

14    answers to questions that don't touch on such sensitive subjects

15    will be explored in open court.

16        Counsel will have electronic devices, earphones and the

17    capacity to speak into a microphone in private.  And so when I

18    have finished the initial, at least, voir dire of the person,

19    I'll ask whether counsel have any further questions that they

20    want me to ask.  And if they do, I'll hear your suggestion and I

21    might or might not follow-up and ask the question, or some

22    version of the question that you've asked.  And then, once I

23    finish that, if counsel have objection to the potential juror

24    for cause they need to interpose that objection at that moment

25    and I will rule on it at that moment.  Again, all on the private

1   channel.

2          And once I've ruled, if the juror is to be excused for

3   cause I'll excuse them right there on the spot, they'll depart.

4   Or I'll deny motion to excuse them for cause, in which case they

5   stay in the pool and they return to Courtroom 1B and we bring in

6   the next person and we continue in this manner until we reach

7   our magic number.

8          I'm going to pick four alternates in this trial.  So we

9   need 12 plus four, plus ten peremptories for the Government,

10  plus six peremptories for the Defendant, plus two alternate

11  peremptories for the Government, plus two alternate peremptories

12  for the Defendant.  Magic number of 36; does that sound right?

13         Okay.  So we go through this process.  We've got 70, say,

14  potential candidates to serve on the jury.  As soon as we've got

15  36 who have not been excused for cause and have been voir dired

16  we stop, and then you exercise your challenges against those 36.

17         The way it actually works is that the courtroom deputy will

18  count down from the top of the list of names that are still on

19  the list, and she'll come down in the first instance, is it 32?

20              THE CLERK:  Yes, Judge.

21              THE COURT:  She'll draw a line after the 32nd name

22  that's still on the list, and then you're to exercise your 10

23  peremptory challenges for the Defendant, six for the Government.

24  I might have misspoken a moment ago, let me correct that for the

25  record.

 1              MR. NIETO:  Thank you, Your Honor.

 2              THE COURT:  That land mine no longer exists on this

 3  record.

 4              MR. PROCTOR:  I knew what you meant, Judge.

 5              THE COURT:  Yeah.  I'm not sure the Court of Appeals

 6  would have.

 7         Ten challenges for the Defendant, six challenges for the

 8  Government.  Let me make that completely clear, and what I said

 9  previously is stricken.

10         Okay.  So we've got 32 names.  Against those 32, the

11  Defendant will exercise their ten, the Government will exercise

12  their six.  Provided that both sides use all of their

13  challenges, and provided that you don't strike any of the same

14  jurors, we will -- the magic number is 28.  I added the first

15  four again.  12 plus ten, plus six.  Okay.  So that when the 16

16  have been challenged that will leave us with 12 jurors.  All

17  right.

18         Let me recapitulate since I fouled that up on the

19  arithmetic.

20         You will exercise your ten and six challenges respectively

21  against the first 28 names that are still on the list, coming

22  from the top down after the jurors have been excused for cause.

23  28 is the magic number.

24         Then you'll exercise your peremptory challenges against

25  alternates against the names that begin with the 29th name

1    that's still on the list and continue down to the 36th name

2    that's still on the list.  That's eight more names.  And if both

3    sides exercise all of their challenges that will leave exactly

4    four jurors to serve as alternate jurors.

5        What happens, you ask, if a party doesn't use all of their

6    peremptories?  Or if both sides do use all of their peremptories

7    but happen to challenge one or more of the same jurors?  Well,

8    the consequence of that as to the first section is that once all

9    of the peremptories are exercised there will still be more than

10   12 names above the line on the list.  So who among those 12

11   serve as the jury?  It's the first 12 as you come down from the

12   top of the list.  If there are extra names it's people at the

13   bottom who do not serve on the jury.

14       The same applies with respect to the peremptories exercised

15   against the alternates.  It's the first four names that remain

16   on the list that are selected to serve as the alternates even if

17   one or more parties didn't use all of their peremptories, or

18   even if there was a double strike.

19       All right.  The last scenario that has to be addressed is

20   what happens to the people who are still on the list, they were

21   not some of the first 12.  They're not among the 12 names that

22   were picked to serve as the jury but they were extra names

23   before we got to number 28 because not all of the peremptories

24   were exercised.  Are those people eligible to serve as alternate

25   jurors?  The answer:  No, they drop out entirely.  We start over

1  with the 29th name when we're considering who to select as

2  alternates.  We pay no regard whatsoever to names that might

3  have been left and not used among the first 28.

