## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO.  JKB-23-278** |
| **CHRISTOPHER KENJI BENDANN,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

Christopher Kenji Bendann stands before this Court having been convicted of exploiting and molesting ▆▆▆▆▆▆▆ ("Minor Victim") while he was a minor and continuing the mental abuse and harassment into Minor Victim's young adulthood.   The Defendant manipulated and viciously threatened Minor Victim;  he was relentless, callous, and cruel.



Minor Victim, 14 years old, taken by Defendant, 2015



Selfie of Defendant and Minor Victim, in class, 2015

After a jury trial, the Defendant is facing a life or life equivalent sentence.   It is the Government's recommendation that this Court sentence him to 35 years of imprisonment to the Bureau of Prisons followed by a lifetime period of supervised release.

1

## I.    __BACKGROUND__

On August 28, 2024, a jury found the Defendant guilty of five counts of Sexual Exploitation of Children, in violation of 18 U.S.C. § 2251(a), three counts of Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), and one count of Cyberstalking, in violation of 18 U.S.C. § 2261A(2).

The sentencing hearing on this matter is scheduled for January 21, 2025.  United States Probation Officer Manisha Garner prepared the Presentence Report (ECF 169), which provides for a final offense level of 43, a criminal history category I, and advisory guidelines of life imprisonment.  The Government agrees with the guideline calculation in the Pre-Sentence Report (PSR).

## II.    __FACTUAL BACKGROUND__

### A.    __The Defendant's Sexual Exploitation of Minor Victim and Possession of Child Pornography__

The evidence at trial established that Minor Victim, born in ███ 2001, was a student at Gilman School.  In ██████, Minor Victim began 8th grade, and the Defendant became both a teacher as well as an advisor to Minor Victim.  As an advisor, the Defendant acted as the intermediary between school and home, providing updates as to Minor Victim's grade, social growth, and emotional well-being to Gilman and to Minor Victim's parents.  The Defendant often drove Minor Victim to social outings and also had supervisor control over Minor Victim by providing rides home from parties, babysitting or housesitting at the homes of Minor Victim's friends, and checking-up on Minor Victim when he was home alone after his parents went out of town.



Minor Victim, 14, taken by the Defendant while out at breakfast, 2015.

Beginning in at least September 2017, when Minor Victim was a sophomore at the Gilman School, the Defendant began to sexually exploit Minor Victim by producing videos and images depicting Minor Victim engaged in sexually explicit conduct. Minor Victim initially ran "naked laps" by himself or with others in the Defendant's presence. This escalated to the Defendant picking Minor Victim up from parties but requiring Minor Victim be naked while in the Defendant's car. Eventually, at the Defendant's request Minor Victim began to masturbate in front of the Defendant while the Defendant recorded Minor Victim on the Defendant's cellphone, and the sexual contact between them escalated. Text messages established that the Defendant threatened Minor Victim with exposure, namely that he would tell Minor Victim's parents and friends, or even girls Minor Victim wanted to date, if Minor Victim did not do what the Defendant asked. During parties at the homes of friends or other Gilman families where the Defendant was in charge of housesitting or babysitting, the Defendant texted Minor Victim to get Minor Victim away from the others and have him alone. This was corroborated by the testimony of a former female student who recalled being present at a party and when she noticed Minor Victim had left

the room, the Defendant stated something about Minor Victim being in trouble again.

The videos show during trial were as follows:

a) **Count 1** – September 16, 2017 at approximately 1:23 a.m.

This video file was created with the Defendant's iPhone 7.  Minor Victim, 16 years old, is in the passenger seat of the Defendant's parked car and is naked from the waist down.  Minor Victim's genitals are visible, and Minor Victim is masturbating himself.  The video is approximately 4 and a half minutes long.



b) **Count 2** – June 21, 2018 at  approximately 12:05 a.m.

