```
1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
2                       NORTHERN DIVISION

3   UNITED STATES OF AMERICA,          )
                                       )
4             Plaintiff,               )
          vs.                          )
5                                      ) CRIMINAL NO.:
    CHRISTOPHER KENJI BENDANN,         ) 1:23-cr-00278-JKB-1
6                                      )
              Defendant.               )
7   _____)

8
                                     Baltimore, Maryland
9                                    January 21, 2025
                                     1:00 p.m.
10
                       TRANSCRIPT OF PROCEEDINGS
11            SENTENCING HEARING (WITH REDACTIONS)
              BEFORE THE HONORABLE JAMES K. BREDAR
12                      Courtroom 5A

13
    For the Government:
14
          COLLEEN E. McGUINN, Esquire
15        KIM Y. HAGAN, Esquire
            Office of the United States Attorney
16          36 South Charles Street, 4th Floor
            Baltimore, MD 21201
17
    For the Defendant:
18
          CHRISTOPHER C. NIETO, Esquire
19          Nieto Law Office
            233 E. Redwood Street, Suite 1000C
20          Baltimore, MD 21202

21        GARY E. PROCTOR, Esquire
            The Law Office of Gary E. Proctor, LLC
22          233 E. Redwood Street, Suite 1000C
            Baltimore, MD 21202
23

24  Also Present:  Special Agents Calista Walker, Rachel Corn, FBI
                   Paige Cameron, U.S. Probation
25
          (Computer-aided transcription of stenotype notes)
```

Patricia G. Mitchell, RMR, CRR  Federal Official Court Reporter
101 W. Lombard Street, Fourth Floor
Baltimore, MD 21201

P R O C E E D I N G S

(1:08 p.m.)

THE COURT:  Good afternoon.  Be seated, please.  The Government will call the case.

MS. McGUINN:  Yes, Your Honor.  Good afternoon. Assistant United States Attorney Colleen McGuinn on behalf of the Government calling United States of America versus Christopher Kenji Bendann, Criminal Case No. JKB-23-278.  Your Honor, standing to my right is my co-counsel Kim Hagan and standing to her right are Special Agents Rachel Corn and Calista Walker with the FBI.

THE COURT:  Good afternoon.  You may be seated.

Mr. Nieto.

MR. NIETO:  Yes, good afternoon, Your Honor.  For the record, Christopher Nieto and Gary Proctor on behalf of Mr. Bendann who is seated to my left.

THE COURT:  Thank you.  I recognize Mr. Bendann, of course, from his earlier appearances before me.  Good afternoon, Mr. Proctor.

MR. PROCTOR:  Good afternoon.

THE COURT:  Beginning on the 21st of August of last year, the defendant appeared before the Court for a jury trial. At the conclusion of that proceeding, he was found guilty on all counts.  Upon the findings of guilt, the Court ordered preparation of a presentence report.  Sentencing was ultimately

1    scheduled for today.  Is the Government ready for sentencing?

2              MS. McGUINN:  Yes, Your Honor.

3              THE COURT:  Mr. Nieto, is the defendant ready?

4              MR. NIETO:  Yes, Your Honor.

5              THE COURT:  You and your client and Mr. Proctor may

6    move up to the forward podium.

7         Good afternoon, Mr. Bendann.  Have you and your lawyers

8    read and discussed the presentence report, including any

9    revisions that might have been made after the report was

10   initially disclosed to you?

11             THE DEFENDANT:  Yes, I have.

12             THE COURT:  Mr. Nieto, can you confirm that you and

13   your client have read and discussed the presentence report and

14   any revisions?

15             MR. NIETO:  Yes, Your Honor.

16             THE COURT:  Tell me now about any objections you have

17   with respect to the content of the report post any revisions

18   and as it stands before the Court currently, including any

19   differences you have with the probation officer's computation

20   of the Federal Sentencing Guidelines.

21             MR. NIETO:  Yes, Your Honor, thank you.  As we had

22   and was noted in the final presentence report, we did have some

23   objections to the computations of the guidelines in this case,

24   some on more general policy terms but others as they are

25   applicable in the context of this particular matter.

1    THE COURT:  You can stand on those written

2    submissions if you wish.  I have reviewed them carefully.  But

3    you can also advocate your position with respect to one or more

4    of those if you care to.

5    MR. NIETO:  No, Your Honor.  I will submit on my

6    filings on that matter.

7    THE COURT:  Okay.  I hope that defense counsel will

8    monitor my review of the subject of the guideline computations

9    to make sure that I don't miss any of the issues that you have

10   raised, but fundamentally they're in three categories.

11       The first is that you contend that the upward adjustment

12   reflective of a custodial arrangement or relationship between

13   Mr. Bendann and the Minor Victim is inappropriate, and you make

14   a specific point or accusation about when the videos in

15   particular were made and whether or not at those moments it's

16   fair to say under the law that the Minor Victim was in the

17   custody of the defendant within the meaning of United States

18   Sentencing Guideline 2G2.1(b)(5).

19       Having reviewed the arguments, those of the Government,

20   reflected on the evidence that was presented in the trial and

21   the totality of the record, I find that there was a custodial

22   relationship; that the entire relationship between the

23   defendant and the Minor Victim was born in a custodial

24   environment; that the Minor Victim's parents placed the

25   defendant in the defendant's custody in middle school and

1    identified the defendant as a trusted adult whom their child

2    was authorized to call upon for help, for assistance, for

3    advice, and for mentorship; and that that relationship with the

4    parents' complete approval and delegation of authority, if

5    that's what's necessary here, continued all the way through the

6    upper school until the defendant reached majority.  2G2.1(b)(5)

7    speaks not just of custody but also of supervisory control and

8    I find that on the totality of the record presented at trial,

9    Mr. Bendann was in a supervisory, custodial role with respect

10   to the Minor Victim and others but significantly, for purposes

11   of this hearing, the Minor Victim during all relevant periods.

12   So the defendant's objection on that ground is overruled.

13        The defendant objects to the application of

14   2G2.1(b)(6)(B), the so-called computer adjustment.  I fully

15   understand the points made by defense counsel.  Computers and

16   related devices are ubiquitous in our society, and the notion

17   that one was employed to assist the completion of an offense is

18   almost like saying that a defendant when committing an offense

19   wore clothing or had a coat on or something like that.  It's

20   perhaps slightly more than that because it's an instrumentality

21   of the crime, but it is a tool that is so much a part of our

22   lives at this point that I think one can reasonably question

23   the appropriateness of the Sentencing Commission continuing to

24   list the use of or the presence of a computer or similar device

25   as an aggravating factor in a case.

1    But that's really not for the Court to decide.  The

2    Commission has been delegated that authority, and they continue

3    to carry that provision on their books in the sentencing

4    guidelines, and the provision squarely applies in this case.

5    The crime couldn't have been committed without the use of such

6    a device here.

7    So while I understand defense counsel's point, the fact is

8    2G2.1(b)(6)(B), to the extent that any guideline is the law of

9    the land, this remains the law of the land, so that objection

10    is overruled.

11    Then, lastly, defense counsel objects to the -- he doesn't

12    phrase it this way but really what he portrays as sort of a

13    double counting process that occurs by virtue of sex offenses

14    of this sort being subject to an enhancement for a pattern of

15    activity, then further enhancement in the multiple count

16    computation, and then there's a chapter 4 further enhancement

17    as a result of a pattern being proven.  Once again, there is

18    argument I, think particularly with respect to the last point,

19    credible argument, but these guidelines have been computed

20    meticulously and competently and correctly by the probation

21    officer; and as Mr. Nieto himself noted a moment ago, a lot of

22    this is policy objection that he has with respect to how the

23    Commission regards some of these offenses.

24    I find the guidelines were appropriately computed in that

25    regard, and so that third objection is also overruled.

1    Mr. Nieto, have I now addressed all of your guideline

2  objections?

3         MR. NIETO:  You have, Your Honor.

4         THE COURT:  Very well then.  Are there any requests

5  by the Government or defense counsel for departures upward or

6  downward?  First the Government.

7         MS. McGUINN:  Not from the Government, Your Honor.

8         THE COURT:  Mr. Nieto.

9         MR. NIETO:  No, Your Honor.

10        THE COURT:  No departures upward or downward are

11 appropriate in the Court's view either.  Accordingly, none will

12 be applied.

13    Well, one of the requirements in every federal sentencing

14 hearing is that the Court, relatively near the beginning of the

15 process, on the record compute the Federal Sentencing

16 Guidelines and make findings as to how they should apply in a

17 particular case.  In this case I have carefully reviewed the

18 guideline computation set out by the probation officer in the

19 presentence report, Document No. 169, beginning essentially at

20 about page 7 and then continuing on after that.  And I conclude

21 that the probation officer has computed the guidelines

22 correctly, and I adopt that computation as the Court's own

23 going forward.

24    Reviewing in a somewhat summary fashion, sexual

25 exploitation of a child is an offense when there are multiple

1  instances that don't group.  They are each their own group.

2  Accordingly, we have five groups where the base offense level

3  is 32.

4      The offense involved the commission of a sexual act or

5  sexual contact so there's a two-level increase.

6      A computer was used or an interactive computer service was

7  employed; that's a two-level increase.

8      And then the significant issue that we discussed which was

9  the custodial issue, I also rule that the probation officer is

10  correct on that as well.

11      So accordingly, we start with a 32, we have upward

12  adjustments of six points, bringing us to a 38.  And that

13  computation applies across all five of the sexual exploitation

14  counts.

15      Then we move to the three counts for possession of child

16  pornography and they are each computed -- well, they group.  So

17  we pull them all together, we have a base offense level of 18.

18  There was a pattern of activity involving the sexual abuse or

19  exploitation of a minor.  There's a five-level upward

20  adjustment to reflect that.

21      The offense, again, involved the use of a computer or

22  interactive computer service.  That's a two-level upward

23  adjustment.

24      Then because of the number of images, there's an upward

25  adjustment of five, and that brings us to a total of 30.

1      The cyberstalking of a minor victim is its own group and

2   the base offense level is 18; a two-level upward adjustment

3   because there was a pattern of activity involving the stalking,

4   threatening, harassing or assaulting of the same victim which

5   brings us to a 20.

6      It was a complicated multiple count adjustment which is

7   explained on page 12.  I've checked it, found it is correct and

8   adopt it.

9      And the result of all of this is that there's a combined

10  adjusted offense level of 43.  There's the chapter 4

11  enhancement that we referred to a few moments ago that brings

12  with it five more levels; we're at a 48.

13     There's been no evidence of an acceptance of

14  responsibility by the defendant.  Accordingly, no downward

15  adjustments under § 3E1.1.  I said we were at a tentative sum

16  of 48, but the sentencing guidelines end or top out at 43.