4      Government clear on how we're going to pick the jury?

5          MS. MCGUINN:  Yes, Your Honor.  Thank you.

6          THE COURT:  Defendant clear, Mr. Nieto?

7          MR. NIETO:  Yes, Your Honor.

8          THE COURT:  Keep this in mind.  There will be two

9  versions of the jury list that are supplied to you.  One will

10 include some identifying and demographic data with respect to

11 the venire persons, the other list will only have juror numbers

12 on it.  Make sure that you make your notes on the list that only

13 has juror numbers if you want to keep your list.  Because at the

14 end of the voir dire process the court will collect the versions

15 of the list that have the names and the demographic data.  You

16 will not be permitted to keep that version of the list.  Most

17 lawyers like to keep their notes; put your notes on the other

18 list, the one that only has juror numbers.

19     So I instruct jurors in what I call the old way, which is

20 at the end of evidence counsel will deliver their closing

21 arguments; opening for the government, defendant's closing,

22 government's rebuttal.  Once all of that has been completed,

23 then I instruct the jury.

24     When you're arguing to the jury please do not argue in the

25 first person.  It's, per se, unethical.  I believe, I saw, I

 1  heard, I think, it's all improper.  The evidence showed, the
 2  testimony was, Mrs. Jones said, that's all proper.  Just don't
 3  argue first person; I think, I believe, I saw, I heard.
 4  Everybody slips, and I'm not going to interrupt you the first or
 5  maybe even the second time.  It happens.  But if it becomes how
 6  you're arguing the case I'll stop you.
 7        Okay.  We're not using JERS.
 8        All right.  When you're examining witnesses in trials in my
 9  courtroom you have certain options.  You can conduct the
10  examination from the podium with the evidence presenter, with
11  the document camera.  Obviously, you'll be on your feet if
12  you're operating in that fashion.  You can stand at your table
13  and conduct the examination from there.  And consistent with
14  longstanding Maryland tradition, something that I wasn't
15  familiar with until I came here, that you can actually sit at
16  your table if that's how you're most comfortable examining the
17  witness.  The only time you're addressing the jury or the court
18  you've got to be on your feet.  But some people are more
19  comfortable sitting during examination.  And if you want to do
20  that I'll permit it.
21        What you can't do is walk around the courtroom.  You can't
22  do the Perry Mason stuff, walking up to the witness stand and
23  slapping papers down in front of the person.  On the other hand,
24  if you have some obvious, logical reason why you need to
25  approach the witness, because we're working with an exhibit

```
 1   that's not on the monitor and you've gotten permission to show
 2   the exhibit, then you can just walk up there.  You don't have to
 3   ask for permission to approach the witness.
 4        That said, never approach the jury box.  If for some reason
 5   something needs to be published and we're not doing it on the
 6   screen, like there's an object or something like that, just ask
 7   that it be published and the courtroom deputy will take the item
 8   from you and she will publish it to the jury box.  She'll pass
 9   it down one row and then pass it down the other and recover it
10   at the other end and bring it back, but the lawyers don't have
11   any contact with the jurors in here.
12        Jury argument to include opening statements and closings
13   will be made from that standing desk which will be rolled over
14   to that utility box which you can see in the floor.  That's the
15   position from which you'll make both openings and closings.
16        And your exhibits, to the extent that your colleague is
17   pulling them up, or PowerPoint, whatever, you'll be able to see
18   it from the screen that is down there to your left and, I think,
19   is obvious to all of you.  Works pretty well.
20        I do expect that counsel in presenting exhibits will use
21   the document camera system to the full extent possible and that
22   we won't be shuffling paper around.  I think at this point
23   everybody is very familiar with that and even more comfortable
24   with that.  So please plan to do that.
25        Please keep this in mind.  It's okay to quote briefly from
```