This video file was created with the Defendant's iPhone 7.  There are three video clips, totaling over nine minutes. Minor Victim, 17 years old, is in the passenger seat of the Defendant's moving car and is fully naked for the first two videos.  Minor Victim's genitals are visible, and Minor Victim is masturbating himself.



c) **Count 3** – August 26, 2018 at approximately 1:05 a.m.

This video file was created with the Defendant's iPhone 7.  There are two video clips, totaling approximately seven minutes.  Minor Victim, 17 years old, is in the shower and completely naked.  Minor Victim's genitals are visible, and at times Minor Victim masturbates.  The Defendant's reflection while he records Minor Victim is visible in the shower glass door.  This video was created at the ███████ residence.



d) **Count 4** – January 2, 2019 at approximately 1:30 a.m.

This video file was created with the Defendant's iPhone 7. Minor Victim, 17 years old, is standing in the shower, completely naked, and his genitals are visible. The Defendant, fully clothed, begins to use a washcloth and soap to wash Minor Victim and then masturbates Minor Victim. The video is over ten minutes in length. This video was created at the ████ residence.



e) **Count 5** – February 9, 2019 at approximately 10:55 a.m.

This video file was created with the Defendant's iPhone XS. Minor Victim, 17 years old, disrobes and enters the shower completely naked, and his genitals are visible. The Defendant, fully clothed, uses a washcloth and soap to wash Minor Victim and then masturbates Minor Victim. This video was created in Minor Victim's home.



All of the above videos were found in the Defendant's iCloud account in a folder called

"expunged." (**Count 6**).  None of these videos were found on the Defendant's iPhone 11, or either of his two older iPhones found under his bed.    A witness from Apple explained that the "expunged" folder is created in the iCloud when a user of the iPhone, in this case the Defendant, deleted videos or images off of their device completely.  The deleted files then move into the iCloud's automatically generated "expunged" folder to be permanently deleted within a set period of time.

Duplicate copies of  the eight videos that comprise Counts 1 through 5 were located within a mobile-sync backup storage file found on the Defendant's Dell Inspiron laptop (**Count 7**).  Three image files dated February 11, 2018, of Minor Victim (16 years old) were also found, depicting Minor Victim naked including his exposed genitals.

 A duplicate copy of the video from Count 1 was located on the Sony Vaio laptop (**Count 8**).  A video file, dated June 15, 2017, of Minor Victim (16 years old) running naked outside was also located.

### B.    The Defendant's Cyberstalking of Minor Victim (Count 9)

Minor Victim provided his iPad device to law enforcement in January 2023 during the initial stages of the investigation.  The iPad contained a series of texts between Minor Victim and the Defendant from May 2022 through December 2022.  Minor Victim was 21 years old during that timeframe and was a sophomore and junior in college.  The text messages showed coercive and threatening communications from the Defendant to Minor Victim.  The Defendant created a fake Instagram page called, "█████," which had explicit images of Minor Victim as its content. On multiple occasions, the Defendant made this page "public" and then notified Minor Victim's girlfriend about the account in order to force Minor Victim to respond to the Defendant, to send explicit images to the Defendant, and to coerce Minor Victim to engage in sex acts with the

Defendant.    The Defendant sent near-constant text messages to Minor Victim, daily threatening or coercing Minor Victim to comply with the Defendant's demands.  Minor Victim testified that this pattern of behavior and course of conduct over those months, as well as throughout his relationship with the Defendant beginning in 2017, caused substantial emotional distress.



From June 2022 – with later video

III.     **SENTENCING CALCULATION**

The Defendant's years of molestation and exploitation that make up the instant offenses results in 5 separate groups that compute to an offense score of 48.   The Defendant has zero criminal history points.   ECF 169, ¶ 90.    This results in a guideline sentence of life or a lifetime equivalent sentence.