17  Accordingly, I find that the defendant's offense level is 43.

18     One last time, is there any objection to the Court's

19  computation of the Federal Sentencing Guidelines?  First from

20  the Government?

21          MS. McGUINN:  No, Your Honor.

22          THE COURT:  And then from the defendant?

23          MR. NIETO:  Your Honor, just as we had noted

24  originally.

25          THE COURT:  Right.

1     MR. NIETO:  But understanding the Court's ruling,

2  no.

3     THE COURT:  Right.  And those issues are preserved

4  because you have noted them.

5     Ms. McGuinn, are there any victims that wish to address

6  the Court?

7     MS. McGUINN:  Yes, Your Honor.  The Minor Victim's

8  mother and father both wish to address the Court on behalf of

9  their child.

10    THE COURT:  Mr. Nieto, you and your client and your

11  colleague may be seated.

12    MR. PROCTOR:  Your Honor, we had previously filed a

13  motion to strike impermissible victim impact.  Your Honor has

14  ruled and found that the Court has wide latitude to consider

15  it.  I don't know obviously what these witnesses are going to

16  say.  Would you like me to object every time, or can we have a

17  continuing objection as outlined in our earlier pleading?

18    THE COURT:  You can have a continuing objection,

19  Mr. Proctor, and I certainly understand your point.  But I know

20  that you understand my interpretation of the law.  § 3662

21  brings with it virtually no restrictions on what may be

22  presented at a sentencing hearing.  A better way I think to

23  express how the law operates in this environment -- and this is

24  in terminology that lawyers will understand, lay people maybe

25  less.  But the information presented at a sentencing hearing

1    effectively is all admissible.  It's just a question of the

2    weight that the Court is going to afford a particular

3    information.

4         Let me assure you and your client that while the Court

5    will give great weight to the information that it acquired

6    through the presentation of evidence during the trial of this

7    case and will listen carefully to all of the submissions that

8    are made orally during the sentencing hearing and has read

9    carefully all of the written information that has otherwise

10   been submitted, you can be sure that I understand how proof

11   works and that that which is submitted to the Court with less

12   corroboration, not in person, not subject to cross-examination,

13   will be accorded appropriately less weight than that which I

14   did hear myself, that considerable volume of evidence that I

15   heard and which was subject to cross-examination and all of the

16   tests that the rules of evidence call for, tests that that

17   evidence passed.

18        MR. PROCTOR:  I understand, Your Honor.  I just

19   didn't want to be jumping up a dozen times if I could have a

20   continuing objection.  I don't expect you to change your

21   ruling.

22        THE COURT:  Thank you, Mr. Proctor.

23     Ms. McGuinn.  Who wishes to present first?

24        MS. McGUINN:  I believe ██████████ would like to

25   present first.

1          THE COURT:  Yes, ma'am, please come forward.

2          MS. McGUINN:  Would Your Honor have her come here?

3          THE COURT:  Yes, she should come to the forward

4    podium, and you can stand with her, Ms. McGuinn.

5          MS. McGUINN:  Yes, Your Honor.

6          THE COURT:  Good afternoon, ma'am.

7          VICTIM'S MOTHER:  Good afternoon.

8          THE COURT:  I recognize you from your earlier

9    appearance in this courtroom, but nonetheless please begin by

10   identifying yourself and tell me what it is that you want to

11   say.

12         VICTIM'S MOTHER:  Sure.  My name is ██████████, and

13   I am the mother of the victim in this case.

14         THE COURT:  You may proceed.

15         VICTIM'S MOTHER:  Okay.  I have written a letter that

16   I choose to share with you today in person.

17       Judge Bredar, my hope is that our family statement will

18   convey the profound and far-reaching impact of the defendant,

19   Christopher Kenji Bendann's actions which include sexual abuse

20   of a minor, cyberstalking, grooming of a minor, and blackmail.

21   The crimes committed by the defendant have irrevocably altered

22   our son's life while also inflicting deep emotional wounds on

23   our family.  Wounds that will likely take a lifetime to heal,

24   if they ever do.

25       Sexual abuse of a minor is one of the most egregious

violations imaginable.  It shatters the innocence and sense of
safety that every child deserves.  When we learned that evil
had infiltrated our son's life, we could not have imagined the
actual depth of emotional and psychological damage inflicted
upon him by the defendant.  While our son had already endured
years of abuse, our family had just begun to comprehend his
trauma while processing our own guilt, grief, remorse and
feelings of helplessness.

        When the defendant was arrested on February 3, 2023, our
son still faced an uncertain future overshadowed by
exploitation, manipulation and fearmongering.  The defendant's
complete lack of remorse and refusal to take accountability,
particularly as the legal proceedings unfolded, was striking.
Showing complete disregard for our son's well-being, the
defendant relentlessly exposed our son to further trauma.  The
scars from years of abuse were now manifesting themselves in
countless ways, affecting our son's ability to form healthy
relationships, succeed in school, and navigate a future with
confidence.

        Your Honor, it is not just the -- it is not just about the
crimes themselves but about the ongoing harm that was inflicted
by the defendant's decision to fight back in the ways that he
did.  The contrast between what could have been a path to
healing for our son and instead choosing to escalate and double
down on his defense highlights the depths of narcissism and his

1    complete lack of remorse.  The defendant's decision to take

2    aggressive actions was not just a legal maneuver; it was

3    personal retribution, continuing the cycle of power and

4    control.

5        The defendant's choice to hold press conferences in order

6    to proclaim his innocence while publicly dismissing, in quotes,

7    "the one whining anonymous victim" was a calculation -- a

8    calculated assertion of power.  His actions were about

9    continuing the abuse, maintaining control, and making sure our

10   son felt powerless and vulnerable.  The defendant was

11   deliberate and calculated, serving to prolong the trauma for

12   our son.

13       During this gut-wrenching time, our son was focused on

14   mustering the courage to face and prosecute his abuser.  Yet

15   even while incarcerated, the defendant managed to further

16   escalate his abusive behaviors.  He and his legal team hired

17   private investigators to try to discredit and smear our son's

18   character while employing intimidation tactics towards family

19   and friends.

20       While home alone one evening, one friend was confronted by

21   a private investigator sent by the defendant to terrify,

22   frighten and intimidate.  In a desperate move, the defendant

23   and his team subpoenaed our son in the hopes that this action

24   would instill fear and dissuade him from taking the stand

25   against his abuser.  The depraved and criminal behaviors of the

defendant are staggering.  His predatory, criminal and
destructive actions only are supplemented by his desire for
personal retribution against our son and our family while
behind bars.

Fragility is our son's new normal.  Both he and our family
cope with emotional trauma, pain, and cruel uncertainty, all
while trying to piece together the fragments of shattered
lives.  Incidents of sexual abuse occurred within our family
home, making it unbearable to remain there, so in 2023 we sold
our home because the one place that should have been a
sanctuary for our son was instead a haunting reminder.

Upon learning of our son's abuse at the hands of the
defendant, I was unable to return to work.  I could not bring
myself to walk the halls or carry on my duties in the wake of
my son's suffering.  My husband persevered, continuing his
employment.  Unfortunately while trying to provide for our
family, he faced unimaginable stress.  My husband suffered a
life-threatening internal bleed and spent 21 days in the
intensive care unit.  After being discharged, he remained out
of work for over a year.  My husband, he defied the odds in
recovery and continued to fight his greatest battle to protect
our son.

When charging documents were filed and subsequent articles
printed, our son's identity was revealed, despite assurances
from authorities that his anonymity would be protected.  This

breach of trust revictimized our son, begging the question of

why any victim of child sexual abuse should come forward if

their identity is not safeguarded.  The gravity of the

defendant's actions cannot be overstated.  The emotional and

psychological damage inflicted upon our son and thereby our

family is profound.  The defendant's predatory behavior knows

no boundaries as materially evidenced by the trial.  He has

shown no remorse.  In fact, he took one last opportunity to

demonstrate his deviant behavior following the verdict.  Upon

exiting the courtroom, he looked over at us and tauntingly

uttered, "I forgive you."

         In light of these repulsive actions, the defendant did not

break our son, and he will never break our family.  Your Honor,

the defendant is a depraved narcissist who can no longer prey,

groom, abuse or blackmail young boys, thanks in large part to

the young men who have stood up to this monster and said no

more.

         Locking up the defendant for the maximum time permitted

would not only be an act of justice for our son but also a

necessary step to ensure the safety of our children.  The Court

has a sacred duty to protect the most vulnerable members of our

society, and that duty must be upheld.

         We cannot allow this monster to continue his reign of

terror, and we must send a message that such heinous acts will

be met with the full force of the law.  Your Honor, please

1  ensure justice by jailing the defendant, the depraved

2  narcissist, the monster, for the maximum sentencing allowed.

3  Thank you.

4      Respectfully submitted by the parents of our beautiful and

5  courageous son.

6          THE COURT:  You may be seated.

7          VICTIM'S MOTHER:  Thank you.

8          MS. McGUINN:  Your Honor, ▓▓▓▓▓▓▓▓▓.

9          THE COURT:  Yes, please come forward.  Do you want to

10  speak on your feet, or do you want to be seated?

11          VICTIM'S FATHER:  This is fine, Your Honor.

12          THE COURT:  Okay.  First of all, begin by telling us

13  your name for the record.

14          VICTIM'S FATHER:  My name is ▓▓▓▓▓▓▓▓▓; I'm the

15  father of the victim.

16          THE COURT:  What is it you would like to say to the

17  Court this afternoon?

18          VICTIM'S FATHER:  The Honorable Judge Bredar, I am

19  the father of the victim.  And while I initially planned for my

20  wife's words to fully express the horror my family has endured,

21  there are three critical points in the defense's letter I could

22  not leave unaddressed.  Truthfully, there are so many more.

23      The defense attempts to portray the defendant as an

24  outstanding mentor, teacher and individual, referring to

25  accolades such as Mentor of the Year awards in 2018 and '19 and

stating "By every account, he was an amazing teacher and well respected by everyone he met." Let me be clear. In 2018 and 2019 when Chris received these awards, he was actively grooming and abusing multiple victims, including my son.

I can see Chris sitting there that day getting the honor, smiling and thinking he's just the best thing in the world for these kids and for the school, only to turn around hours later and exploit the trust of those he was entrusted to protect, sending requests for explicit images and engaging in unspeakable acts against the very children he was supposed to mentor.

Chris is not an amazing teacher. He is a predator. Pedophiles gravitate to places where children are: schools, camps, Scouts. Chris used his privilege to infiltrate Gilman, bypassing the usual credentials, as he highlighted in his letter, and once inside, he weaponized his position to manipulate, exploit and destroy innocent lives.