Pretrial Conference 08/09/2024

 1  jury instructions during your closing arguments, but I don't
 2  permit you to put up a whole jury instruction as an exhibit and
 3  then go through it with the jury.  I will instruct the jury at
 4  the end.
 5       Now, it can be that a particular part of an instruction is
 6  very important to your case or whatever and you want a segment
 7  of a jury instruction up there as part of your PowerPoint,
 8  that's fine, but just don't turn it into you're instructing the
 9  jury and then I instruct the jury.
10       Okay.  So there's a little bit of a problem in this
11  courtroom, and all of our courtrooms except the ceremonial
12  courtroom downstairs, with respect to the basic size of the
13  courtroom.  And there's no alternative to placing the
14  government's table where it is.  On occasion there have been
15  problems when the whispering between government counsel and
16  their agents, or between the lawyers at the government table is
17  loud enough that people in the end of the jury box, in say the
18  number 8 seat, can hear what's going on at the government table.
19  You just have to be mindful of that.  I apologize for the
20  architecture of these courtrooms, they're too small.  But this
21  courthouse was built during the austere fiscal times in 1970's
22  and they built all the courtrooms about 15 percent below the
23  size that the design guy said they should be built, and we've
24  been living with that ever since.  You have to be mindful of
25  that at the government table, and I'll be watching for it as

1    well.

2        It's not usually a problem, and then something happens like

3    you're missing an exhibit and you're telling the agent to go get

4    it and so forth, and all of the sudden that whispering can be

5    heard.  None of the lawyers with whom I've had that problem

6    chronically over the last 30 years are in this case, although

7    one or two of them do remain on your staff.  Please keep it in

8    mind though.

9        All right.  We're not going to have any firearms in this

10   trial.  We're not going to have any ammunition.

11       Okay.  The typical trial day is we try to start at 9:30.

12   We try to end in the 5:00 to 5:15 time frame.  Hour and 15

13   minutes for lunch typically.  Morning and afternoon breaks of 15

14   minutes each.  Bear all that in mind as you're scheduling your

15   witnesses.

16       I think I already indicated that we will sit on Fridays in

17   this case, which is not my normal practice but we're starting on

18   Wednesday, and the hope is to complete the trial before the

19   Labor Day weekend but that might not happen and we're going to,

20   as you saw from the voir dire, specifically tell the potential

21   jurors that the expected length of the trial is about two weeks,

22   that we won't sit on Labor Day.  And the implication is, you

23   know, if it continues into the Labor Day weekend we'll just pick

24   up on the Tuesday after Labor Day.

25       To the extent that you plan to use any demonstrative aides

1  in either your opening or your closing, by that I mean

2  PowerPoint slides or other shots of evidence or whatever, please

3  make sure that you've shown them to your opponent in advance.

4      Do we have any stipulations that are ready for submission

5  or attention at this point?

6          MS. MCGUINN:  Not yet, Your Honor.

7          THE COURT:  Will there be some?

8          MS. MCGUINN:  I don't believe there will be.

9          THE COURT:  Okay.  If there are, and if you can get

10  them to the court before the first day of trial that's

11  appreciated, but if that's not possible, make sure that you call

12  my attention to them on the morning that the trial is scheduled

13  to begin.

14      One moment.

15      Last question.  Mr. Smolkin appears on the docket.  Will he

16  be participating in the trial?

17          MS. MCGUINN:  No, he will not, Your Honor.  I'll ask

18  him to strike his appearance.  I know he's been meaning to.

19  That was, again, last year when we were in a different posture

20  he was maybe going to have to be in, so I'll ask him.

21          MR. PROCTOR:  Can I raise -- I don't have an objection

22  to the voir dire, I already said we don't.  I guess my point,

23  and I don't have strong feelings if you say we're doing it that

24  way, fine, certainly not an objection.  But what always seems to

25  happen is we spend ten minutes with a prospective juror talking

1    how their uncle is an FBI agent, and then another ten minutes

2    talking about how they were on a hung jury in Howard County.

3    And we get through all that and then we get to question 30 and

4    they say they have a nonrefundable trip to Aruba the day after

5    tomorrow.

6              THE COURT:  I don't know if I've had this conversation

7    specifically with you before, Mr. Proctor, but here's the

8    problem with that issue.  I've wrestled with that too.  But, in

9    my experience, if you start out with is there any reason why you

10   don't want to sit on this jury, and that's the first question

11   that they get hit with, they are very quick to come up with

12   trips to Aruba, they're ill, they've got hearing problems,

13   they've got to take their dog to the groomer, et cetera.  But if

14   you save that question until after you've gotten through

15   everything else, it conveys the significance and the import of

16   what's going on, and they're less likely to start the frivolous

17   stuff in terms of trying to get out of sitting.