The maximum sentence that can be imposed for Counts 1 through 5, Sexual Exploitation of a Child, is thirty (30) years for each, up to one hundred fifty (150) years if consecutive to one another.   The mandatory minimum sentence for Counts 1 through 5 is fifteen (15) years each, concurrent or consecutive to each other.   The maximum sentence that can be imposed for Counts 6 through 8, Possession of Child Pornography is ten (10) years for each; there is no mandatory minimum sentence.   The maximum sentence that can be imposed for Count 9, Cyberstalking, is five (5) years.   The overall minimum sentence that could be imposed is fifteen (15) years.   The overall maximum sentence that could be imposed is one-hundred-eighty-five (185) years or two-thousand-two-hundred-twenty (2,220) months.

The Defendant has made several objections to the sentencing guidelines as calculated by Probation Officer Manisha Garner. *Id.* at p. 21.  Specifically the Defendant objects to several of the specific offense characteristics for Sexual Exploitation of a Child and Possession of Child Pornography, as well as the imposition of a criminal livelihood enhancement under U.S.S.G. § 4B1.5(b)(1), Repeat and Dangerous Sex Offender.

A.     **Application of Care/Custody Enhancement – U.S.S.G. §2G2.1(b)(5)**

The Defendant argues that Minor Victim was not under his care, supervision, or custody at the time the five videos were produced.  For all five of the Sexual Exploitation counts, a two-point enhancement should be added because the Defendant <u>did</u> have custody, care, or supervisory

control of Minor Victim. *Id.* at ¶ 29, 37, 45, 53 and 61. During all five videos that comprise Counts 1 through 5, the Defendant was acting as the driver or house sitter/babysitter for Minor Victim, who was a minor and was entrusted to the Defendant to provide transportation or serve as the guardian of the children in the home where he was babysitting. There was ample testimony at trial that the Minor Victim's parents gave permission for the Defendant to transport their child home from parties or to be the adult while staying overnight at the homes of friends.

### B.    Application of Use of a Computer/Interactive Computer Service Enhancement – U.S.S.G. §2G2.1(b)(6)(B)

Further, all five Sexual Exploitation counts should include a two-point enhancement because the Defendant used a computer or interactive computer service in order to persuade, induce, entice, or coerce Minor Victim to engage in sexually explicit conduct, under U.S.S.G. §2G2.1(b)(6)(B). The testimony at trial included evidence that the Defendant would use Snapchat and text messages in order to communicate with Minor Victim and would arrange for Minor Victim to join the Defendant in the car, in a bathroom, or other places so that the abuse and exploitation could occur. *Id.* at ¶ 30, 38, 46, 58, and 66.

### C.    Application of the Number of Images Possessed – U.S.S.G. §2G2.2(b)(7)(D)

As to the Possession of Child Pornography counts, the Defendant produced five sets of videos, eight in total, that were several minutes in length (Counts 1 to 5). For purposes of the three counts of Possession of Child Pornography, Counts 6, 7, & 8, the counts group together. Under §2G2.2(b)(7)(D), a five-level increase should be imposed because collectively the Defendant possessed these eight video clips as well as other videos and images of Minor Victim across several devices. In the Commentary of §2G2.2, Application Note 6(B)(ii), "each video, video-clip, movie, or similar visual depiction shall be considered to have 75 images." All five sets of videos combined are well over 30 minutes in length; all five sets of videos were found in the iCloud (Count 6) and

the Dell (Count 7); a duplicate of the first video (Count 1) was found on the Sony laptop (Count 8). With over 11 videos at 75 images each, plus other images, the number possessed is well over 600, so the five-point enhancement is applicable.