Contrary to the defense's claims, not everyone who encountered him would say he was well respected. In fact, most would now call him a privileged, narcissistic pedophile which is the truth, and there were plenty of people in school who were worried about his behavior.

Secondly and perhaps most disturbingly, Chris has shown no remorse, as my wife mentioned. Not once, not once has he accepted responsibilities for his actions. While he mouthed

the words "I forgive you" to my wife and I after his conviction, this was not an admission of guilt.  It was just another display of manipulation and narcissism.  I can't believe he did that to us, thought he could get away with that.

The defense's letter repeatedly refers to his crimes with detached phrases like "the defendant was convicted of," "the evidence adduced," carefully avoiding any acknowledgment of the devastating reality he inflicted on our family.  Chris's refusal to take responsibility forced our son and our entire family through many years of anguish that will continue.  By insisting on trial, he prolonged our suffering, stealing precious years from our lives, and depleting personal and governmental resources that could have been better spent elsewhere.  He could have admitted his guilt and spared us further pain from public scrutiny, but instead he chose to maintain control just as he always has.  Chris used his role as a -- trusted role as a mentor, one of society's most valued positions, to disguise his true nature: a manipulative self-serving predator of minors which is one of society's worse creations.

The trauma Chris inflicted on our son and family and countless other victims will not fade in 20 years the defense is hoping for.  It will last a lifetime, well beyond the combined years of the victim's sufferings.  Victims of child

1    abuse carry scars forever.  The mere thought of Chris being

2    released and having another opportunity to inflict harm is

3    terrifying.  I implore you to ensure that he is never granted

4    the chance.

5        Lastly, I kept thinking why should he get any reduction

6    when he chose to push us to trial?  Our society is forgiving

7    for those who make mistakes and have remorse and issue sincere

8    apologies, and a reduced sentence prior to the trial would have

9    made sense as it would have saved so many people anguish and

10   distress.  But he went all in and he pushed all of us.  Our

11   society should not reward or forgive those who don't admit

12   mistakes, show remorse, especially when seeking a reduced

13   sentence for something as horrible as child abuse.  I

14   personally can't believe he won't show something when given the

15   opportunity because he is a master manipulator, but as the

16   letter showed, he has no remorse for the evidence adduced at

17   the trial.

18       Thank you, Your Honor, for your time and consideration.  I

19   ask that justice be served and that Chris be held fully

20   accountable for his unfathomable breach of trust and the

21   immeasurable pain he has caused.  Thank you.

22       THE COURT:  You may be seated, Mr. ████.

23   Are there any other statements or victim presentations

24   that the Government wishes to sponsor, Ms. McGuinn?

25       MS. McGUINN:  No, Your Honor.

1           THE COURT:  I'll hear from the Government next on the

2     question of what sentence should be imposed.  Ms. McGuinn.

3           MS. McGUINN:  Thank you, Your Honor.

4        Your Honor, as the Government indicated in its written

5     sentencing memorandum, the Government is seeking a sentence of

6     35 years.  The Government feels that is sufficient, but not

7     greater than necessary, in this case.  That number derives from

8     a 30-year maximum sentence as to child exploitation if those

9     five counts were to run concurrent with one another, plus a

10    five-year sentence for the cyberstalking, that additional

11    behavior on top of the sexual abuse that was endured by Minor

12    Victim during these years.

13        Your Honor, I'm going to shuffle the sentencing factors a

14    little bit from the traditional order.  I wanted to start first

15    with the need to avoid sentencing disparities.  The defense

16    raised a few cases in their memorandum that the Government

17    wanted to mention, but first and foremost, as Your Honor knows,

18    the Fourth Circuit has held more than once that disparity of

19    sentencing, which I would argue is probably one of the more

20    difficult factors because Your Honor is charged with handling

21    Mr. Bendann's case individually and addressing all of his

22    factors and all of the case factors.  It is different from

23    every other case Your Honor has seen, so it can't be done in a

24    case-by-case comparison apples to oranges, and the Fourth

25    Circuit has recognized that.

1    However, the defense has brought forth two cases in

2  particular that I personally handled and a third case that

3  Ms. Hagan handled that Your Honor I know is familiar with

4  because you were the judge.  The first two are the United

5  States versus Evan Frock which was handled by me in front of

6  Judge Hurson.  First of all, it was a plea.  There were no

7  hands-on abuses in that particular case.  It was all online

8  exploitation.  And while, yes, Mr. Frock himself was a

9  substitute teacher in Carroll County and a volleyball coach, he

10  pretended to be an age-mate of the children that he abused

11  which is starkly different and stands in direct contrast to

12  what this defendant did.  Again, it's hard to make that

13  apples-to-apples, apples-and-oranges comparison, but Mr. Frock

14  also accepted responsibility early and pled guilty.

15    Lewis Blandon was also a Baltimore public middle school

16  teacher.  He exploited teenagers online and it should be noted

17  none of them were in Maryland and/or students of his.  He had a

18  hands-on abuse with a cousin from 20 years prior to these

19  offenses when he himself was only 20 years old.  In all of

20  these cases -- on his counts, he met those individuals online

21  and in one event did engage in hands-on abuse, but that child

22  was 17 and of the age of consent; also different because he did

23  not coerce or threaten or do anything of that nature to get

24  that child to engage in sexual intercourse with him, and he was

25  not charged with that because that part was not a crime.

1    Again, that case was not a trial, and but for the abuse of

2  his cousin when he himself was 20 years old, 20 years prior to

3  those offenses, it was not the same type of hands-on abuse that

4  we see here.

5    Lastly, counsel raised the RICO case that I know Your

6  Honor is aware that Ms. Hagan handled, Davante Harrison.

7  Again, as Your Honor is aware of that case, as with so many of

8  our RICO cases that take place in Baltimore City, is an

9  entirely different calculus.  There are issues involving

10 witnesses, snitches, individuals who are in jail.  And in that

11 case, if I'm correct, Mr. Harrison did not plead to anything

12 that involved he himself committed a murder -- is that correct,

13 Ms. Hagan?  Thank you, I wanted to make sure I said that

14 correctly.  On top of that, Your Honor, I know that was placed

15 on the record before Your Honor, there were a lot of evidence

16 concerns in that case that was a huge litigation risk and, yes,

17 he received 25 years.  That is vastly different than where we

18 are today.

19    Here, the Government proved all nine counts beyond a

20 reasonable doubt at a trial.  There are no evidence issues.

21 There are no witness concerns.  There are no victim concerns.

22 It's done.  The Government did not negotiate a plea to keep

23 anybody protected or to make sure evidence wasn't lost or to

24 protect victims.  This was a trial.  And the defendant stands

25 guilty of all nine counts.

1   Your Honor, as to the nature and circumstances of the
2   offense and history of the defendant, I know that Your Honor
3   has read the Government sentencing memorandum, but I do want to
4   highlight a few portions of that as the Government feels it's
5   probably the more important aspects that we would like for Your
6   Honor to consider.  The minor victim in this case was only 14
7   years old when the grooming began.  The defendant started
8   calling him "puppy" at that time which, as Your Honor saw in
9   trial, became more and more degrading as Minor Victim got
10  older.  This began in 2015 and it didn't end until 2022 so
11  roughly seven, eight years of abuse and exploitation and
12  degradation and humiliation and threatening and exploitation at
13  the hands of this man.
14      He knew Minor Victim's particular vulnerabilities when he
15  took him on as an advisee, knowing he had to repeat a grade in
16  a different school; he was coming back and he had one foot in
17  middle school, one foot in high school in the sense that all
18  his friends were there; that he had a lower self-esteem; that
19  he was struggling with his grades.  He knew those things and
20  knew that Mr. and Mrs. ████████, thinking that they were doing
21  the absolute best thing for their child, had requested him to
22  help them.  He had unfettered access to Minor Victim to start
23  sending him text messages when he was just a 14-year-old kid.
24      "Did you see me today?  Did you see me waving at you?  Do
25  you want to come to my office or classroom before?  Do you want

1     to get breakfast with me?  Do you want to go out to dinner?"

2     That was Government's Exhibit 122 at trial which was the 2015

3     messages taken from the defendant's iPhone 7 chat that he

4     didn't even realize was saved in a backup directory on his own

5     computer.  That whole exhibit was 330 pages and roughly 220

6     messages in about an 18-month time span.  I say that because

7     when we get to the cyberstalking, you'll see how different it

8     becomes.

9         Those messages from FaceTime, offers to help him, take him

10    places, wanted to know what songs he likes to hear, asking if

11    he wanted to go to dinner and expressing disappointment when he

12    can't go; this is not a normal or acceptable teacher behavior

13    with a 14-year-old.  That was grooming and was targeting, and

14    it was manipulative.  Those chats, from what we had or were

15    able to procure, ended on July 20 of 2017.  If you fast-forward

16    three and four months later, that's where Count 1 begins

17    because as Minor Victim testified, that's when things started

18    to just get really bad.

19        Naked rides home.  "I'll give you a ride home from this

20    party that I pick you up from, but you need to be naked in the

21    car" which turns into "you need to do these sexual acts to

22    yourself in the car."  Which eventually evolved into Count 3

23    which, in my mind when I try to keep track of what happens in

24    all of the accounts, I call that one the sad shower video.  If

25    Your Honor will recall the video we watched, Minor Victim is

slumped in the shower at his friend, the Halpert's house, and
the defendant is seen in the glass just standing there and
filming him.  And then we progress further to the Feiss's
video, Count 4, and lastly the one that occurred at his own
home just before he turned 18.

     If that weren't enough, that sexual abuse of a minor by a
person who had been his advisor, his teacher, someone who had
care of him and ultimately control of him, he heaped it on
because once Minor Victim turned 18, he continued forcing him
and coercing him and threatening him to keep sending him videos
and images.  Through the entire COVID-19 shutdown when schools
weren't in session, those text messages continued.  Using
Snapchat later and ultimately Instagram to set up a fake
account threatening him.

     He was vindictive and cruel and tyrannical.  In
Government's Exhibit 221, which is that adult chat from May of
2022 through December of 2022 -- just to show the distance
between those two time frames, that is about six months' worth
of texts, Your Honor, and there were over 4,700 messages across
370 pages; that the Government only produced a snippet of them
in front of the jury but the entire exhibit, as Your Honor
knows, admitted into court.