18        So I have struggled with that question myself and been just

19   as frustrated as you that hey, we just spent 20 minutes with

20   that juror and now they've got the plane tickets or whatever

21   else.

22             MR. PROCTOR:  Yes, sir.  I don't know what the answer

23   is.

24             THE COURT:  I don't know what the answer is either.

25   And, you know, so far I've decided that I'm sticking to this

1   approach.

2           MR. PROCTOR:  Yes, sir.

3           THE COURT:  But I grant the significance of the point.

4       Is there anything else from the Government?

5           MS. MCGUINN:  Two minor points, Your Honor.  One, and

6   I believe we broached this with defense counsel.  Minor victim's

7   mother and father are going to testify, they're presumably going

8   to be the first and second witnesses.  They would like to, per

9   the statute, remain in the courtroom as the representatives of

10  minor victim for the remainder of the trial.

11      Defense counsel has indicated at this point that they do

12  not believe they would have any objection to that.  They do not

13  believe they would be subject to recall once their, you know,

14  direct and cross exam is completed.  I just wanted to alert Your

15  Honor to that.  For somewhat obvious reasons minor victim

16  himself does not want to sit through this entire thing so his

17  mother and father are going to act as his representatives.

18          THE COURT:  So my normal practice is to excuse

19  witnesses when they have finished their direct, cross, and

20  redirect, and I ask counsel for both sides if they may be

21  excused.  And if they're excused they're excused and they are

22  then free to sit in the courtroom or leave or do whatever it is

23  that they want to do.  And that's the practice that I would

24  expect to follow in this case.

25      You know, could there be a circumstance where the defendant

1    decides no, wait a minute, I want to call that person in my

2    case, I don't want to excuse them.  And then the government's

3    position is well, they're entitled to stay, then we're going to

4    have so sort that out as between any statutory rights that might

5    have been created by Congress and weigh those against

6    Constitutional rights that the defendant has to a fair trial,

7    and certain prophylactic measures that are taken to ensure the

8    integrity of the trial.

9         So I appreciate your alerting me to that.  Hopefully, the

10   issue won't present itself.  If we think there's some likelihood

11   of it, you know, you can sometimes address that by expanding the

12   scope of the testimony when they're on direct from the

13   Government.  You know, we, maybe by agreement, don't confine the

14   cross to the scope of that direct and let the defendant

15   essentially conduct their direct, too.

16             MS. MCGUINN:  Understood.

17             THE COURT:  That becomes a pretty successful way to

18   fix that problem.