### D. Application of Repeat and Dangerous Sex Offender – U.S.S.G. §4B1.5(b)(1)

Lastly, the Defendant has argued that the Repeat and Dangerous Sex Offender enhancement does not apply. This application specifically states that "in any case in which the defendant's instant offense of conviction is a covered sex crime… and the defendant engaged in a pattern of activity involving prohibited sexual conduct: (1) the offense level shall be 5 plus the offense level determined under Chapters Two and Three [of the U.S.S.G.]." Under the Commentary, Application Note 2, a "covered sex crime as instant offense of conviction" includes Sexual Exploitation of a Child, 18 U.S.C. §2251, under Chapter 110. Under application note 4(B)(i), a pattern of activity exists if the defendant, "on at least two separate occasions… engaged in prohibited sexual conduct with a minor." Further, an occasion of prohibited sexual conduct may be considered… without regard to whether the occasion occurred during the course of the instant offense or resulted in a conviction for the conduct that occurred on that occasion. Application note 4(B)(ii). In this case, the Defendant sexually abused Minor Victim on at least 5 occasions during the course of the instant offense. The enhancement under §4B1.5(b)(1) should be applied.

## IV.  <u>ARGUMENT</u>

The Defendant's disturbing conduct shows the worst of human nature. Considering the sentencing factors set forth in 18 U.S.C. § 3553(a), a sentence of 35 years imprisonment and lifetime supervision is sufficient but not greater than necessary to achieve the purposes of sentencing. "In sentencing a Defendant, first the district court 'shall consider ... the kinds of

sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of Defendant as set forth in the guidelines.' 18 U.S.C. § 3553(a)(4)(A)." Regarding sentencing, the Supreme Court states, "the Guidelines should be the starting point and initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Guidelines are the "natural starting point from which the sentencing court exercises its discretion under § 3553(a).  *United States v. Langford*, 516 F.3d 205, 212 (3d Cir.2008).  This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual Defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter."  *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the Defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the Defendant; and to provide the Defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Another factor that Section 3553(a) considers are similar sentences for similarly situated Defendants for to avoid sentence disparities.  18 U.S.C. § 3553(a)(6).  Consideration of these factors necessitates a 35-year sentence.

### A.  Nature and circumstances of the offense

Minor Victim was eleven years old when he first met "Mr. Bendann."

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████.  Minor Victim was vulnerable; he was scared; he was very much alone.  And the Defendant knew it.

The Defendant enjoyed a stellar reputation as a middle school teacher, working with children during those three school years of extreme angst, awkwardness, growth, and struggle. The Defendant was beloved by his students and advisees; he was trusted by the Gilman community.  The Defendant appeared to be the epitome of the important role teachers play in the lives of their students both inside and outside the classroom.

The Defendant ingratiated himself into the ██████ family, giving himself access to Minor Victim and the opportunity to groom Minor Victim – breakfasts, dinners, movies, texting, Facetime calls, babysitting, rides to/from school, etc.  What started out as inappropriate innuendo and double entendre, turned into regularizing "naked runs," self-masturbation, and time alone together.



From December 2015 – 8th grade (Minor Victim is 14)



From March 2016 – 8th grade (Minor Victim is 14)



From August 2016 – summer between 8th/9th grades (Minor Victim is 15)

From September 2016 – 9th grade (Minor Victim is 15)

In 2017, when Minor Victim was 16 years old, the Defendant began to take videos of Minor Victim– beginning as a quid-pro-quo for the Defendant picking up Minor Victim after Minor Victim had been drinking and giving Minor Victim rides home. As Minor Victim testified, it continued to get worse: threats of exposure if Minor Victim did not comply – by sharing pictures

with Minor Victim's family or a girl he liked or by making a public Instagram account. Over time, the Defendant's demands increased – in the number of videos and images required of Minor Victim and in the level of explicitness. Minor Victim could no longer get away with sending a quick and simple shirtless selfie. Minor Victim felt trapped – he could not find a way out of this hell that enveloped him and that Bendann controlled. And so for the remainder of his high school years, Minor Victim submitted to the Defendant's demands. Each time Minor Victim tried to stop, or postpone, or pacify, the Defendant only became more enraged and tyrannical. His text messages to Minor Victim read like direct orders.



Taken from the Dell laptop – iPhone 11 mobile sync backup
April 2020 – just prior to Minor Victim's graduation from Gilman

The Defendant began to touch Minor Victim – masturbating Minor Victim in showers, filming Minor Victim as he laid in a bed or ran naked outside, documenting his orchestrated exploitation while Minor Victim was still a minor.