     You can almost have a visceral reaction to that portion of
the evidence when we read on June 11 as Minor Victim went up to
see his girlfriend, all of us have probably been in that

1   position when you get to meet a significant other's parents for

2   the first time and what that feels like and that nervousness

3   and that excitement, and is this person going to be a lifetime

4   partner or a long-term partner, and you go to have dinner with

5   those parents the first time.  And here is Minor Victim getting

6   messages:  "Answer.  Answer.  Answer" -- excuse my language --

7   "fuck you.  Answer.  Answer me now.  I'm exposing you.  I'm

8   turning it public.  10, 9, 8, 7, 6, 5, 4, 3, 2, 1" and you can

9   picture each as a separate text as his phone is buzzing and

10  buzzing and buzzing, and he's sitting there trying to live a

11  normal 21-year-old's life and meet a girl's parents.

12      And you can almost have a visceral reaction to when his

13  girlfriend did uncover sort of what happened when they were

14  overseas, and they go to see Mr. and Mrs. ███████  and she's

15  saying to them, "Oh, we have to buy this special tea for

16  Mr. Bendann because he's been so good to you."  And we hear how

17  Minor Victim was acting up a bit and being rude at that lunch,

18  and you can imagine what he and his girlfriend were going

19  through in that moment, and they can't do or say anything and

20  here his mother and father have no idea.  They've just opened

21  this can of worms in front of him and had no idea what they had

22  done.

23      That cruel puzzle game he played involving his best

24  friend, James Schloeder, who now has to live with the fact that

25  this man who was his friend too -- the defendant, he looked to

1  him as a mentor -- and he now feels that the defendant is

2  sending him snippets of his best friend's scrotum to play some

3  sort of guessing game in order to get Minor Victim to comply.

4  Mr. Schloeder had no idea that's what was going on, and now he

5  has to live with that and know he was being used in order to

6  get to his best friend because the defendant was playing some

7  sort of sick game with all of them.

8           And we know that Minor Victim was not alone.  The

9  Government included in its sentencing memorandum information

10 about two other victims.  Your Honor is correct, neither of

11 them are here, and in fact one of the individuals had planned

12 to write a victim impact statement and just simply couldn't do

13 it.  That was the second individual who did not attend Gilman.

14 But the Government presents that information to you at the

15 preponderance standard to simply show this was not a person

16 where this was a one-off situation.  There were text messages

17 or Snapchat, screenshots where he's grooming another kid and

18 there are other children running naked laps, and there are

19 other groups of kids that he is working on to try to get them

20 to be his next full-fledged victim in the way that Minor Victim

21 was in this case.

22          The defendant used his image as a pillar of the Gilman

23 community to access these children, to access Minor Victim.

24 Starting with innuendo, flirting -- if we can call it that --

25 watching them run naked, watching him and manipulating him and

1    somehow convincing Minor Victim that he owed him in some way,

2    turning it into threats, covering up for drinking, horseplay

3    tradition.  And he did all that and it wasn't the only time he

4    attempted to do those types of things.

5         Your Honor, as to the need of the sentence imposed, I will

6    agree with Mr. and Mrs. ████████ there have been no shows of

7    remorse.  There has been what the Government also saw when the

8    defendant was standing there at the verdict and there when he

9    was leaving the courtroom, looking at the family, particularly

10   Mr. and Mrs. ████████ and saying "I forgive you" to them.

11        This sentence, Your Honor, therefore needs to reflect the

12   seriousness of the offense, promote respect for the law, just

13   punishment and protect the public.  The seriousness of the

14   offense, Your Honor, is that the defendant sexually abused and

15   exploited a student of his own.  He began grooming him in 2015,

16   and for eight years, he manipulated, humiliated, degraded,

17   harassed, intimidated and abused him.

18        Your Honor, there have been any number of other sentences

19   in this court by Your Honor, and other judges of this court and

20   those of our counterparts in Greenbelt, where over 30 years

21   have been given even in response to a plea.  The Government's

22   request here is not unusual given the amount of evidence, given

23   this was a trial.  And the Government feels that a sentence of

24   35 years adequately reflects the needs for a just sentence and

25   reflects all the other aspects of 3553(a), that it is

1    sufficient but not greater than necessary.  I will submit

2    unless Your Honor has any questions.

3              THE COURT:  Thank you, Ms. McGuinn.

4          Mr. Nieto, I'll hear from you next, and then your client

5    will be given the last word.  You may proceed.

6              MR. NIETO:  Yes, Your Honor.  Before we start, if I

7    may, I call Mr. Bendann's father to say a few words for the

8    Court if I may.

9              THE COURT:  Yes.  You may join him at the forward

10   podium.  Mr. Bendann, you may come up.

11         Good afternoon, sir.

12             MR. L. BENDANN:  Good afternoon, Your Honor.

13             THE COURT:  If you would begin by identifying

14   yourself.

15             MR. L. BENDANN:  My name is Lance Bendann, and I'm

16   the father of Christopher Bendann.

17             THE COURT:  What is it you would like to tell me

18   today, Mr. Bendann?

19             MR. L. BENDANN:  Last week I sent to you a letter

20   with my thoughts about my son Christopher's crimes, trial and

21   conviction.  I have little to add to that except to say that I

22   have significant sympathy and sadness for the victims and

23   additional empathy for the parents, some of whom I know.

24         At the same time, as Chris's dad, I will always love him.

25   A father's love of his son is powerful, and if you allow, I

31

1   will do all in my power to assist him in becoming a productive

2   citizen as his debt to society is paid.  I know that you will

3   consider all the facts of this case in making your final

4   sentencing decision.  Thank you.

5               THE COURT:  Thank you.  You may be seated.

6         Mr. Nieto.

7               MR. NIETO:  Yes, Your Honor.  I wanted to call

8   Mr. Bendann's father initially just to sort of set the tone for

9   our presentation here today.  We respectfully submit a request

10  to the Court that 240 months is a sufficient, but not greater

11  than necessary, sentence to further the aims of 3553(a).

12        To address some of the things that I've heard today as

13  well as in the Government's filings, and I know the Court knows

14  this, but sentencings are always a challenge but even more so

15  after trial.  As the attorneys, we're limited in our

16  presentation and in our filings, and we're restrained with what

17  we can say because we never know what an appeal or a

18  post-conviction may result moving forward.  As the Court knows,

19  it is the first rule of the defense to do no harm to the

20  client's case.

21        Now Mr. Bendann was charged and maintained his innocence.

22  We had a jury trial and those 12 jurors were convinced beyond a

23  reasonable doubt that these events occurred and that

24  Mr. Bendann committed these offenses.  Today is not the day for

25  me to relitigate any of those facts, nor do I intend to.

1    That's already been determined.  We are only here today to
2    determine an appropriate sentence, taking into consideration
3    all the relevant factors that the Court -- upon which the Court
4    must rely.
5        The Government has cited some factors that they consider
6    to be aggravating that I would like to address, if I may,
7    because I do think it's important for the Court to understand
8    how we ended up in this position, in this post-trial capacity.
9        My client, Mr. Bendann, dedicated his childhood and his
10   adult life to this community.  When he was suspended and fired
11   from his job, this was big news.  This is a tightly-knit
12   community and with the salacious nature of these charges, there
13   was a ground swell of conjecture and rumors that were swirling
14   around the community, a community in which my client and his
15   family lived and were members.  As those rumors were running
16   rampant, my client could not respond to them.
17       When he was arrested on state charges, the experience was
18   traumatic for everyone involved.  After I was appointed in this
19   case, I had spoken to some folks that I know professionally and
20   personally that happen to be neighbors of the Bendanns, and
21   when I spoke to them about the case, one of the first things
22   they referenced was the manner in which he was arrested.  As
23   they described it, it sounded like a bomb went off.
24       Now Mr. Bendann and his then 78-year-old father were
25   traumatized by that.  Per our jobs, we know sadly this happens

1    in almost every single case but to someone with no experience

2    with this system, the manner in which this arrest was executed

3    is horrific.  It is of course further compounded when it

4    happens again when the federal indictment is obtained after

5    Mr. Bendann had already been on house arrest for months.

6        At his state bail review, an attorney not employed by the

7    state's attorney's office was given an audience with the bail

8    review judge.  He made various statements to her and then to

9    the media about Mr. Bendann.  Many of the things that he said

10   were not true but he was obviously advocating for his client

11   and, as we heard throughout the trial, a lifelong friendship

12   with the family at the center of this case.  Mr. Bendann was

13   unable to say anything on his own behalf at that time.

14       To be clear, Your Honor, I'm not suggesting that lawyer

15   overstepped his bounds.  Indeed, post trial, the Government had

16   actually intimated to me that by me doing my job through my

17   cross-examination and closing arguments that I also victimized

18   one of their witnesses.  But we're doing our jobs.  And so I

19   understand the lawyer's approach.  But to the people involved,

20   it is still traumatic.

21       When anyone or anything, any creature is wounded, they may

22   bare their teeth but that's not a sign of aggression.  That's a

23   defense mechanism, a sign of self-preservation.  That ill-fated

24   press conference on the courthouse steps was an attempt to push

25   back on a public narrative that had already seemingly

determined Mr. Bendann's guilt before he had his day in

court.

     There was a consequence for that action as it contributed,
I believe, to the federal indictment.  And the regrettable
decision for that conference, of course, only led to another
talking point against Mr. Bendann, but I'd be remiss if I
didn't tell the Court that's my understanding as to sort of the
logic behind those decisions.

     In advance of the jury verdict, Mr. Proctor and I on all
our cases will try to prepare our clients for the moment in
which jurors may say guilty.  After 20 years of doing this job,
I can tell the Court it never gets easier.  It is emotional for
everyone involved, specifically for my clients.  To be forced
to stand, surrounded by U.S. marshals, and to hear strangers
determine whether you will be confined against your will within
four cinder-block walls without parole for decades, to know
that you will never be able to hug your father again, to feel
that your life is for all intents and purposes over -- well,
that is one of the worse experiences we can have on this side
of the room.

     Respectfully, Your Honor, Mr. Bendann did not threaten
anyone but we let our emotions get the better of us.  I don't
offer that as an excuse, but I wanted to provide the Court an
explanation and some context as to how or why these things
happened.

1        I fear that all these factors, factors that were there

2   before Mr. Proctor and I were part of this case, were

3   contributing factors to the path that this case took.  But

4   additionally, one of the other factors that I think is

5   incredibly important is what a conviction would do to

6   Mr. Bendann's legacy at Gilman, what it would do to his

7   father's legacy, and how invalidating this case renders all his

8   previous good work.

9        When Mr. Bendann's house was raided, police found photos

10  of Mr. Bendann with his students.  They received and took

11  notebooks that were filled with messages and notes from his

12  students over the years.  Mr. Bendann cherished these materials

13  and kept them at his home as a positive reminder about what he

14  was doing.  Now they were obviously seized because the law

15  enforcement thought they might have some evidentiary value, but

16  they did have significant value to Mr. Bendann and for good

17  reason.