19             MS. MCGUINN:  Understood.

20             THE COURT:  Let's see what happens.

21             MS. MCGUINN:  Thank you.

22        And the last point, Your Honor, this was also already

23   raised with defense counsel but I wanted to make Your Honor

24   aware of it.  In particular, as it relates to the cyberstalking

25   count, the Government has -- and one or two other witnesses as

```
 1  well, the Government has a series of text messages.  The entire
 2  document is several hundred pages long.  The Government
 3  anticipates introducing the document itself.
 4           THE COURT:  And that document itself going back to the
 5  jury.
 6           MS. MCGUINN:  Yes.  But only publishing certain pages
 7  or certain parts so that we don't spend all day showing the jury
 8  300 pages of texts.  We have broached with defense counsel --
 9  and myself and Mr. Budlow did this last year, we had an FBI
10  agent and actually Mr. Zelinsky in my office sit in the well of
11  the courtroom and read each part monotone as it went faster than
12  having the agent up there as we put page after page just of the
13  portions we intend to publish to the jury.
14      And we broached that and explained to counsel that we had
15  done this, and told them Ms. Newberger and -- I'm blanking on
16  who the other federal public defender was.  We had done this in
17  a trial with them, if they had any questions about what
18  happened.  And my understanding is there's not going to be an
19  objection to doing it that way.
20           THE COURT:  Who are you proposing as the actors?
21           MS. MCGUINN:  Same.  We would do the same people
22  because it went well and they both understood to not inflect and
23  simply speak monotone.  And that was Mr. Aaron Zelinsky of the
24  U.S. Attorney's Office and Agent Grace Meyer of the FBI.  There
25  is actually one --
```

```
1              THE COURT:  But are the people who are speaking in the
2   text both of the male gender?
3              MS. MCGUINN:  One is male, one is female.  If Your
4   Honor --
5              THE COURT:  No, I mean --
6              MS. MCGUINN:  In the text, I'm sorry.  Yes, Your
7   Honor, I'm sorry.  The text is both male so --
8              THE COURT:  I think that gets confusing.  I think you
9   should match -- attempt to match the genders of the actual
10  speakers.
11             MS. MCGUINN:  If that --
12             THE COURT:  What's the Defendant's position about
13  using essentially actors to read out the text in this way?
14             MR. NIETO:  Your Honor, we've had that done in other
15  cases without objection.
16             THE COURT:  It's pretty standard.  I just insist on it
17  being done in a way that is as non -- I don't want to draw any
18  attention to the fact that, you know, you have a woman reading a
19  man's part.
20             MS. MCGUINN:  I understand.
21             THE COURT:  So I would say get two men.
22             MS. MCGUINN:  Yes, sir.
23             THE COURT:  Okay.  That's how we'll plan to do that.
24  Give me advance warning before we set that up.  Obviously, we
25  have to configure the courtroom.
```

```
 1            MS. MCGUINN:  Yes.  Just for Your Honor's
 2   understanding, that comes much later.  We're sort of dealing
 3   with the sexual exploitation counts first and then the
 4   cyberstalking.  So for Your Honor's, I guess, mindfulness it
 5   comes a little later.
 6            THE COURT:  I think that's the folding table and the
 7   two chairs directly in the well, directly facing the jury.
 8            MS. MCGUINN:  Will we have a table behind us for our
 9   legal assistant to run our computer?
10            THE COURT:  You can if you want it.
11            THE CLERK:  Yes.
12            MS. MCGUINN:  Can we, please.
13            THE COURT:  Yes.  So now we have two folding tables.
14      The other thing you have to bear in mind is this monitor up
15   here, which can be seen from the gallery in terms of our other
16   issue, how are you going to turn that off at appropriate times,
17   not just the big monitor.
18            MS. MCGUINN:  Okay.  I think that's it, Your Honor.
19   Thank you.
20            THE COURT:  All right.  On the defense side, anything
21   else?
22            MR. NIETO:  Nothing additional, Your Honor.
23            THE COURT:  Okay.  Very well.  The Defendant's
24   remanded to the custody of the marshal consistent with the terms
25   of the earlier order.
```

```
 1              Counsel are excused.

 2              We will resume on, what's that date Wednesday?

 3                   THE CLERK:  Wednesday, August 21st.

 4                   THE COURT:  Wednesday, August 21.  We're scheduled to

 5    start at 9:30.  I would urge counsel to plan to be here no later

 6    than 9:15.

 7                   MR. PROCTOR:  Report here or report to --

 8                   THE COURT:  Excuse me, Courtroom 1A, the Motz

 9    Ceremonial Courtroom on the first floor, that's where you should

10    report.  I don't think you need to test out any technology in

11    that courtroom, that's purely jury selection.  But you

12    absolutely need to be over here meeting with the courtroom

13    deputy clerk, testing out your technology, making sure that all

14    the arrangements that you're planning are actually going to

15    work.  And it's one thing to design it, it's another thing to

16    bring the hardware over here, hook it up and have it actually

17    work and function.  And I insist that you dry run it to that

18    point.

19                   MS. MCGUINN:  Yes, Your Honor.

20                   THE COURT:  Okay.  You're excused.  Thank you.  We're

21    adjourned.

22                   THE CLERK:  All rise.  This Honorable Court now stands

23    adjourned.

24              (The proceedings concluded at 12:49 p.m.)

25
```

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kassandra L. McPherson, Registered Professional
    Reporter, in and for the United States District Court for the
4   District of Maryland, do hereby certify, pursuant to 28 U.S.C. §
    753, that the foregoing is a true and correct transcript of the
5   stenographically-reported proceedings held in the above-entitled
    matter and that the transcript page format is in conformance
6   with the regulations of the Judicial Conference of the United
    States.

7
                         Dated this 12th day of August 2024.
8
                         -S-
9
                         _____
10                       KASSANDRA L. MCPHERSON, RPR
                         FEDERAL OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```