Even as Minor Victim graduated from Gilman ███████ and attempted to move on – literally moving out of state to attend college and begin his young adulthood - the Defendant continued his stranglehold on Minor Victim.  Every day, multiple times a day, Minor Victim was gaslighted into believing this was an irrevocable situation. His life then was like a constant, stressful balancing act – trying to be present and live… while also being controlled by the Defendant:



From June 2022 (Minor Victim is 21)

It was not until January 2023, when other students wholly unrelated to Minor Victim reported similar grooming behaviors to Gilman administrators, that Minor Victim began to breathe again.  After eight years of grooming, abuse, exploitation, harassment, staking, and emotional

distress, Minor Victim started to regain his life.  The complaints by other students ultimately led to the Defendant's exposure as a child abuser, upending Minor Victim's life forever.

When the Baltimore County Police and the FBI searched the Defendant's home on February 3, 2023, the Defendant had already known about the potential for an investigation.  The rug had already been pulled out from under him when other students reported "naked laps," underaged drinking, and inappropriate texts via Snapchat.   And between the time he was fired on January 20, 2023, and the execution of the search warrant, the Defendant  attempted to destroy evidence, deleting the videos he had painstakingly saved and stored for several years of this exploitation of Minor Victim while he was a minor.

### B.  History and characteristics of the Defendant

The Defendant was born in Seoul, South Korea, and adopted at the age of 6 months to his parents.   ECF 169, ¶ 95.   His parents were able to provide the Defendant with a stable home environment, giving him an education at the Gilman School and later Skidmore College. *Id.*  at ¶ 112-113.  The Defendant describes his upbringing as "fairly normal" and that he had "no issues in the home while growing up." *Id.* at ¶ 96.  The Defendant does describe some identity struggles but does not connect these struggles with any aspect of his abuse and exploitation of children.  *Id.*

The exploitation and abuse of Minor Victim is part of a pattern of disturbing behavior by the Defendant, using his position of power over boys in order to selfishly satisfy his own sexual needs.[1]  Minor Victim is not alone, but because of his disclosures no other boy will be exploited by the Defendant.

**1.**  █████████████

---

[1] The Defendant's grooming, sexual exploitation and/or abuse of ████████████████, and others, is not included in any stipulated facts and were not included as evidence during trial.   The Government will establish the sexual abuse of these additional victims at the sentencing hearing, by a preponderance of the evidence.

Another student, ███████, attended Gilman as a high school student from ██ to ██. ███████, similarly, had a social relationship with the Defendant outside of school; the Defendant also housesat and babysat for ████ and his family.[2] ████ was interviewed in July 2023 regarding the allegations surrounding the Defendant and Gilman students.[3] ████ stated that the Defendant would buy him and his friends alcohol, and that on at least one occasion, the Defendant drove ████ and others to Meadowood Park to have them run a "naked lap" in exchange for a previous purchase of alcohol. The Defendant had explained to the students that Gilman alumni had done this and that it is a tradition. Eventually, ████ and the others began to refuse to run for alcohol, so the Defendant told ████ he needed to send the Defendant a picture. On one occasion, the Defendant drove ████ to one of his friends houses to bring them alcohol, and that it was a far drive. When they got there, the Defendant told ████ that he needed to run naked or go inside and take a naked picture; ████ said it was cold outside, so he chose to take a picture. The Defendant told him to take it in front of a mirror but to cover his genitals with his hands. ████ said that he never actually took the picture.

On a second occasion, the Defendant wanted ████ to do a naked lap at St. Paul's School. ████ refused to run, so the Defendant told him to take off all his clothes except his underwear. The Defendant wanted ████ to cover his underwear with his shirt to make it appear he was naked, and then the Defendant did take the picture.