18       I had submitted to Your Honor 100-plus pages of different

19  notes and messages through the years.  Notes in which students

20  say:  "I look up to you and have since I first met you.  You're

21  making such a positive impact in our lives.  I love you.  Thank

22  you for being a great teacher, friend and mentor.  Your love

23  for the students is known throughout the school, and it has

24  made you one of the most liked and respected teacher at Gilman.

25  You have helped me grow as a person over the past four years.

"I kind of thought it would be cool to write you a future note so you always have a chance to look back on it.  You have really developed me into an outstanding young man and you should be proud of it.  Your opinion on life subjects has always made me intrigued so if you don't mind, please take time to chat with me moving forward.

"I can see by the way you interact with us that it's never about you, it's about us.  You tailor yourself to bring out the best in everyone.  I have come to recognize you not only as a really fun and entertaining guy but also as someone with some great wisdom.  Thank you for being such a nice person to not only me but to everyone else.  You are very selfless.  You are a great friend.  You have been an awesome friend over the past five years, and I so very much appreciate all you have done for me.

"You have been a great advisor and friend who has been one of the most influential people at Gilman to shape the man I am today.  I will strive to see you more and cherish my friendship with you.  You know I have loved you and have respected your leadership and the huge heart you have.  I love your humor and you are a great teacher.

"Never stop being you.  Boy, did your mom and dad knock it out of the park.  You are a wonderful, upbeat and caring man.  Thank you for being a friend to me.  I look up to you as someone who I can be.  Thank you for always helping me out

whenever I needed it and keeping me on the straight path.  You

live such a worthwhile life.  Keep being you and sharing your

light.

    "Thank you for being there for me when I was at my low

points.  You are the greatest of all time.  You are a very

warm-hearted person, and I wish there were more people like you

in this world.  You rock.  I can see clearly why so many of my

peers look up to you as I have learned to.  You've changed my

life.  You have a comforting, almost therapeutic aura that

everyone can feel.  I appreciate your dedication to the school

and to each and every student.  You remain a role model in my

life.  Your happy attitude and zest for life always has cheered

me on.  You are such a funny individual and teacher.  I admire

your comedy and love the dedication you show to the Gilman

community.  I want to keep you in my life as another source of

light and guidance moving forward.

    "You are a special human being.  You are one of the best

teachers that I've ever had at Gilman, if not the best.  I

admire how smooth every conversation I have with you and how

kind-hearted and genuine a person you are.  You are a really

special person.  Somehow you are Gilman's older brother,

father, babysitter and teacher at the same time.  I think you

are able to do it because you are so genuinely caring of

others.  You care about us more than yourself.  That's amazing.

Thank you for being a great friend to so many of us.  I love

1    you and love everything you do for this school.

2        "So many lessons you have taught me have helped me grow as

3    a person and I'll be forever grateful for having you as a

4    teacher.  You have always been a light in my journey through

5    Gilman.  I want to thank you for the helping hand you extended

6    to me.  Your help has changed me in so many ways.  Thank you,

7    I've made it.  Your effort to get to know everyone makes you

8    one of those unforgettable people with contagious kindness.

9    Your teaching style and your class have had such a drastic

10   effect on who I am as a student and for that I am grateful.

11       "You always encourage my growth as a student.  You are an

12   excellent teacher, a wonderful personality and an embodiment of

13   everything Gilman stands for.  I truly cannot express how

14   grateful I am to have you in my life.  Thank you.  I am

15   grateful for everything you have done for me.  Whenever I

16   return to Gilman, your office is one of my first stops.  You

17   are a kind and helpful person who always looks out for his

18   students even after graduation.  You are a special teacher that

19   Gilman is blessed to have, and I can't thank you enough for

20   everything you have done."

21               THE COURT:  I've got it.  Move on.

22               MR. NIETO:  Your Honor, of course.  There's many,

23   many more.  Pages and pages of these messages.  This is who

24   Christopher Bendann is.  He is so much more than the conduct

25   that has been determined in support of these charges.  But

1  understandably, understandably, at this posture no one cares.

2      Indeed I suggest to the Court that every single one of

3  these students who wrote these notes now questions the intent

4  behind Mr. Bendann's leadership and care.  That is horrible.

5  To think that these students -- to have these students think

6  that they were going to be victimized as well when they were

7  not is horrible.

8      But, again, I understand it, Your Honor.  It's the path of

9  least resistance.  The psychology of trying to understand the

10  incongruity between the Mr. Bendann they knew and what they

11  know he did, it's nuanced and complicated.  It's just easier to

12  throw the bath water out with the baby rather than divide the

13  two.  And I submit to the Court that this too was a factor that

14  led us here today and at trial.

15      I offer this additionally to the Court because this is a

16  legitimate consequence of his actions, one that my client will

17  suffer for the entirety of his life.  The knowledge that all

18  that good he did is now corrupted and cannot be returned is

19  irrevocable.

20      But notwithstanding that, through my representation of

21  Mr. Bendann, I have seen the light about which these students

22  reference.  Whilst incarcerated, the care and concern he

23  exhibited for the other inmates at that facility.  I can tell

24  Your Honor on many a jail visit, the first half hour and 40

25  minutes would be dedicated to the other inmate's problems.  The

1    request that I reach out to their attorneys, both at the

2    federal public defender's office and private for suicide

3    attempts, for issues they were having, for extorted offense,

4    for whatever issues they may have, Mr. Bendann tried to help.

5    That is at his core who he is.

6        Accordingly, we respectfully submit that 240 months is

7    appropriate.  The guidelines again, respectfully, Your Honor,

8    do not give the Court true guidance, although applicable, are

9    duplicative and arcane in some portions.  In fact, they seem to

10   enhance the guidelines two or threefold.  If not, our proposed

11   sentence would fall within the advisory guideline range.  We

12   had submitted to the Court that this proposed sentence falls

13   within similarly charged federal cases in this district

14   involving teacher-student relationships.  To be sure, it's an

15   inexact science.  Each case is different.  I just wanted to

16   provide the Court some context for how our request was.

17       I also referred to a RICO case involving multiple murders

18   that was prosecuted by Ms. Hagan in front of Your Honor as a

19   counterweight to what the Government is seeking.  Their

20   explanation or distinguishment between that case and this case,

21   I disagree.  I disagree because the co-defendant Mr. Warren's

22   fact patterns outline precisely what the Government knew that

23   individual had done, Mr. Harrison.  But they did not include

24   that in their facts.  They did not tell that to the Court, I

25   presume.

1    And with regards to the evidence in the case, Your Honor

2    knows it's a RICO case.  If an overt act is reasonably

3    foreseeable, that is mandatory life.  I knew about that case

4    because I represented at least two potential witnesses.  So,

5    respectfully, I think the Government had what they needed, for

6    whatever that's worth to the Court.

7        With our proposed sentence, Mr. Bendann will not be

8    released before he is 60 years old.  That age, respectfully, is

9    important to us because we submit it as a hallmark in

10   recidivism studies that show a significant lower risk of this

11   ever happening again.  The Court can't go back in time to

12   protect the community; you can just focus on protecting the

13   community moving forward.  That's why again, Your Honor, this

14   is not a case involving strangers on the internet or from the

15   neighborhood.  As Your Honor had suggested even at a detention

16   hearing, this conduct was occurring in the darkness, but there

17   is no darkness anymore.  The fact that Mr. Bendann can never

18   return to this community and that everyone understands and

19   knows his adjudicated crimes, respectfully, suggests it makes

20   it even less likely that this would happen again in the

21   future.

22       There is also a period of supervised release upon the

23   completion of that sentence.  I'm not sure what the world is

24   going to look like in 2045, but I do know he will be on

25   supervision to prevent any future instances occurring again.

1     Mr. Bendann has lost almost everything he has, and he may

2  very well lose the last thing that he has, which is his father,

3  during this proposed sentence.  That is a factor.  When

4  released, he cannot return to this community, and the steep

5  fall from grace from where he was before to where he is now we

6  submit is another consequence.

7     So in determining a sufficient but not greater than

8  necessary sentence, we respectfully submit that the 240 months

9  is appropriate.

10          THE COURT:  Thank you, Mr. Nieto.

11     Mr. Bendann, you have the absolute right to address the

12  Court before sentence is imposed on you.  You're not required

13  to speak but if you wish to speak, I'm eager to hear anything

14  you have to say.

15          THE DEFENDANT:  Yes, I do.  Would you like me to come

16  to the front, Your Honor?

17          THE COURT:  You can come to the forward podium with

18  one or both of your lawyers.  Step to your left, Mr. Bendann,

19  that microphone.  Thank you.  Mr. Nieto?

20          MR. NIETO:  Your Honor, if I may very briefly.

21          THE COURT:  Yep.

22     (Defendant conferred with his counsel.)

23          MR. NIETO:  Thank you, Your Honor.

24          THE COURT:  Mr. Bendann.

25          THE DEFENDANT:  Good afternoon, Your Honor.  I am not

1    a perfect person and I don't claim to be, but I'm far from the

2    monster that the prosecution and these families are making me

3    out to be.  I can be stubborn, I know that, and sometimes

4    callous but one of my personal values is my own sense of

5    integrity, and that's why we're here today talking about

6    sentencing because I couldn't admit to something that I know I

7    didn't do.

8        The prosecution in cases like this are about story

9    telling, and I will admit that Ms. McGuinn and Ms. Hagan are

10   very compelling story tellers.  They've done a great job with

11   the evidence that they found available to craft a particularly

12   good narrative, albeit somewhat disingenuous, especially

13   considering the fact that much of the exculpatory information

14   that might have helped me, their client actually asked me to

15   delete, as he acknowledged himself in open court.

16       That being said, perhaps oddly, I'm grateful for this

17   experience.  It's not to say that I'm enjoying it or that I

18   want this to happen, but it has liberated me in a number of

19   ways.  It's taken me far from my comfort zone.  I've met and

20   befriended people that in my prior existence -- I think ███

21   and ███ said it well:  Being a Gilman student, there's a sense

22   of entitlement and elitism I grew up with.  I really viewed

23   people that were incarcerated, whether pretrial, post trial or

24   during trial, as guilty despite the fact that they had the

25   right to an open and fair trial.

1      Meeting these people, hearing their stories, I know that I

2  was wrong today and I've appreciated that perspective.  I knew

3  as both a Gilman student and as a Gilman faculty member that

4  our judicial system was painted in black and white, but more to

5  the point now is I'm seeing all of the shades of gray.