All of these instances took place in 2021. ████'s friend took photos, creating screenshots, of ████'s iPhone showing a Snapchat conversation between the Defendant and

---

[2] ████████ will not testify at sentencing. Based on his prior statements, police reports and the screenshots regarding the allegations, all of which are attached as exhibits to this filing, the Government has proven that the Defendant's illicit behavior and conduct with ████, by a preponderance of the evidence.

[3] See Gov Ex A, Baltimore County Police Reports, documenting the interview of ████████ and others. A copy of these reports have already been provided to counsel for the Defendant.

███████.  In the conversation, the Defendant agreed to supply ███████ with vapes in exchange for explicit photos of ███████:







**2.** ███████████

The Defendant also sexually abused another high school student: ███████████.[4] ████
was ████████████, ████████████████████████████████████ who
recommended the Defendant as a babysitter and house sitter. ████ was friends, through lacrosse,
with many of the witnesses from the trial including ███████████████████. ████
███████████████, and on two occasions, the Defendant babysat him and his
brothers while at his home in Baltimore County.

████ described that on one of the occasions the Defendant was babysitting, ████ had
friends over for a party, and the Defendant became angry about the party. Eventually, ████ left
the home and returned inebriated. The Defendant was awake and had ██████████████████
████ drink tea that he had made. ████ then remembers going to his room to pass out and
sleep. ████ was awakened and found himself, naked, being put into the shower by the
Defendant. ████ then recalled being back in his room and the Defendant performed fellatio on
him. ████ felt drugged on top of the alcohol he had already consumed. When he woke in the
morning, he was only in a towel. ████ stated that he suppressed this incident for several years
and began to abuse drugs and alcohol. When the Defendant was arrested in February 2023, the
memories "flooded back" for ████, forcing him to confront the abuse for the first time. ████
████████████████████████████████████████████████████████████
████████████████

It is clear that the Defendant is sexually attracted to children, particularly teenaged boys.
His pervasive and continual abuse of his position of trust, using his teaching position to access

---

[4] See Gov Ex B, Baltimore County Police reports, documenting the interview of ███████████. The Government
will hand deliver a copy of Gov Ex C, the recorded interview of ███████████. A copy of these documents and the
interview have been provided to counsel for the Defendant. ███████████ prepared a victim impact statement, which
the Government will submit in advance of sentencing

and exploit students, is both shocking and horrific.  While the Defendant was able to present himself in the Gilman community as a trusted guardian and mentor for these children, and as an exemplary teacher, he was secretly breaking that trust – the Defendant was two-faced, a wolf in sheep's clothing.   The Defendant orchestrated naked laps for countless boys, using horseplay or alumni "tradition" as a coercive tactic,  using these laps as a test to see  which students he could groom further.  Through his position at Gilman, he was privy to their home lives, their grades, their self-esteem, their relationships with their parents, and their levels of confidence.

After the jury returned their verdict, the Defendant used his few moments before being led out of the courtroom to inflict heartache and pain once more on Minor Victim's family and friends.   The Defendant looked over at the families and young people who were still present in the courtroom including, ██████████████████████, and others, and mouthed "I forgive you."  And when he reached the door to exit the courtroom, the Defendant turned to ███████████████ and mouthed again, "I forgive you."  The Defendant confirmed this in his recorded jail call to his father the following day on August 29, 2024:

> "Well I was looking at the gallery yesterday and I was able to tell the ████████s and the ████████ and the ████████ that I forgive them, and ████████████. I get why they lied; they thought they were doing the right thing."[5]

There was no remorse; there was no acceptance of responsibility.  There was only his continued need to hold power over others, to gaslight Minor Victim and his family.  This is in line with the Defendant's gaslighting behavior while he was on pretrial release pursuant to the initial state charges in Baltimore County.

---

[5] The Government will hand deliver to the court Gov. Ex. D, a compact disc containing the jail call recorded on the Defendant's account at the Chesapeake Detention Facility.  A copy has already been provided to counsel for the Defendant.