6      I've developed confidence that I didn't know that I had.

7  When the worst is said about you in public and you see yourself

8  on TV routinely and you hear about yourself from other inmates,

9  you know, it's hard to take anything much harsher than that,

10  and the sense that I can come out stronger and still feel okay

11  about myself despite hearing all of those words has given me a

12  sense of confidence that allows me to move past the old portion

13  of my life.  I really felt that I was a people pleaser, living

14  at Gilman with a sense of imposter syndrome, trying to make

15  everybody else happy around me.

16      I also know now who my real friends and family are.

17  Although my ocean of supporters has drastically shrunk and is

18  perhaps just a pond, that pond still has enough water in it to

19  take care of my garden.

20      Judge Bredar, I understand the limitations that are placed

21  upon you from Congress in terms of sentencing, and I also

22  understand that the nature of this case and the evidence that

23  Ms. McGuinn and Ms. Hagan have produced are also going to be a

24  mitigating -- sorry, also going to be a factor.  My lawyer

25  advised against this, but I have to say I don't necessarily

1   have a sense of what your verdict should be.  I don't

2   necessarily think that there's a right number in my head,

3   largely because I know I'm not guilty.  I'm comfortable where I

4   am.

5        In fact, the thing that I'm most worried about is just the

6   transition from Howard County Detention Center to the next

7   location.  But as I've discovered both being an inmate at

8   Chesapeake Detention Facility and at Howard County, once I'm in

9   a setting -- in a jail setting, I do okay.

10        To the families that stand against me, I've been fortunate

11  enough to find faith, and a favorite passage of mine comes from

12  the Bible, Matthew 18:21.  In the passage is a parable about

13  the unforgiving servant.  The message is that to be forgiven,

14  you have to forgive those who stand against you.  Now we

15  probably disagree as to who stands in what role, but I am

16  sincere when I say that in the future, when we examine

17  relationships and people are able to take a look back, that I

18  don't hold any ill will or malice against them.  I have fond

19  memories of all the experiences that I've had with these

20  families, and I'll take that with me.

21        I am proud of my time at Gilman, and I stand by my earlier

22  statements that the greatest harm comes from the lie that I was

23  a threat to my other students.  I ask them to reflect on the

24  positive relationships we had and not the messages spread by

25  the Gilman administration, notably including ███ and ██.  For

1   whatever it's worth, I credit all of my values to my experience

2   at Gilman both as a student and a teacher and the experiences

3   that were given to me by my colleagues.

4         I also want to thank the COs at Chesapeake Detention

5   Facility and at Howard County for being kind and supportive.

6   The staff workers there have been amazing.  I want to

7   acknowledge my friends and tier mates at both of these

8   facilities as well.  Having the support of other people who are

9   incarcerated, only they can understand what we go through.

10        And perhaps most importantly, I say this because I don't

11  want or expect any pity or leniency.  I understand where the

12  court system lies.

13        Finally, I want to thank my father for the love and

14  support that he's provided for me all my life, both of my

15  parents.  While we may not always see eye to eye, his

16  perspective, his love and his guidance have always been

17  important.  I think the hardest thing about this whole

18  experience for me actually was reading Jack, Susan and James

19  Schloeder laughing about the fact that somebody who they accuse

20  of committing these crimes must have been molested by their own

21  parents.  I found that to be one of the harsher statements in

22  there, especially considering the fact that my parents were

23  both wonderful to me my entire life.

24        Your Honor, that's all I have to say.  Thank you.

25        (Conference on the sealed record.

1     It is the policy of this court that every guilty plea and

2   sentencing proceeding include a bench conference concerning

3   whether the defendant is or is not cooperating.)

4     (The following was held in open court:)

5     THE COURT:  Mr. Nieto, Mr. Proctor, the Court of Appeals

6   requires that the sentencing court rule on any points made in

7   mitigation and at least acknowledge the same so that there can

8   be certainty that the sentencing was in every respect fair.

9   The points that I believe I have heard in mitigation, Mr.

10  Nieto, are that first, based on your oral presentation, that

11  your client, apart from these offenses, was a much admired,

12  productive professional at the time that he was teaching at

13  Gilman and that he had positive healthy relationships with a

14  vast number of students there and that you hope when the Court

15  sentences the defendant, it considers the whole person who

16  stands in the well, not just the crimes that cause him to be

17  here

18    The second point -- and I hear your point on that and will

19  consider the substantial presentation that you made in support

20  of it.  I have to say that it is somewhat undercut by your

21  client's own statements, but nonetheless it's a point you've

22  offered in mitigation, and I want to make sure that the record

23  reflects that I have considered it.

24    The second I draw from your papers which is that in some

25  detail you contend that your client, really from childhood,

1    suffered with identity issues, owing to his Asian ancestry and

2    his being raised in a white Caucasian family and in a community

3    where people of that race largely dominated the social picture.

4    I considered carefully the points you made in that regard and

5    how they potentially could have contributed to the defendant's

6    wayward behavior, but ultimately my conclusion is that while

7    life in our diverse society is generally full of challenges for

8    people who find themselves in the racial minority or others who

9    find that they just don't fit in for one reason or another,

10   never can that circumstance become a license to commit crimes,

11   especially the serious crimes that the defendant committed here

12   and harm other innocent parties.

13        So I've heard the point and I have considered it and

14   factored that into my thoughts about what is the appropriate

15   sentence in the case.  But like the first point, it -- I

16   find -- doesn't do much work for the defendant in this

17   process.

18        Are there other points in mitigation that you made in the

19   process of representing your client that I haven't expressly

20   addressed now?

21             MR. NIETO:  Your Honor, I guess I would simply

22   suggest the collateral consequences of this conviction,

23   everything that can stem from that both here at a more local

24   level and also with the registration and supervision, and the

25   mandatory minimums in this matter, sentences, the loss of his

1    father presumably; all these different factors.

2            THE COURT:  You've argued those well, Mr. Nieto,

3    consistent with how you have handled this case from start to

4    finish -- expertly, I would say, actually to the sometimes

5    consternation of the Government and others who are deeply

6    engaged.  But our system is an adversary process.  That's its

7    design.  It's on purpose, and we expect defense attorneys to

8    perform as you and Mr. Proctor have in this case, to fight hard

9    for your client no matter how unpopular or how difficult the

10   facts.

11       So let me note that those points in mitigation were made

12   and I heard them.  The difficulty is that what you're really

13   describing is no different from the collateral consequences

14   that attend to any lengthy sentence.  They have all kinds of

15   impacts in a defendant's life.  But I would contend that those

16   adverse impacts are, frankly, part of the design.  In street

17   parlance, you do the crime, you do the time.

18       Anything else, Mr. Nieto?

19            MR. NIETO:  No, Your Honor.

20            THE COURT:  In sentencing the defendant, I'm required

21   to apply the factors that are set out in Title 18 of the United

22   States Code, § 3553(a).  There are eight factors, I'll apply

23   each of them now.

24       The first is the history and the characteristics of the

25   defendant.  I find that the defendant was born abroad.  He's of

Asian ancestry; he was adopted in infancy and raised in a

Caucasian family in north Baltimore.  I find that he had a

solid, even privileged upbringing with loving parents.  He

received a fine education, he graduated from college.  He

ultimately was employed at the Gilman School, the very

institution that he had attended as a child and as a

adolescent.

I credit the submission from defense counsel that the

defendant felt alienated from his community through much of his

time at Gilman and otherwise as an adolescent and young

adult, although there are certainly facts and circumstances in

this record that suggest that he was anything but alienated

from that community.  A picture from a graduation ceremony or

graduation party at the Elkridge Club comes to mind where the

defendant was welcomed by the community, the students, the

parents with open arms and, if anything, was a central figure

in that community, not an alien.

I find that the defendant was employed for years at the

Gilman School where he was professionally successful and that

while there may have been a blemish or two, in general, the

picture is that he gained the confidence of his colleagues, his

supervisors, and especially the students and their families.

The second factor -- let me also note the defendant has no

prior criminal history.

The second factor that the Court's required to consider is

1   the nature and the circumstances of the offenses.  I find

2   consistent with the jury's verdict that the defendant sexually

3   exploited a minor on five distinct occasions.  I find that he

4   created and possessed pornographic videos of a minor three

5   times.  I find that the defendant cyberstalked his minor victim

6   into adulthood for years.  I find that the defendant engaged in

7   a scheme to secretly exploit and then extort the minor victim

8   over a period of years.

9       I find it hard to find words to adequately describe the

10  defendant's cruelty.  His conduct was cunning, was calculated,

11  it was cold, and the associated harm was inflicted over and

12  over and over again.  The defendant made his young victim's

13  life hell.

14      No defendant is required to speak at his sentencing

15  hearing.  Defendants who have been convicted after trial are in

16  a particularly ticklish spot when it comes to sentencing for

17  all of the reasons ably laid out by Mr. Nieto.  In a case where

18  a defendant has proceeded to trial, the Court has no

19  expectation of their coming before the Court and admitting

20  guilt, and the Court holds nothing against the defendant who

21  stands silent in those circumstances.  It's his absolute right.

22  But that's a different circumstance from what occurred here.  I

23  find that the defendant is overtly unrepentant, even defiant.

24      The third factor for the Court to take into account is the

25  seriousness of the offense, the need to promote respect for the

Case 1:23-cr-00278-JKB   Document 215   Filed 03/10/25   Page 52 of 71

1/21/2025 Sentencing                                          52

law, the need to provide just punishment.  I'll elaborate on
this issue at greater length in a moment, but for now let us
note that the crimes were deeply serious because of the harms
that were inflicted as well as the trust that was broken.

Fourth, the Court is required to consider the need for
deterrence.  Like most judges, I divide the concept of
deterrence into two segments: specific deterrence and general
deterrence.  We sentence defendants with both concepts in mind.
Specific deterrence is those elements of a sentence that are
calculated and designed to dissuade or deter the individual
defendant from engaging in this sort of criminal conduct in the
future.

I find that in this case, particularly after the defendant
has given us an insight into his perspective on the crimes that
he committed, that it's necessary that the Court impose a
sufficiently severe penalty to dissuade the defendant from ever
committing another offense against a child.

General deterrence is the term that we apply to the need
for a Court to impose a sentence that communicates with the
wider community, not just the individual who's being sentenced,
but that part of the sentence that makes a statement to the
wider community about the severity of the offense and hopefully
accomplishing the purpose of dissuading others who are
similarly situated, who might be contemplating similar criminal
conduct, from ever engaging in it, from ever actually acting on

1   it.  The Court needs to impose a sufficient penalty that will

2   dissuade others in positions of trust from acting on impulses

3   or appetites to achieve their own satisfaction at the expense

4   of an innocent child.