In August 2023, the Defendant held a press conference with his prior attorney on the courthouse steps of the Baltimore County Circuit Court.[6]  The Defendant stated, "Gilman and Baltimore County have done their best to defame my character, to make my former students question my relationships with them, and that's what hurts the most.  There are hundreds of children who are now questioning the positive experience they have had with me and wondering about my intentions."  His attorney, speaking on the Defendant's behalf, said, "There is only one complaining witness, and that complaining witness has several reasons to be less than honest."  Of course it has now been proven beyond a reasonable doubt that the "complaining witness," Minor Victim, was absolutely truthful and courageous in disclosing to law enforcement.  It is now understood that other students who were subjected to grooming, "naked laps," text messages, and other inappropriate contacts had *every right* to question their experiences with as well as the intentions of with their beloved teacher.

### C.  The need for the sentence imposed.

There can be no doubt the "prevention of sexual exploitation and abuse of children constitutes a government objective of *surpassing importance*."  *New York v. Ferber*, 458 U.S. 747, 757 (1982) (emphasis added).  The Court in *Ferber* went on to note that "[i]t has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults."  *Id*. at 758 n. 9.  Quite simply, "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional, and sexual development in ways which no just or humane society can tolerate."  *Kennedy v. Louisiana*, 554 U.S. 407, 468 (2008) (Alito, J., dissenting) (quotation marks omitted).

---

[6] For the full news story:  https://www.wbaltv.com/article/christopher-bendann-speaks-trial-date-set-child-sex-charge/44763822

"Retribution is a valid penological goal." *Glossip v. Gross*, 135 S. Ct. 2726, 2769 (2015)

(Scalia, J. concurring).  As the Eleventh Circuit explained in *Irey*: "the greater the harm the more

serious the crime, and the longer the sentence should be for the punishment to fit the crime." 612

F.3d at 1206.  The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just deserts" concept--should be reflected clearly in
> all sentences; it is another way of saying that the sentence should reflect the gravity
> of the Defendant's conduct.  From the public's standpoint, the sentence should be
> of a type and length that will adequately reflect, among other things, the harm done
> or threatened by the offense, and the public interest in preventing a recurrence of
> the offense.  (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.*  Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus

essential that this Court promote and maintain respect for the law by pronouncing sentences that

fully reflect society's revulsion.  *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976) (citing

Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)).

"Child sex crimes are among the most egregious and despicable of societal and criminal

offenses…" *Sarras*, 575 F.3d at 1220 (discussing how courts have upheld lengthy sentences in

cases involving child sex crimes as substantively reasonable).  Here, the seriousness of the crimes,

taken with the need for just punishment and the goal of promoting respect for the law, weigh

heavily in favor of a significant sentence.

### 1. Reflect the seriousness of the offense, promoting respect for the law, and provide just punishment.

This Court's sentence must consider the need to "promote respect for the law." 18 U.S.C.

§ 3353(a)(2)(A). The Defendant's actions violated federal law, but they also transgressed every

conceivable normative principle undergirding our laws.  What's worse, the Defendant was a

teacher, an advisor, and a trusted member of a very small community.  His victim was a child and

the long-lasting effects of his crime on Minor Victim are immeasurable.  This Court's sentence

must express an appropriate level of social condemnation of his crimes.

### 2. Adequate deterrence and need to protect the public.

Deterrence is important for crimes involving the sexual abuse of children, including child pornography. *See United States v. Goldberg*, 491 F.3d 668 (7th Cir. 2007). "Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *See Id*. The Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class..." *Smith v. Doe*, 538 U.S. 84, 103 (2003).

The Defendant exhibited a continual pattern of exploitation and abuse of children; almost all of these allegations went un-reported for years. There is a strong need to protect the public from any further violations – and this Defendant did not start or stop his behavior with the exploitation of Minor Victim. Other offenders, as well as the Defendant, need to know and understand that they will be caught, their abuses will be revealed, and they will be punished accordingly no matter the passage of time or delay in a child's disclosure.