5        Fifth, the Court must take into account the need to

6   protect the public.  I find that Mr. Bendann is dangerous.  I

7   find that he is capable of getting people to trust him and then

8   after inveigling his way into a family or a school community or

9   another institution, in response to his own sexual appetites,

10  he will strike.  Accordingly, to mitigate that danger, he must

11  be incapacitated.  He must be incarcerated for a lengthy

12  period.

13       Sixth, the Court is required to consider the need to avoid

14  unwarranted sentencing disparities among defendants with

15  similar records and culpability.  Counsel for both sides have

16  spent some time discussing other sentences imposed by this

17  Court and by other judges in similar and in dissimilar

18  circumstances where the facts were particularly aggravated and

19  then have made comparisons in terms of length of sentence

20  imposed.  The Court is required to go through a process of

21  considering where a particular crime and defendant fits in the

22  wider matrix that is established by all of the sentences that

23  this Court and others impose over time for a variety of

24  offenses, and I have engaged in that process extensively in

25  recent weeks.

1    Let's discuss some of the circumstances that have been

2    presented to the Court.  I'm not going to speak so much to the

3    sentences imposed in the instances of other sex crimes by other

4    judges in this court other than to say that I've heard enough

5    in this hearing to have confidence that the sentence ultimately

6    imposed here will make sense in the context of those other

7    cases.

8        I want to talk, though, about the very sensitive subject

9    of the prosecution of RICO murder cases in this district, of

10   which, frankly, this Court has had a belly full in the last ten

11   years.  It's unfortunately been my duty to impose sentence on

12   more defendants at this point than I can count who have been

13   involved in those cases.  It's absolutely true that there have

14   been murderers who have come before this Court and with respect

15   to whom the Court has imposed sentences of 25 years, 30 years,

16   and so forth.

17       First, let me make this observation.  I can't remember a

18   case where a defendant before me was convicted at trial in

19   circumstances giving rise to culpability for first degree

20   murder where the Court didn't impose a life sentence.

21       Now, in other murder cases, defendants have not proceeded

22   to trial.  Sometimes they've actually become cooperators and

23   testified against other members of the gang.  Sometimes there

24   are circumstances where there are witnesses who could be called

25   to testify, but they're deeply frightened of their

1   circumstances and the potential consequences associated with

2   their testifying; and accordingly the Government has entered

3   into a recommended disposition with defense counsel that while

4   not perhaps achieving the length of sentence that is

5   appropriate in the abstract, it makes complete sense in the

6   totality of the circumstances of the particular case because of

7   the risks the witnesses face.

8         There are other times when agreements of this sort are

9   struck because there is real litigation risk.  Witnesses might

10  not show up.  God forbid, witnesses might be murdered before

11  the trial is actually completed.  In those difficult

12  circumstances which have afflicted our city in the last decade

13  or two, yes, there have been agreements reached and the

14  Government -- the Court has played its part in that regard.

15  And there are people who have been convicted of murder who have

16  received sentences of 25 and 30 years, not life in prison.  But

17  it is all explained and understandable in the context of

18  reality.

19        Mr. Bendann's case does not present a defendant who is

20  cooperating, providing assistance to the Government as they

21  attempt to bring others to justice, cooperating and facing risk

22  for having agreed to testify against other offenders.

23  Mr. Bendann's case is not one where witnesses lack the courage

24  and the confidence to come forward and state on the public

25  record horribly difficult facts and circumstances but things

1  they knew were true.  Mr. Bendann's case is not one where the

2  Government had to deal from a position of litigation risk,

3  chance that their case might collapse and they might, from

4  their perspective, fail to achieve any element of justice.

5      This was a straightforward trial.  The evidence came in

6  unalloyed by these other issues that I'm describing.  The

7  picture was painted, a jury of Mr. Bendann's peers heard it,

8  and they reached their verdicts.  I take all of that into

9  account as well when deciding what disparities are appropriate

10 between the sentence imposed in this case and the many others

11 in which I have participated.

12     The seventh factor the Court is required to consider, the

13 need to provide the defendant with training or treatment.  The

14 defendant needs treatment but that treatment can be provided

15 whether he's incarcerated or on supervised release.  While I

16 will recommend that he receive treatment in both settings, the

17 need for that treatment I find is not a significant factor in

18 resolving the question of how much incarceration to impose in

19 this case, largely drops out of the analysis.

20     Last of all, the Court considers the advice of the Federal

21 Sentencing Guidelines.  I have faithfully computed the

22 guidelines with the assistance of counsel and the probation

23 office, and I've considered their advice before crafting the

24 sentence in this case.

25     The lead charges in this case speak of exploitation of a

1    child and there certainly was that, extensively.  But, in

2    addition, there was another feature of this criminal episode:

3    extortion.  Extortion carried out over years.  And considering

4    its sexual context and the victim's age, it was particularly

5    cruel and harmful.  Considering the defendant's age and status

6    as a teacher, advisor, role model and trusted custodian, the

7    crimes were particularly heinous; they deserve a severe

8    consequence reflective of the grievous harm afflicted and the

9    massive breach of trust they embody.

10        These crimes fall in a special category.  When a lawyer

11   steals from an elderly client, when a police officer takes

12   bribes and violates the very law he or she is charged with

13   enforcing, when a teacher takes advantage of the special trust

14   placed in him by parents and the institution that employs him

15   to gratify his own sexual appetite, in any of these situations,

16   we have especially serious deviations from the rules and norms

17   by which our society operates.

18        Crimes where relationships of trust are violated and

19   exploited are especially bad.  Not just because of the harms

20   afflicted on individual victims but also because those crimes

21   tear at relationships that are otherwise essential to our

22   communal lives.  Picking up on the earlier examples, we must be

23   able to trust that lawyers will fight for and look out for

24   their clients and not steal from them.  We must be able to

25   trust the law enforcement officers won't themselves break the

very laws we engage them to enforce.  And we must be able to
trust that teachers will not violate their sacred
responsibilities to protect children with whom we invite them
to develop mentoring relationships.  We must be able to trust
that teachers will not exploit the dependency that inevitably
develops in close student-teacher relationships.  We must be
able to trust that teachers will not sexually exploit their
students.

Mr. Bendann, through his pattern of behavior with the
minor victim, a pattern engaged in over many years and then
concealed through a pattern of extortion after the child
reached adulthood, blatantly broke this norm, this sacred trust
imposed on all teachers.  And he simultaneously violated
relevant statutes that otherwise ensure that such relationships
operate within certain guardrails.  Mr. Bendann is a violator
of public and private trust.  He's a criminal.  He's a sexual
predator.

In violating these norms and in committing these crimes,
Mr. Bendann inflicted harm, pain, suffering, physical and
psychic injury for years upon his victim.  His crimes inflicted
collateral harms on a nuclear family, on members of an extended
family, and on an otherwise fine educational institution and
its wider community of educators, students and those students'
families.

When a fundamental trust is broken, a trust such as this

1   one, the shards of shattered glass spray far and wide,

2   lacerating many beyond the primary victim.  Mr. Bendann has

3   done grave harm.  First, of course, to the minor victim but

4   also to these many others in the wider community.

5       Upon the jury's verdict and because I find that he acted

6   intentionally with a full appreciation for the harms he was

7   inflicting and because these harms were so great, he should and

8   will receive a lengthy sentence, one that is reflective of the

9   extent of the great pain and harm he inflicted.

10      The sentence that is sufficient, but not greater than

11  necessary, to comply with the purposes set out in Title 18 of

12  the United States Code § 3553(a)(2) is, as to Count 1, 30 years

13  of imprisonment; as to Count 2, 30 years of imprisonment to be

14  served concurrently with the sentence imposed on Count 1; as to

15  Count 3, 30 years of imprisonment to be served concurrently

16  with the sentences imposed on the earlier counts; as to Count

17  4, 30 years of imprisonment to be served concurrently with the

18  sentences imposed on the earlier counts; Count 5, 30 years of

19  imprisonment to be served concurrently with the sentences

20  imposed on the earlier counts; Count 6, 10 years of

21  imprisonment to be served concurrently with the sentences

22  imposed on the earlier counts; Count 7, 10 years of

23  imprisonment to be served concurrently with the sentences

24  imposed on the earlier counts; Count 8, 10 years of

25  imprisonment to be served concurrently with the sentences

imposed on the earlier counts; Count 9, 5 years of imprisonment to be served consecutively with the sentences imposed on the earlier counts, for a total sentence of 35 years of imprisonment.

The Court further imposes supervised release terms as follows:  First as to Count 1, for life.  As to Count 2, for life.  As to Count 3, for life.  As to Count 4, for life.  As to Count 5, for life.  As to Count 6, for 3 years.  As to Count 7, for 3 years.  As to Count 8, for 3 years.  As to Count 9, for 3 years, with all terms of supervised release to be served concurrently for a total term of supervised release of life.

Mr. Nieto, I intend now to impose terms and conditions of supervised release on your client.  First, I impose the statutory terms and conditions of supervised release which are set out in the relevant statute and of which your client has ample public notice.

But, second, I intend to impose the Maryland standard conditions of supervised release which are recited in the Court's Standing Order 2020-13.  Your client is entitled to have those 13 standard conditions read to him explicitly here on the record in open court pursuant to the Court of Appeals' opinion in *Rogers*.  However, I will dispense with that reading if, Mr. Nieto, you assure me that you have reviewed each one of those 13 terms and conditions of supervised

1   release, explicitly word for word with your client consistent

2   with ordinary practice.

3       Mr. Nieto, did you do that?

4           MR. PROCTOR:  If I can jump in, Your Honor, yes, we

5   have, both in a jail setting and again today.  He understands

6   as outlined in the presentence report.  There's no need to read

7   them.

8           THE COURT:  Thank you.  All 13, Mr. Proctor?

9           MR. PROCTOR:  Yes, sir.

10          THE COURT:  Thank you.

11      The Maryland standard conditions of supervision as read to

12  you by your lawyer today are imposed, numbered 1 through 13,

13  appearing on pages 25 and 26 of the presentence report.

14      Also, Mr. Nieto, Mr. Proctor, at the beginning of this

15  hearing, one or both of you confirmed that you had carefully

16  reviewed the presentence report with your client.  Is that

17  right, Mr. Nieto?

18          MR. NIETO:  Yes, Your Honor.

19          THE COURT:  And those conditions are set out on pages

20  25 and 26, numbered 1 through 13, so that was a second

21  opportunity or perhaps the primary opportunity to review with

22  him those conditions.

23          MR. NIETO:  Ergo my hesitancy, Your Honor; I didn't

24  know you were referencing these.  Yes, we reviewed all the

25  conditions in the final presentence report, ECF 169.