### D. Impact on the Victims

It is axiomatic that sexual abuse (particularly hand-on sexual abuse, which was experienced by the victim of the Defendant's instant offenses) inflicts upon its victim enormous, devastating, and long-lasting harm. That the abuse is inflicted on a child adds a devastating dimension to the harm ordinarily inflicted on rape victims. As the Supreme Court explained while addressing an Eighth Amendment challenge to capital punishment for the rape of a child by her stepfather in *Kennedy v. Louisiana*:

> [...] the victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin. The attack was not just on her but on her childhood.... Rape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of

long anguish that must be endured by the victim of child rape.

554 U.S. at 435 (citing various studies).  Those years of anguish can include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide.  *Id.* at 468 ((Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting).  Sexually exploited children also struggle to develop healthy affectionate relationships, they suffer from sexual dysfunctions, and they have a tendency to become sexual abusers themselves.  *See New York v. Ferber*, 458 U.S. 747, 758 n. 9 (1982) (citation omitted).

Minor Victim suffered greatly, under a severe mental strain during the abuse and for many years afterwards as the Defendant essentially held him captive.   His family members and his friends noted how often he drank, often to the point of "blacking out" during those years.  Minor Victim said he drank to this point so he could just not think about what was happening, to forget, and to be completely numb when forced to do these despicable acts.   Soon after these events came to light in January 2023, Minor Victim was struggling with guilt, shame, and a whole tidal wave of brutal emotions.  He felt terrible for bringing this pain to his parents.  He knew they would blame themselves.  Fearful that his college friends and teammates who comprised his "safe place" would find out, Minor Victim worried that he would no longer feel like he belonged at school. Knowing how close knit the Gilman community was back at home, Minor Victim also feared that everyone he knew in Baltimore would find out as well. ███████████████████████ ███████████████████████████████████████████████ ███████████████████████

The collateral damage to those around Minor Victim is expansive.  Minor Victim's parents have been dealing with unwarranted guilt,  for attributing his withdrawn behavior to teenage woes,

and for thinking that his academic and emotional decline were deliberate. At the time, they wondered where that beautiful boy they once knew went. They blamed themselves for not seeing the true cause of their child's slow deterioration – Christopher Bendann. ███████████

████████████████████████████████████████████████████████

████

Minor Victim's friends to this day are struggling as well – worried about their friend, unable to comprehend how this could have happened. Most of the Gilman student witnesses at trial, particularly ███████████, loved the Defendant and trusted him. ███████ now looks back at that entire time period, convinced that the Defendant was just using him to get to Minor Victim, his best and oldest friend.

The long-term impacts of these events on Minor Victim are unpredictable. The effects of the exploitation and the cyberstalking on his future relationships with friends, partners, potential mentors, or supervisors are unknowable; his ability to trust has been forever altered and those happy years of high school and college are cast in the Defendant's dark shadow. The Defendant stole his innocence, maliciously and relentlessly.

His conduct must be adequately punished. A sentence of 35 years, followed by lifetime supervised release, adequately accounts for the §3553(a) factors. The sentence imposed by this Court should leave no doubt that when the Defendant is one day released from incarceration, he will hesitate to exploit or abuse another child again; such a sentenced should also send the message that child molesters, especially those in positions of trust over children, will receive a significant sentence.

## IV.    **CONCLUSION**

The Defendant sexually exploited Minor Victim over an extended period of time – as a minor for several years and then into young adulthood. He recorded this abuse and did so over

and over again.  The Defendant continued his chokehold on Minor Victim into early adulthood, stalking him and tormenting him.  The position of trust as a teacher and member of the Gilman community was not only violated by the offenses proven during this trial, but by the Defendant's grooming and exploitation of other students as well.

The lives of Minor Victim and his family and friends, and so many others, are forever changed by the Defendant.  The United States requests that this Court  sentence the Defendant to a sentence that is sufficient but not greater than necessary -  35 year imprisonment.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____
    Colleen Elizabeth McGuinn
    Kim Y. Hagan
    Assistant United States Attorneys