1    THE COURT:  Does your client expressly waive their

2    reading to him now?

3    MR. NIETO:  Yes, Your Honor.

4    THE COURT:  Do you, Mr. Bendann?

5    THE DEFENDANT:  Yes, I do.

6    THE COURT:  There are special conditions of

7    supervision which I will impose now.  Mr. Bendann must not have

8    direct contact with any child that he knows or reasonably

9    should know to be under the age of 18, including any of his own

10   children, without the permission of the probation officer.  If

11   he has any direct contact with any child that he knows or

12   reasonably knows to be under the age of 18, including his own

13   children, without the permission of the probation officer, he

14   must report that contact to the probation officer within 24

15   hours.

16   Direct contact includes written communication, in-person

17   communication or physical contact.  Direct contact does not

18   include incidental conduct during ordinary daily activities in

19   public places.

20   Next, the defendant must not communicate or otherwise

21   interact with the victim of this case as notified by the

22   Government, either directly or through someone else, without

23   first obtaining the permission of his probation officer.

24   Next, the defendant must submit any computers that he has,

25   as they are defined in 18 USC § 1030(e)(1), or other electronic

1    communications or data storage devices or media to a search.

2         The defendant must allow the probation officer to install

3    computer monitoring software on any computer, as defined in 18

4    USC § 1031, that he uses.  You must not make any attempt,

5    Mr. Bendann, to circumvent or inhibit the software after its

6    installation.  You must pay the cost of computer monitoring as

7    directed by the probation officer.

8         Next, to ensure compliance with the computer monitoring

9    condition, the defendant must allow the probation officer to

10   conduct initial and periodic unannounced searches of any

11   computers, as defined by the statute I just referred to,

12   subject to computer monitoring.  These searches shall be

13   conducted for the purposes of determining whether the computer

14   contains any prohibited data prior to installation of the

15   monitoring software, to determine whether the monitoring

16   software is functioning effectively after its installation, and

17   to determine whether there have been attempts to circumvent the

18   monitoring software after its installation.  You must warn any

19   other people who use these computers that the computers may be

20   subject to searches pursuant to this condition.

21        Next, you must not engage in any occupation, business,

22   profession or volunteer activity that would require or enable

23   you to have contact with minors without the prior approval of

24   the U.S. probation officer.

25        You must provide the probation officer with access to any

requested financial information and authorize the release of

any financial information.  The probation office may share

financial information with the U.S. Attorney's Office.

You must participate in a mental health treatment program

and follow the rules and regulations of that program.  The

probation officer, in consultation with the treatment provider,

will supervise your participation in that program.

You must take all mental health medications that are

prescribed by your treating physician.

You must not go to or remain at any place where you know

children under the age of 18 are likely to be, including parks,

schools, playgrounds and childcare facilities.  You must not go

to or remain at a place for the primary purpose of observing or

contacting children under the age of 18.

You must not view or possess any visual depiction as

defined in 18 USC § 2256, including any photograph, film,

video, picture or computer or computer-generated image or

picture, whether made or produced by electronic, mechanical or

other means, of sexually explicit conduct as defined in 18

United States Code § 2256.  You must not view or possess any

visual depiction as defined in 18 United States Code § 2256,

including any photograph, film, video, picture or computer or

computer-generated image or picture, whether made or produced

by electronic, mechanical or other means of sexually explicit

conduct as defined in 18 USC § 2256 that would compromise your

1    sex-offense-specific treatment.

2        Next, you must participate in a sex-offense-specific

3    assessment.

4        Next, you must participate in a sex-offense-specific

5    treatment program and follow the rules and regulations of that

6    program.  The probation officer will supervise your

7    participation in the program.

8        Next, you must submit to periodic polygraph testing at the

9    discretion of the probation officer as a means to ensure that

10   you are in compliance with the requirements of your supervision

11   or treatment program.

12       That concludes the special conditions of supervised

13   release.

14       Next, I find that the defendant has no ability to pay a

15   fine; no fine is ordered.

16       Next, restitution.  Ms. McGuinn?

17           MS. McGUINN:  Your Honor, the Government is not

18   seeking restitution.

19           THE COURT:  No restitution is being sought, very

20   well.

21       Forfeiture?

22           MS. McGUINN:  Your Honor, the Government filed a

23   preliminary order of forfeiture, I believe, on January 15th.

24   It's ECF 193.

25           THE COURT:  Right.

1      MS. McGUINN:  It is for the several cell phones and

2  laptop computers that were seized pursuant to the search.  In

3  that memo, Your Honor, the Government outlined the bases for

4  the seizure -- excuse me, for the forfeiture -- the evidence,

5  exhibits, as well as the proffer testimony of Agent Calista

6  Walker.  I'm unaware if there's any objection from the

7  defense.

8      THE COURT:  Without objection, Mr. Nieto?

9      MR. NIETO:  Correct, Your Honor.  We do not consent

10  but we submit.

11      THE COURT:  All right.  I find it's appropriate on

12  the totality of the circumstances and the record assembled in

13  this case, and accordingly I now enter that order and it's made

14  a part of the record in this case.

15      Special assessment.  What's his exposure on assessments,

16  Ms. McGuinn?

17      MS. McGUINN:  I believe it is $100 for every count;

18  that would be $900 total which cannot be waived.

19      THE COURT:  I impose the same: $100 per count, total

20  of $900.  Are there no other assessments to which this

21  defendant is subject or is the Government not seeking them if

22  they are?

23      MS. McGUINN:  The Government is not seeking any other

24  mandatory restitution assessments or anything, either because

25  the defendant is unable to pay or the Government is simply not

1    seeking them, Your Honor.

2            THE COURT:  Got it.  So noted.

3        This is a variant sentence.  The sentence does not fall in

4    the guidelines range but is nonetheless appropriate in light of

5    the Court's findings on the § 3553(a) factors and purposes as

6    follows:  This sentence best matches the circumstances and

7    nature of this case.

8        Now I wish to make the following record.  The Court has

9    effectively imposed a prison sentence in this case of 35 years,

10   followed by a lifetime of supervised release.  The record

11   should reflect that even had I computed the sentencing

12   guidelines differently and even if I were later to conclude

13   that I was in error with respect to some of the issues or all

14   of them on which the defendant has objected, I would

15   nonetheless exercise the independent discretion that I have to

16   impose a variant sentence outside or inside of the Federal

17   Sentencing Guidelines of 35 years of imprisonment, followed by

18   a lifetime of supervised release for the reason that I find

19   that this was a particularly aggravated offense, the defendant

20   is unrepentant, and the defendant poses a risk and is a danger

21   to the community.

22       So even if the guidelines were computed differently such

23   that the sentence imposed here were to fall above the relevant

24   guidelines range, the Court would find that there was the

25   necessity for an upward departure to achieve a guideline

1   sentence or, alternatively, that a variant sentence was

2   regarded via an upward variance.  In any case, this is the

3   sentence that the Court would impose.

4       Mr. Bendann, you may appeal your conviction.  You may also

5   appeal your sentence if you believe it is unlawful.  If you

6   wish to appeal either your conviction or your sentence or both,

7   you must file a notice of appeal in this court within 14 days

8   of today.  Mr. Bendann, do you understand that deadline?

9           THE DEFENDANT:  Yes, and it is ready.

10          THE COURT:  The defendant was previously ordered

11  detained.  That detention order did not enter until the trial,

12  as I recall, but it has been of record since then.  I take it

13  there is no request from the defense for voluntary surrender or

14  for reconsideration of the detention order at this time?

15          MR. NIETO:  No, Your Honor.

16          THE COURT:  And, accordingly, the detention order

17  shall remain in effect and voluntary surrender shall be

18  denied.

19      A judgment and commitment order will be prepared.  A

20  statement of reasons will be prepared.  These records, together

21  with other appropriate records of the sentencing, will be filed

22  with the United States Sentencing Commission and the United

23  States Bureau of Prisons.

24      The defendant shall be remanded to the custody of the

25  United States Marshal pending his delivery to the designated

1 | place of incarceration.  Everyone will stay in place; the
2 | marshals will remove the defendant.
3 |             MR. NIETO:  Your Honor?
4 |             THE COURT:  Mr. Nieto.
5 |             MR. NIETO:  With regards to judgment and commitment
6 | paperwork, if the Court would see it wise to make a
7 | recommendation to the Bureau of Prisons that, if appropriate --
8 |             THE COURT:  Hold on one second.  The marshal will
9 | hold the defendant for one second.
10 |             MR. NIETO:  Yes, if we could make the recommendation
11 | to the Bureau of Prisons, if appropriate, if he be designated
12 | to either Danbury or Petersburg.  In addition, in terms of some
13 | of the classes that he's interested in, culinary arts might be
14 | something he might pursue upon release.
15 |             THE COURT:  The Court will recommend that the place
16 | of incarceration be the federal correctional institution at
17 | Danbury or -- did you say Petersburg?
18 |             MR. NIETO:  Yes, Your Honor.
19 |             THE COURT:  Danbury, Connecticut, or Petersburg,
20 | Virginia, provided that those facilities are appropriate for
21 | the defendant's security level and his programmatic needs.  The
22 | Court will not make recommendations with respect to the other
23 | requests the defense counsel have made.  I'm sorry, Mr. Nieto,
24 | to have cut you off on that.  Is there anything else?
25 |             MR. NIETO:  No, Your Honor.  No, Your Honor.  Thank

1    you.

2              THE COURT:  Take the defendant out.

3          (Defendant exits the courtroom.)

4              THE COURT:  Mr. Nieto and Mr. Proctor, thank you for

5    your service in a difficult case in challenging circumstances.

6    It's been the highest tradition of lawyers in this bar to do

7    when they are appointed in these circumstances.  You don't

8    choose your clients.  We assign you to the case.  But we expect

9    that you will perform professionally, as you did in this

10   action, and you will leave this afternoon with the Court's

11   gratitude.

12         Thank you, you are excused.  Counsel are all excused.

13   Court is in recess.

14             THE CLERK:  All rise.  This Honorable Court now

15   stands adjourned.

16         (Proceedings concluded at 3:06 p.m.)

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia G. Mitchell, Registered Merit Reporter,
Certified Realtime Reporter, in and for the United States
District Court for the District of Maryland, do hereby certify,
pursuant to 28 U.S.C. § 753, that the foregoing is a true and
correct transcript of the stenographically-reported proceedings
held in the above-entitled matter and the transcript page
format is in conformance with the regulations of the Judicial
Conference of the United States.

Dated this 20th day of February 2025.


*Patricia G. Mitchell*
_____
Patricia G. Mitchell, RMR, CRR
Federal Official Reporter